IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-cv-80526

GOOD SAMARITAN MEDICAL CENTER,
INC., DELRAY MEDICAL CENTER, INC.,
PALM BEACH GARDENS COMMUNITY
HOSPITAL, INC. D/B/A PALM BEACH
GARDENS MEDICAL CENTER, ST.
MARY'S MEDICAL CENTER, INC., AND
WEST BOCA MEDICAL CENTER, INC.,

               PLAINTIFFS,

    v.

THE LEAPFROG GROUP,

               DEFENDANT.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Good Samaritan Medical Center, Inc. ("Good Samaritan"), Delray Medical Center, Inc. ("Delray Medical Center"),  Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center ("Palm Beach Gardens Medical Center"), St. Mary's Medical Center, Inc. ("St. Mary's"), and West Boca Medical Center, Inc. ("West Boca Medical Center") (collectively, "Plaintiffs" or "the Plaintiff Hospitals"), by and through their attorneys for their Complaint against The Leapfrog Group ("TLG"), allege as follows:

**PRELIMINARY STATEMENT**

Hospitals are trusted pillars of their communities, responsible for safeguarding the lives of patients in their most vulnerable moments.  The integrity of information guiding patients' healthcare decisions must be beyond reproach.  Yet Defendant TLG, under the guise of public service, has corrupted that trust—weaponizing fear, distorting facts, and misleading the public to

serve its own craven financial interests.  Through a brazen pay-to-play scheme, TLG pressures hospitals to participate and pay, or else suffer devastating and misleading public "safety" grades. Plaintiffs bring this action not because they fear evaluation, but because TLG's false and reckless conduct endangers patients, undermines public health, and cannot go unchallenged.

## INTRODUCTION

1.      Defendant TLG holds itself out as an honest and credible public service organization devoted to hospital safety.  In reality, it operates a brazen pay-to-play scheme that distorts the truth, misleads patients, and inflicts serious harm on hospitals and the communities they serve.  Hospital participation drives TLG's revenue and enriches this so-called "non-profit" to the tune of many millions of dollars—including exorbitant compensation for its Chief Executive Officer.  Through its "Hospital Safety Grades," TLG assigns A, B, C, D, and F letter grades to hospitals nationwide and prominently displays them on its website, www.hospitalsafetygrade.org. These "grades" are based, in material part, on easily manipulable, self-reported data submitted by hospitals that choose to dedicate the time and resources to respond to TLG's sprawling 100+ page data requests.  TLG then aggressively broadcasts these so-called grades directly to patients, caregivers, and healthcare workers, orchestrating a sweeping media campaign—including by embargoing grades with reporters nationwide—to maximize public exposure.  The message TLG pushes is alarmist and clear:  Patients must "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than at an 'A' hospital." (emphasis added).  But TLG's "safety grades" are a fraud.  Far from protecting patients, they present a clear and present danger to public health across Palm Beach County and beyond.

2.      Four years ago, the five Plaintiff Hospitals made a deliberate choice to stop responding to TLG's excessive data requests.  During the height of the COVID-19 pandemic,

Plaintiffs prioritized their administrative resources toward achieving specialty-specific accreditations and certifications that directly respond to patient needs.  Until last year, TLG continued to assign grades to Plaintiffs based on how similarly situated participating hospitals performed on standard metrics, and notably, Plaintiffs were never assigned F grades under that system.

3.     That changed in 2024.  Facing declining hospital participation, escalating expenses, and intensifying pressure to drive up revenue—including hefty consulting and advertising fees from participating hospitals along with revenue from insurers—TLG abruptly rigged its methodology.  Under its new policy, any hospital declining to provide data would automatically fail on the affected metrics, leading to inevitable Ds and Fs for Plaintiffs for the first time.  TLG openly admitted the change was designed to punish non-participating hospitals and ensure they would not "inadvertently benefit" from positive scores—regardless of the truth.  Tomorrow's anticipated release of new grades continues TLG's reckless campaign.  Instead of simply choosing not to grade Plaintiffs, TLG will deliberately misrepresent these trusted hospitals as dangerous facilities, undermining the doctors, nurses, and healthcare workers on whom the community depends.

4.     The reality could not be further from TLG's false narrative.  Plaintiffs' five hospitals form the backbone of urgent and critical healthcare services in the Palm Beach community.  They serve vulnerable populations—especially children and the elderly—with award-winning care.  St. Mary's, for example, is the only children's hospital between Fort Lauderdale and Orlando, providing critical care to high-risk pregnancies and fragile newborns in a low-income community where infant mortality risks are tragically high.  Plaintiffs' collective

impact is enormous:  Together, they treated approximately 470,000 patients in 2024 through emergency, critical care, and outpatient services.

5.      TLG's misinformative "Safety Grades" have been repeatedly condemned by leading healthcare organizations and academic researchers for precisely the dangers they pose. The American Hospital Association ("AHA") has warned that "no one should use [TLG's Hospital Safety Grades] to guide their choice of hospitals," because they are "neither fair nor accurate."[1] Academic studies have confirmed that TLG's methodology consistently misrepresents hospital quality nationwide, misleading patients into healthcare decisions that increase mortality risks and worsen outcomes.[2]  TLG has even awarded its highest possible safety grades to a facility the federal government determined in a 384-page report had "quality of care . . . so bad that it had 'caused—or is likely to cause—serious injury, harm, impairment, or death to a patient.'"  Multiple patients died at that facility, despite its pristine TLG ranking.  For nearly a decade, healthcare professionals and scholars have sounded the alarm about TLG's dangerous practices.  Those practices are even worse today as a result of TLG's 2024 move to punish non-participating hospitals.[3]  But TLG refuses to fix its reckless model.  So long as hospitals are willing to pay to

---

[1] Rich Umbdenstock, *Letter to Leah Binder (The Leapfrog Group)* (June 22, 2012), https://www.leapfroggroup.org/sites/default/files/Files/AHALettertoLeah.pdf.

[2] *See, e.g.*, Joe Nicholl et al., *The Relationship Between Distance to Hospital and Patient Mortality in Emergencies: An Observational Study*, Emerg. Med. J. (Aug. 21, 2007), https://pubmed.ncbi.nlm.nih.gov/17711952/; Julia C. Prentice, *Delayed Access to Health Care and Mortality*, Health Serv. Res. (Apr. 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1955366/pdf/hesr0042-0644.pdf.

[3] *See, e.g.*, J. Matthew Austin et al., *National Hospital Ratings Systems Share Few Common Scores and May Generate Confusion Instead of Clarity*, 34 Health Affs. 423 (Mar. 2015); Shawna N. Smith et al., *Dissecting Leapfrog: How Well Do Leapfrog Safe Practices Scores Correlate With Hospital Compare Ratings and Penalties, and How Much Do They Matter?*, 55(6) Med. Care 606, 611-12 (June 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5517312/pdf/nihms851990.pdf.

escape failing grades, TLG has no incentive to reform—and every incentive to perpetuate its deceptive scheme.

6.     Plaintiffs do not fear scrutiny.  Their healthcare leaders and frontline providers have devoted their lives to advancing patient safety and clinical excellence.  Several of Plaintiffs' Chief Executive Officers began their careers as bedside nurses, rising through the ranks through hard work, dedication, and an unwavering commitment to quality care.  Plaintiffs welcome evaluations based on objective, accurate, and verifiable standards applied fairly across the healthcare industry.  They embrace real accountability and rigorous performance measurement.  And like all hospitals, they are continuously working to improve the patient experience and achieve the highest possible quality of care.  What they will not accept—and what no patient should accept—are reckless, misleading, and commercially motivated "safety grades" that endanger public trust and patient lives.

7.     Plaintiffs did not bring this action lightly.  Before commencing this case, Plaintiffs asked TLG to cease and desist its deceptive grading practices.  Plaintiffs made clear that TLG's conduct was not only wrong, but dangerously harmful—driving patients away from some of the region's safest hospitals and toward objectively riskier facilities.  TLG refused.  Hiding behind a self-serving and legally unsupportable invocation of the First Amendment, TLG claimed a "free speech right" to deceive the public.  It then doubled down: embargoing its false grades with the press, orchestrating a media blitz, and further misleading patients in Plaintiffs' communities—all while knowing the devastating consequences of its campaign.

8.     There is no First Amendment protection for deceptive practices.  That is exactly why the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") exists: to protect consumers from modern-day snake oil salesmen like TLG.  TLG's supposed "mission" is a sham.

Its true mission is self-enrichment.  A material percentage of TLG's "non-profit" budget goes directly to compensating its Chief Executive Officer, who has pocketed many millions of dollars in recent years at the expense of the very patients TLG claims to serve.  TLG's business model is as simple as it is sinister: prey on public fear, distort the truth, and profit from deception.  Enough is enough.  This lawsuit seeks to put an end to TLG's dangerous practices and to protect the patients and communities who deserve honest, reliable information about their healthcare choices.

## PARTIES

9.      Plaintiff Delray Medical Center is an accredited hospital with 536 licensed beds. Delray Medical Center is incorporated in Florida, and its principal place of business is at 5352 Linton Blvd., Delray Beach, Florida 33484.  As both a general hospital and a Level I Trauma Center for both pediatric and adult patients, Delray Medical Center provides a variety of high-quality, specialized services to the community.

10.     Plaintiff Good Samaritan is the first hospital built in Palm Beach County.  It has served the community for over 100 years.  Good Samaritan is incorporated in Florida, and Good Samaritan's principal place of business is 1309 N. Flagler Dr., West Palm Beach, Florida 33401. It has 333 licensed beds.  Good Samaritan is an accredited acute care hospital that is focused on offering premier and comprehensive oncology services with its robust medical and surgical programs.

11.     Plaintiff Palm Beach Gardens Medical Center is an acute care hospital with 199 licensed beds.  Palm Beach Gardens Medical Center is incorporated in Florida, and its principal place of business is 3360 Burns Road, Palm Beach Gardens, Florida 33410.  Palm Beach Gardens Medical Center focuses on providing comprehensive cardiovascular care, including open heart surgeries and structural heart procedures.  It also provides the community with access to a broad

range of other important medical services, including 24-hour emergency care, general surgery, various orthopedic surgery services, and specialty services such as urology.

12. Plaintiff St. Mary's houses the only children's hospital between Orlando and Fort Lauderdale. St. Mary's is incorporated in Florida, and its principal place of business is 901 45th St., West Palm Beach, Florida 33407. St. Mary's is an accredited acute care hospital that is a Level I adult and pediatric Trauma Center, certified Comprehensive Stroke Center, and has a Level III neonatal intensive care unit ("NICU"). St. Mary's has 413 licensed beds of which 45 are in the NICU. St. Mary's is a Centers for Medicare & Medicaid Services ("CMS") designated Regional Perinatal Intensive Care Center ("RPICC")—one of only 11 RPICC hospitals in Florida.

13. Plaintiff West Boca Medical Center is an accredited hospital with 195 licensed beds and primarily serves women and children. West Boca Medical Center is incorporated in Florida, and its principal place of business is 21644 State Road 7, Boca Raton, Florida 33428. West Boca Medical Center is the only Level III NICU in southern Palm Beach County.

14. Defendant The Leapfrog Group is a not-for-profit corporation incorporated in the District of Columbia, with its principal place of business at 1775 K Street, NW, Suite 400, Washington, D.C. 20006.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs are all citizens of Palm Beach County, Florida, and TLG is a citizen of Washington, D.C. The amount in controversy is in excess of $75,000 given Plaintiffs seek greater than $75,000 in damages and seek to recover injunctive and declaratory relief valued in excess of $75,000.

16. This Court has personal jurisdiction over TLG pursuant to Fla. Stat. Ann. § 48.193(1)(a)(2) because TLG "submit[ted itself] . . . to the jurisdiction of the courts of this state for any cause of action arising from [TLG] . . . [c]ommitting a tortious act within this state." TLG

is also subject to this Court's jurisdiction as TLG is operating, conducting, engaging in, or carrying on a business or business venture in this state.  To the extent the alleged injury to persons in this state arises out of an act or omission by TLG outside of this state, this Court has jurisdiction over TLG because it engaged in solicitation or service activities within Florida.

17.     Plaintiffs' claims arise out of TLG's contacts with and purposeful availment of Florida—including but not limited to its misleading "Hospital Safety Grades" of Plaintiffs on its website.  TLG's false and misleading "Hospital Safety Grades" were directed at residents of Florida, accessed by residents of Florida, pertained to Plaintiffs (all residents of Florida), harmed Plaintiffs in Florida, and harmed consumers in Florida.  TLG has publicly commented on its Hospital Safety Grades for Plaintiffs with Florida publications like Stet News Palm Beach County designed to drive more attention to the Safety Grades in Florida.  TLG has also affirmatively "embargoed" its "Safety Grades" about Plaintiffs with members of the press, including members of the press in Florida, confirming TLG has knowingly and intentionally targeted the Florida healthcare market and Florida healthcare consumers with its "Safety Grades" about Plaintiffs.

18.     This Court also has personal jurisdiction over TLG pursuant to Fla. Stat. Ann. § 48.193(2) because TLG is "engaged in substantial and not isolated activity within [Florida]" and Plaintiffs' claims arise out of that substantial, not isolated, activity.  For example, for its Fall 2024 Survey, TLG solicited data from 621 health facilities in Florida, embargoed safety grades as to 192 of them with the media in Florida, and widely publicized the safety grades of those 192 Florida facilities to patients in Florida.

19.     Venue in the Southern District of Florida is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the actions giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

### A.    The Plaintiff Hospitals Are High-Performing Florida Hospitals.

20.    Plaintiffs are five hospitals in the Palm Beach region.  Collectively, they have 1,676 licensed beds and treated approximately 470,000 patients in 2024.  Plaintiffs have reputations for being high-quality healthcare systems that put patient care first.  Many well-regarded industry commentators that compare hospitals consistently rank Plaintiffs' performance well above their peers'.  The quality of Plaintiffs' care has been confirmed, validated, and acclaimed by objective third parties following rigorous vetting and assessment from accreditors, commercial insurers, and experts like the American College of Surgeons.

21.    ***Delray Medical Center*** has received numerous awards and accolades.  For example, Delray Medical Center was awarded the Resuscitation Center of Excellence award for 2025, becoming the first hospital in Palm Beach County to be named a Florida Resuscitation Center of Excellence.  To achieve that accolade, Delray Medical Center met approximately 15 criteria for patient care that were established by the Florida Resuscitation Center Committee, including intensive neurological monitoring, strong collaboration with Emergency Medical Services partners, and community outreach programs to promote health and lifestyle modifications to decrease the prevalence of cardiac disease.  Additionally, the American College of Surgeons awarded Delray the Metabolic and Bariatric Surgery Accreditation and Quality Improvement Program ("MBSAQIP") Surgery Center of Excellence award, which is dedicated to enhancing the safety and quality of care for bariatric patients in the United States and Canada.  MBSAQIP accreditation promotes uniform standards and continuous quality improvement.

22.    Delray Medical Center also earned a DNV GL Comprehensive Stroke certification, which means Delray Medical Center gives the highest quality of care to most complete patient cases and offers evidence-based treatments with cutting-edge research protocols.  Delray Medical

Center earned the VQI (Vascular Quality Initiative) Carotid Care Champion this year, which honors participants that are dedicated to improving the safety and effectiveness of vascular care. Delray Medical Center also earned a Certification for the American Association of Cardiovascular and Pulmonary Rehabilitation ("AACVPR") Program.  Delray Medical Center is also accredited by the Joint Commission, the nation's largest hospital accreditor that evaluates hospitals' quality performance standards through an objective evaluation process.   This accreditation is peer-reviewed and designed to review individual facilities.

23.    The American Heart Association honored Delray Medical Center with "Get with the Guidelines" Gold Plus awards in three specializations.  First, Delray Medical Center earned the Target Stroke Honor Roll Elite, meaning Delray Medical Center is able to achieve door-to-needle times of within 60 minutes for at least 85% of applicable patients.  Second, Delray Medical Center earned the Target Stroke Honor Roll Advanced Therapy, meaning that 50% of applicable patients are able to achieve door-to-device times of 90 minutes or less in the case of directly arriving patients, and 60 minutes or less for transfer patients.  Third, Delray Medical Center earned the Target Type II Diabetes Honor Roll, meaning that Delray Medical Center met numerous requirements, including qualifying for a Silver level or higher Achievement Award in the "Get with the Guidelines-Heart Failure, Stroke, and/or Coronary Artery Disease" modules.

24.    Earlier this year, Delray Medical Center was named "one of the best 250 hospitals in the country" by Healthgrades, one of the top sites Americans use when searching for a doctor or hospital.[4]  In total, Delray Medical Center earned 25 accolades from Healthgrades, including the 2025 Critical Care Excellence Award and the 2025 Pulmonary Care Excellence Award.  Delray

---

[4] To assess and evaluate hospitals, Healthgrades relies on data from Medicare medical claims records and states' data on Medicare and commercially insured patient outcomes to determine patients' actual clinical outcomes when visiting a given hospital.

Medical Center has received countless five-star awards from Healthgrades, including Five-Star Recipient for Valve Surgery for two years in a row (2024-2025), Five-Star Recipient for Treatment of Heart Attack for two years in a row (2024-2025), Five-Star Recipient for Treatment of Heart Failure for twenty-three years in a row (2003-2025), Five-Star Recipient for Defibrillator Procedures for three years in a row (2024-2025), Five-Star Recipient for Treatment of Stroke for eighteen years in a row (2008-2025), Five-Star Recipient for Coronary Interventional Procedures (2024), Five-Star Recipient for Treatment of Pneumonia for two years in a row (2024-2025), Five-Star Recipient for Treatment of Sepsis for twenty-two years in a row (2004-2025), Five-Star Recipient for Treatment of Respiratory Failure for three years in a row (2023-2025), Five-Star Recipient for Upper Gastrointestinal Surgery for three years in a row (2022-2024), Five-Star Recipient for Small Intestine Surgeries for five years in a row (2017-2021, 2024), and Five-Star Recipient for Cranial Neurosurgery (2024).

25.     ***Good Samaritan*** has received numerous awards and accolades, including many that are directly relevant to patient care for the community it serves.  As a full-service cancer hospital, it is important to Good Samaritan that it is accredited by the Commission on Cancer ("CoC").  In order to be accredited, Good Samaritan has to undergo an on-site visit on a triennial basis, in which a trained CoC reviewer visits Good Samaritan and reviews its required cancer program activity documentation to ensure compliance with the standards.

26.     The American College of Surgeons has designated Good Samaritan a National Accreditation Program for Breast Centers ("NAPBC") for 13 years in a row.  The American College of Radiology designated Good Samaritan a Breast Imaging Center of Excellence, which it received only after accomplishing the highest level of care in breast imaging, including being committed to patients, providers, and payers.  Good Samaritan has been recognized as an

Accredited Comprehensive Center by the Metabolic and Bariatric Surgery Accreditation and Quality Improvement Program ("MBSAQIP®"), a joint Quality Program of the American College of Surgeons ("ACS") and the American Society for Metabolic and Bariatric Surgery ("ASMBS").

27.     Good Samaritan is accredited by the Joint Commission.  Good Samaritan has been accredited by Joint Commission for specialization certifications for Gold Seal of Approval for Total Hip and Knee Replacement, Shoulder Replacement and Spine Surgery—these certifications are designed for hospitals providing the critical elements to achieve long-term success in improving critical medical outcomes—which signifies its services have delivered evidence-based proof of clinical quality sought by patients and payers alike.  The entities that award and assign these accreditations and certifications visit the healthcare facility and perform regular periodic in-person reviews, surveys and assessments of the facility.

28.     Good Samaritan has also recently been awarded the Florida Department of Health and Florida Agency for Health Care Administration Excellence for Maternal Care Award, which highlights hospitals that surpass Florida Department of Health's goal of reducing the rate of C-sections among first-time mothers with low-risk pregnancies.  Good Samaritan was recognized by BlueCross BlueShield as a Blue Distinction Center for Bariatric Surgery designation, as part of the Blue Distinction Specialty Care program.  Good Samaritan earned this recognition by providing a full range of bariatric surgical care services, including inpatient care, postoperative care, follow-up, and patient education that operate to standards set by BlueCross BlueShield, in partnership with physician experts and medical organizations.  Good Samaritan is also recognized as a Blue Distinction Center for Knee and Hip Replacement.  Aetna has also designated Good Samaritan as an Aetna Institute of Quality orthopedic facility for total joint replacement and spine surgery, which it earned by consistently delivering safe and effective orthopedic care.

29.     Good Samaritan was the only hospital in South Florida to earn recognition as one of "America's 100 Best for Spine and Outpatient Orthopedic Excellence Award" in 2025.  Good Samaritan has also received countless five-star awards from Healthgrades, including Five-Star Recipient for C-Section Delivery for four years in a row (2022-2025), Five-Star Recipient for Vaginal Delivery for twelve years in a row (2014-2025), Five-Star Recipient for Outpatient Back and Neck Surgery (except Spinal Fusion) (2025), Five-Star Recipient for Spinal Fusion (2025), and Five-Star Recipient for Treatment of Gastrointestinal Bleed (2024).

30.     ***Palm Beach Gardens Medical Center*** has received numerous awards and accolades, including many that are especially relevant to patient care for the over-65 patient community that makes up over half of the patients Palm Beach Gardens Medical Center serves. Palm Beach Gardens Medical Center is accredited by Joint Commission as an Advanced Primary Stroke Center—a certification designed for hospitals providing the critical elements to achieve long-term success in improving stroke outcomes—and Total Joint Hip/Knee Certification—which signifies its services have delivered evidence-based proof of clinical quality sought by patients and payers alike.  Additionally, it has a lab accreditation from the College of American Pathologists—a requirement to perform testing on specimens from human beings—and was selected as a certified program with the AACVPR—the only peer-reviewed accreditation process designed to review individual facilities for adherence to standards and guidelines developed and published by the AACVPR.  These accreditations and certifications are only awarded after in-person visits to Palm Beach Gardens Medical Center where its health care professionals are interviewed and patient care is reviewed firsthand.  Palm Beach Gardens Medical Center is also subject to regular periodic in-person reviews, surveys, and assessments of the facility.

31.     Palm Beach Gardens Medical Center has also received numerous awards that exemplify its quality such as Blue Distinction Center+ Designation for Quality and Cost-Efficiency in Knee and Hip Replacement Surgeries by BlueCross BlueShield, the Joint Commission's Gold Seal of Approval for Hip and Knee Replacement, an Aetna Institute of Quality Orthopedic Facility for Total Joint Replacement and Spine Surgery, Get with the Guidelines Gold Plus Stroke Recognition Award from the American Heart Association for 10 years straight, and the Gold Plus Diabetes Recognition Award for the last three years, among several other awards.

32.     Healthgrades named Palm Beach Gardens Medical Center among the nation's top 10% for pulmonary services.  It has also been awarded five stars by Healthgrades for many services, including Five-Star Recipient for Valve Surgery (2023, 2025), Five-Star Recipient for Treatment of Heart Failure for three years in a row (2023-2025), Five-Star Recipient for Carotid Procedures for three years in a row (2023-2025), Five-Star Recipient for Respiratory Failure for two years in a row (2024-2025), Five-Star Recipient for Colorectal Surgeries (2025), Five-Star Recipient for Treatment of GI Bleed (2024), Five-Star Recipient for Treatment of Stroke (2025), Five-Star Recipient for Treatment of Pneumonia for three years in a row (2023-2025), and Five-Star Recipient for Treatment of Chronic Obstructive Pulmonary Disease (2024).

33.     **St. Mary's** has several accreditations that demonstrate the high quality of care it provides to pregnant women and children in the community.  For example, it is an accredited acute care hospital that is a Level I adult and pediatric Trauma Center.  A Level I Trauma Center is a healthcare facility that is central to the trauma system and capable of providing the highest level of care for every aspect of injury for both adults and children.  St. Mary's is also a Level III NICU, meaning it provides lifesaving care for babies born before 32 weeks' gestation and / or weighing less than 1,500 grams (approximately 3.3 pounds) or babies with specific medical conditions that

require surgery or specialized pediatric care.  Additionally, St. Mary's is one of only 11 designated hospitals by the Florida Department of Health as a RPICC that provide obstetrical services to women who have a high-risk pregnancy and care for newborns with special health needs, such as critical illness or low birth weight.  St. Mary's is also certified by the American College of Surgeons for the Verified Pediatric Surgery Program, which recognizes hospitals that properly address the surgical care of infants and children.

34.     St. Mary's is also a Commission on Accreditation of Rehabilitation Facilities ("CARF") accredited facility for its stroke, brain injury and amputation specialty services. Achieving CARF accreditation means that St. Mary's meets CARF's standards and has demonstrated a commitment to being among the best available to patients. St. Mary's is also a Certified Comprehensive Stroke Center, which signifies its dedication to raising the bar for evaluating and evolving the care of patient at every part of the stroke care continuum.

35.     St. Mary's is accredited by the Joint Commission.  St. Mary's has been accredited by the Joint Commission for specialization certifications for Spine Surgery and Total Joint Replacement for Hip and Knee—a certification designed for hospitals providing the critical elements to achieve long-term success in improving critical medical outcomes—which signifies its services have delivered evidence-based proof of clinical quality sought by patients and payers alike.

36.     These accreditations and certifications are particularly important given St. Mary's patient population.  With its accreditation and specialties, St. Mary's provides patients care they are not able to receive at other facilities.  St. Mary's sees more transfers to its facility from nearby hospitals who are unable to provide patients with the care they need than any other Palm Beach County hospital.  Also, due to its location in a low-income community, St. Mary's treats a

significant number of high-risk pregnancies in which infant mortality is a serious risk and heartbreaking reality.

37.     St. Mary's has also received numerous awards.  St. Mary's has been awarded multiple Get with the Guidelines awards, including Stroke Gold Plus Award 2024 (13th Consecutive Year); Stroke Elite Plus Honor Roll; Stroke Advance Therapy Honor Roll; and Type 2 Diabetes Honor Roll.  The Get with the Guidelines Stroke program is designed to improve stroke care by promoting consistent adherence to the latest scientific treatment guidelines.

38.     Additionally, St. Mary's has been recognized by BlueCross BlueShield with a Blue Distinction Centers for Knee, Hip Replacements, Spine Surgery and Maternity Care designation, as part of the Blue Distinction Specialty Care program.  The Blue Distinction Specialty Care is a national designation program that recognizes health providers that demonstrate expertise in quality and affordable health care to meet consumers' specialty care needs.

39.     St. Mary's has also received numerous awards that recognize the high-quality care it provides to pregnant women and children in particular.  For example, it has recently been awarded the Florida Department of Health and Florida Agency for Health Care Administration Excellence for Maternal Care Award, which highlights hospitals that surpass Florida Department of Health's goal of reducing the rate of C-sections among first-time mothers with low-risk pregnancies.  Similarly, the Florida Hospital Association also recently awarded St. Mary's the Excellence in Maternity Care designation, which is awarded to a hospital that demonstrates exceptional dedication to maternal health care.

40.     *The Palm Beach Post* has awarded St. Mary's with Community Choice Awards for Best Hospital, Best Orthopedic/Sports Medicine 2024 and Best Maternity and Childbirth Center

2024 & 2025.  The Palm Beach County Community Choice Awards celebrate the best business and organizations in the area, with people in the community voting on these designations.

41.     St. Mary's has been awarded several five-star awards from Healthgrades, including for its spinal fusion surgery and hip fracture treatment for five years in a row; knee replacement surgery; and, for the eleventh year in a row, for both vaginal and C-section delivery.

42.     *West Boca Medical Center* has received numerous awards and accolades, including many that are directly relevant to patient care for children and women that it serves.  For example, West Boca Medical Center is the only Level III NICU facility in southern Palm Beach County. Level III NICUs provide lifesaving care for babies born before 32 weeks' gestation and / or weighing less than 1,500 grams (approximately 3.3 pounds) or babies with specific medical conditions that require surgery or specialized pediatric care.  The American College of Radiology accredited West Boca Medical Center for Imaging Modalities including Nuclear Medicine, Ultrasound, MRI, CT—which provides it the ability to care for the Level III NICU children and at-risk pregnancy mothers that it treats and ensures it is using best practices.  Relatedly, West Boca Medical Center has an accredited education program in radiology through Joint Review Committee on Education and Radiologic Technology ("JCERT"), which is the only agency recognized by the United States Department of Education ("USDE") and the Council for Higher Education Accreditation ("CHEA") for the accreditation of traditional and distance delivery educational programs in radiography, radiation therapy, magnetic resonance, and medical dosimetry.  This program provides West Boca Medical Center's clinical staff with the educational opportunities to ensure its patients receive quality care.

43.     West Boca Medical Center is accredited by the Joint Commission.  West Boca Medical Center has also been accredited by Joint Commission for specialization certifications for

Joint-Replacement – Hip, Joint Replacement – Shoulder, and Joint Replacement – Knee—a certification designed for hospitals providing the critical elements to achieve long-term success in improving critical medical outcomes—which signifies its services have delivered evidence-based proof of clinical quality sought by patients and payers alike.

44.     West Boca Medical Center has also received numerous awards that exemplify its quality such as Get with the Guidelines Silver Plus Stroke Recognition Award and Diabetes Honor Roll.  In addition, as a facility that primarily treats mothers and children, it is important to it that it implements the American Academy of Pediatrics ("AAP") best practices and have been recognized for doing so by receiving the Silver designation from the Cribs for Kids' National Safe Sleep Hospital Certification program, which signifies its facility's commitment to infant safe sleep to reduce the risk of Sudden Unexpected Infant Death ("SUID"), Accidental Suffocation and Strangulation in Bed ("ASSB"), SIDS, and unsafe sleep injuries.

45.     West Boca Medical Center earned two Healthgrades Excellence Awards, one for gastrointestinal care and the other for gastrointestinal surgery, and it placed in the top 10% of hospitals in the nation for overall GI services and gastrointestinal surgery.  West Boca Medical Center has also received many five-star awards, including Five-Star Recipient for Treatment of Sepsis for four years in a row (2022-2025), Five-Star Recipient for Colorectal Surgeries for three years in a row (2023-2025), Five-Star Recipient for Treatment of Bowel Obstruction (2025), Five-Star Recipient for C-Section Delivery for eleven years in a row (2015-2025), Five-Star Recipient for Vaginal Delivery for eleven years in a row (2015-2025), and Five-Star Recipient for Treatment of Respiratory Failure for three years in a row (2023-2025).

**B.     TLG's Safety Grade Methodology Punishes Non-Participating Hospitals Like Plaintiffs And Conceals that Penalty From Consumers.**

46.     TLG conducts an annual "Hospital Survey" in which TLG "asks hospitals to report quality and safety data and then publicly reports that information by hospital."  In connection with the Hospital Survey, TLG assigns a "Hospital Safety Grade" to nearly 3,000 general acute-care hospitals across the nation every spring and fall.  TLG posts its safety grade on one of its websites, www.hospitalsafetygrade.org, and it markets, references and links to the Hospital Safety Grade website on another website, www.leapfroggroup.org.

47.     TLG admits it assigns hospitals Safety Grades to influence where consumers and patients decide to receive care.  TLG explicitly tells consumers, "Patients should *always* decide on where to receive care based on a hospital's current Safety Grade."  (emphasis added).  TLG even tells consumers that choosing a hospital "could be a life or death decision" and amplifies this threat by misleading consumers into thinking they're "twice as likely to die of a preventable problem at a C, D, or F hospital than at an A hospital."

48.     The Safety Grade uses CMS data, TLG's Hospital Survey responses, and information from other supplemental data sources to produce a single letter grade that purports to represent a hospital's "overall performance in keeping patients safe from preventable harm and medical errors."  "A" represents the best TLG Hospital Safety Grade, followed in order by "B," "C," "D," and "F."  The Safety Grade aggregates up to 22 national patient safety measures.  For hospitals who participate in TLG's Hospital Survey, TLG uses the hospitals' answers to TLG's Hospital Survey for 12 of the 22 measures.  In other words, a majority of the grade for participating hospitals is based on their self-reported survey responses.

49.     When a hospital does not participate in TLG's Hospital Survey, TLG uses other sources for those 12 measures.  For five measures, TLG uses government data.  TLG abandons three measures entirely.  And for the last four measures, TLG uses its "imputation model."

50.     According to TLG, that "imputation model" is how it assigns a value for a measure when it lacks any data pertaining to it.  If a hospital does not provide TLG data, TLG assigns an "imputed" value.  Prior to Fall 2024, TLG's imputation model assigned hospitals that did not participate in its survey a score based on the average score applicable to similarly situated hospitals.  Beginning in Fall 2024, however, TLG modified its imputation model.  It now assigns the lowest possible score to non-participating hospitals.  In other words, TLG now punishes non-participants for their lack of participation.  TLG has admitted its new model imposes a penalty.  It specifically explained its 2024 change was designed to prevent non-participating hospitals from "inadvertently benefit[ing]" compared to hospitals that self-report, even though TLG has no data to show how non-participation could benefit a hospital.

51.     The four measures for which TLG "imputes" scores are: Computerized Physician Order Entry ("CPOE"), Bar Code Medication Administration ("BCMA"), ICU Physician Staffing ("IPS"), and Hand Hygiene Score.  CPOE measures whether a hospital has implemented a system to record medication prescriptions via computer.  BCMA measures whether a hospital confirms medication via bar code process.  IPS measures a hospital's use of intensivists in an intensive care unit.  A Hand Hygiene score measures hospitals' policies for monitoring hand washing and glove usage.

52.     TLG's imputation model deceives consumers by inventing negative data about hospitals that TLG wishes to punish for declining to participate in its survey.  For the four imputed measures (CPOE, BCMA, IPS, and Hand Hygiene), if a hospital does not participate in TLG's

survey, TLG assigns "a point value that is equivalent to receiving 'Limited Achievement' for this measure"—its lowest possible score—without any factual basis.  The result is that hospitals who elect not to participate in TLG's survey receive only 60 out of 400 possible points in these four categories—resulting in artificially deflated overall grades with no basis in fact and no correlation to a hospital's actual safety performance.  For example, TLG assigns a hospital the lowest possible value for the Hand Hygiene measure even if it has the best possible Hand Hygiene policy just because the hospital doesn't participate in TLG's Hospital Survey.  TLG has no basis to assign that low value.

53.    TLG's "imputation" model for ranking non-participating hospitals directly conflicts with TLG's own National Expert Panel's guidance.  As TLG explains, "not all hospitals have enough data publicly available to be eligible for a grade."  "As per the National Expert Panel guidance, [TLG] has requirements for the minimum amount of data [it] need[s] to issue an accurate grade."  Accordingly, "[h]ospitals missing more than **six** process measures" are "not graded."  Non-participating hospitals should fall easily into that "not graded" bucket, because their decision not to participate in TLG's survey necessarily means TLG is missing ***seven*** process measures that rely on voluntary submission of hospital data.[5]  The responsible thing to do based on TLG's own Expert Panel guidance, therefore, would be to *not* provide a safety grade for a non-participating hospital.  But TLG cooks the books.  Of those seven missing measures, TLG "imputes"—or gins up—scores for four of them, using those concocted scores to justify ranking non-participating hospitals.

---

[5] Those seven include CPOE, BCMA, IPS, Safe Practice 1: Culture of Leadership Structures and Systems; Safe Practice 2: Culture Measurement, Feedback & Intervention; Total Nursing Care Hours per Patient Day; and Hand Hygiene.

54.     TLG's statements about its imputation model mislead consumers and misrepresent its own model.  One Frequently Asked Question on its website asks whether "a hospital get[s] a better Safety Grade if it reports to the [TLG] Hospital Survey."  In response, TLG falsely states, "The Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the [TLG] Hospital Survey."  Given the nature of TLG's imputation model, which involves inventing data with no objective source, that's a clear lie.  TLG relies on invented data for some hospitals but not others, and it applies a different methodology to determine Hospital Safety Grades for non-participating hospitals as compared to participating ones—all despite its claims that it meaningfully compares all hospitals regardless of participation.

55.     Another way TLG's deceptive methods punish non-participating hospitals is by rewarding participating hospitals with grade inflation.  The data provided by hospitals that do participate in the TLG Hospital Survey is self-reported, biased, and subject to manipulation.  Median responses for hospitals that report their own scores show that those hospitals inflate their performance.  TLG lacks appropriate auditing mechanisms to ensure self-reported data is accurate, and it factors measures into its grading methodology that are unverifiable.  TLG assumes the data it relies on is accurate without adequately verifying it.

56.     Participating hospitals are not receiving strong TLG grades because they are achieving better results on an objective basis.  In one illustrative example, TLG assigned a grade of "A" or "B"—its highest possible safety scores—to Mission Hospital in Asheville, North Carolina, for seven consecutive review cycles between Spring 2021 and Spring 2024.  During this same time period, investigators with the North Carolina Department of Health and Human Services conducted a survey at Mission Hospital to evaluate its compliance with Medicare standards.  On February 1, 2024, CMS designated Mission Hospital as in "immediate jeopardy [of losing federal

funding]"—the most severe sanction possible—because the investigators "determin[ed] that the quality of care at Mission was so bad that it had 'caused – or is likely to cause – serious injury, harm, impairment or death to a patient.'"[6]  According to the 384-page report from CMS, at least three patients died in 2022 and 2023 following "significant delays and lapses of care in the emergency department and other areas"[7]—two years in which TLG awarded Mission Hospital four consecutive "A" Hospital Safety Grades.

57.    Hospitals in Florida that have participated in TLG's survey are similarly receiving high TLG grades that do not reflect their performance, which damages their higher-performing but non-participating competitors.  Participating hospitals have received high grades (A's and B's) in recent years despite investigative reports that a participating hospital had cockroaches in operating rooms, dirty and broken medical equipment, inadequate monitoring of ICU patients, an overcrowded emergency department, staffing deficiencies of telemetry technicians—those responsible for monitoring changes in vital signs in patients with electronic devices—that resulted in deaths related to telemetry, patients attacking nurses, and even a misplaced patient who died after staff was unable to locate him or her.

58.    The flaws in TLG's methodology reveal themselves through a simple comparison between TLG's rankings and CMS data.  CMS provides its own hospital safety rankings—rankings that are the product of data hospitals are required to submit to the federal agency in order

---

[6] Andrew R. Jones, *Mission Hospital's Leapfrog, Healthgrade scores and rankings don't tell the whole story, draft report says*, Asheville Watchdog (Feb. 12, 2024), https://avlwatchdog.org/mission-hospitals-leapfrog-healthgrade-scores-and-rankings-dont-tell-the-whole-story-draft-report-says/.

[7] Andrew R. Jones, *'The patient was subsequently found unresponsive in a hallway bed': CMS report on Mission Hospital details deaths of patients, significant delays in care*, ASHEVILLE WATCHDOG (Feb. 17, 2024), https://www.northcarolinahealthnews.org/2024/02/17/plan-of-correction-report-mission-hospital/.

to qualify for the Centers for Disease Control's National Healthcare Safety Network incentive programs.  There are numerous examples throughout the country where TLG's grade for a hospital is two grades removed from the rating CMS provides—for example, where CMS considers a hospital a 5-star (the highest CMS rating) and TLG assigns the hospital a C, and where CMS considers a hospital a 2-star (the second lowest) and TLG assigns the hospital an A.

| Examples of Leapfrog Advantaging Hospitals Who Provide It Free Data and Disadvantaging Hospitals Who Don't | | | |
|---|---|---|---|
| Hospital | Participates in Leapfrog Survey? | Leapfrog Safety Grade (Fall 2024) | CMS Overall Star Rating |
| Examples of Grade Deflation for Non-Participating Hospitals | | | |
| Uintah Basin Medical Center | No | C | 5 |
| University of Utah Hospital and Clinics | No | C | 5 |
| Examples of Grade Inflation for Participating Hospitals | | | |
| UVA Health Culpeper | Yes | A | 1 |
| Twin County Regional | Yes | A | 2 |
| Sentara Northern Virginia | Yes | A | 2 |
| Iredell Memorial Hospital | Yes | A | 2 |
| Maria Parham Medical Center | Yes | A | 2 |
| Vidant/ECU Health Edgecombe | Yes | A | 2 |

59.     Similarly, in 2023, TLG awarded nine hospitals who participated in its survey passing grades (A–C) when the government had assigned them "immediate jeopardy" warnings because the hospitals' "noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death[.]"  In other words, TLG assigned failing hospitals an A and directed patients to go there at the same time the government was concerned with patients' safety at that hospital.

60.     These discrepancies exist because TLG rewards participating hospitals and penalizes non-participating hospitals.

**C.      TLG Has Been Subject To Significant Industry And Academic Criticism.**

61.      For more than a decade, industry experts and academics have been sounding the alarm that TLG's methodologies are inaccurate, misleading, or inconsistent based on who participates in the surveys and who does not.

62.      The Journal of the American Medical Association ("JAMA") published an article in 2009 titled *Association Between Hospital-Reported Leapfrog Safe Practices Scores and Inpatient Mortality.*  That article concluded that in the "sample of . . . hospitals . . . that completed the [2006] Safe Practices Leap" survey, "survey scores were not significantly associated with risk-adjusted inpatient mortality."

63.      On June 22, 2012, Richard J. Umbdenstock, President and CEO of the American Hospital Association ("AHA") sent a letter to Leapfrog declaring that the Leapfrog Hospital Safety Grade "was neither fair nor accurate," and he outlined "several methodological shortcomings in the survey."  The flaws included "an unfair bias toward responding to the survey, the use of unreliable measures, significant variation in the weights applied to measures for different groups of hospitals, and significant errors in the data."  Umbdenstock's letter detailed three major criticisms of TLG's hospital safety score: (1) a minority of U.S. hospitals participate in TLG's voluntary reporting program, while those that do not receive lower imputed scores; (2) more than 80% of the outcome measures have been shown to be unreliable; and (3) there are errors in the TLG data.  AHA expressed its "disappointment that the [TLG] scorecard's assessment was neither fair nor accurate"—leading AHA to conclude that "no one should use [TLG's Hospital Safety Grades] to guide their choice of hospitals, unless and until, a more accurate assessment method is used."

64.     In 2017, the peer reviewed journal Medical Care published an article titled:

*Dissecting Leapfrog: How Well Do Leapfrog Safe Practices Scores Correlate with Hospital*

*Compare Ratings and Penalties, and How Much Do They Matter?*   The authors, a team of

researchers from the University of Michigan, concluded that participation in TLG's survey

consistently inflated the participant's TLG Hospital Safety Score because self-reported

information overwhelmingly "skew[ed] towards positive self-report."  For example, over 50% of

participating hospitals reported perfect scores in their surveys for all but one safe practice measure,

and nearly 20% reported perfect scores for all safe practices.

65.     The University of Michigan study further found that TLG's heavy reliance on self-

reported data had the effect of "artificially deflating the mean of the distribution" to which non-

reporting hospitals were compared.  In other words, non-participating hospitals are subject to

"large grade penalties for less-than-perfect self-reported Safe Practices compliance" because they

are graded on the same curve as participating hospitals with inflated self-reported data.

66.     The authors determined that "Leapfrog's current methodologies, in combination

with strongly positively skewed self-reports of [Safe Practices Scores ('SPS')] measures, punish

low SPS reports substantially more than they reward high SPS.  These concerns cast doubt on the

utility of SPS and, more generally, the [Hospital Safety Score] and grades."  In addition, the TLG

Hospital Safety Scores were not positively associated with patient outcomes reported by Hospital

Compare or Medicare penalties for readmissions or complications.

67.     Jennifer Meddings, M.D., M.Sc.—the senior author of the Michigan study—said

the Hospital Safety Grade is "based on whether a hospital self-reports that it has adopted certain

protocols, and not whether those protocols are actually followed"—meaning the Hospital Safety

Grades offer little indication of a hospital's actual safety metrics in practice.  Indeed, participating

hospitals that reported high levels of self-compliance for TLG's safe practices did not have correspondingly lower hospital-acquired infection rates or lower federal penalties for readmissions, demonstrating the ineffectiveness and misleading nature of TLG's methodology.

68. In 2019, The New England Journal of Medicine Catalyst ("NEJM") published a peer reviewed article criticizing the methodology used by rating agencies, including Leapfrog. The authors said "[t]he greatest concerns were with [TLG's] internally developed and modified Safety Survey." The NEJM authors noted that TLG "had only done a formal audit for approximately five hospitals of about 2,600 in the past year, and only 72 hospitals underwent an electronic audit." In addition, the authors also reported concerns that the survey "may not truly reflect patient safety efforts or be currently meaningful to stakeholders (e.g., computerized physician order entry)." And "[a]nother major area of concern was how Leapfrog assesses hospitals that do not answer their Safety Survey. When hospitals do not report the survey, the missing data are filled in from other secondary sources. However, hospitals that answer the survey and those that do not are assessed in the same way despite not having the same measures upon which to base the ratings. Approximately 50% of hospitals answer their survey, so a good deal of the rankings are based on missing or inconsistent data."

**D.    TLG Reaps Substantial Rewards From Its Pay-to-Play Scheme.**

69. TLG heavily tilts its grading in favor of hospitals that participate in TLG's scheme in a quid-pro-quo arrangement: Hospitals provide TLG free data, which it can then monetize, and in return hospitals receive better TLG grades while their competitors are penalized for not supplying TLG free data. And though it pretends to be a non-profit, TLG also rakes in millions of dollars from the data it obtains from participating hospitals incentivized to keep TLG happy, so it keeps inflating grades.

70.     Between 2019 and 2023, TLG collected millions in revenue from hospitals that it later rewarded with inflated grades.  TLG also has collected troves of data from hospitals who complete its survey so it can financially benefit from such data.  Participants in the TLG survey are specifically required to sign an acknowledgment that "[t]he Leapfrog Group may use this information in a commercial manner for profit":

---

**2025 Leapfrog Hospital Survey – Hard Copy**                    *Section 1: Patient Rights and Ethics*

**Affirmation of Accuracy**

As the hospital CEO or as an employee of the hospital to whom the hospital CEO has delegated responsibility, I have reviewed this information pertaining to the Patient Rights and Ethics Section at our hospital, and I hereby certify that this information is true, accurate, and reflects the current, normal operating circumstances at our hospital. I am authorized to make this certification on behalf of our hospital.

The hospital and I understand that The Leapfrog Group, its members, the public and entities and persons who contract or have other business dealings with The Leapfrog Group are relying on the truth and accuracy of this information. The hospital and I also understand that The Leapfrog Group will make this information and/or analyses of this information public through the Survey Results public reporting website, The Leapfrog Group's Hospital Safety Grade, and/or other Leapfrog Group products and services. This information and/or analyses and all intellectual property rights therein shall be and remain the sole and exclusive property of The Leapfrog Group in which The Leapfrog Group retains exclusive ownership. This information does not infringe upon any third-party intellectual property rights or any other third-party rights whatsoever and is free and clear of all encumbrances and liens of any kind. The hospital and I acknowledge that The Leapfrog Group may use this information in a commercial manner for profit. The hospital shall be liable for and shall hold harmless and indemnify The Leapfrog Group from any and all damages, demands, costs, or causes of action resulting from any inaccuracies in the information or any misrepresentations in this Affirmation of Accuracy. The Leapfrog Group and its members and entities and persons who contract or have other business dealings with The Leapfrog Group reserve the right to omit or disclaim information that is not current, accurate or truthful.

Affirmed by _____, the hospital's _____,
                 *(first name and last name)*                           *(title)*
on _____.
        *(date)*

---

71.     TLG collects revenue from participating hospitals in multiple ways.  For instance, TLG charges hospitals—including ones TLG rates—over $25,000 annually to join its Partners Advisory Committee to influence the TLG Board of Directors four times a year.  TLG thereby creates a structure for hospitals to pay for access to its decision-makers and curry favor with them

to ensure TLG's system benefits hospitals who participate in TLG's scheme and punishes those who do not.  Some of TLG's paying members own some of its highest-rated hospitals.[8]

72.    TLG also charges hospitals between $6,700 and $29,900 per year to advertise their TLG safety grade.  That creates an incentive for TLG to rate higher the hospitals willing to pay, as opposed to those who do not.  No hospital would pay $29,900 to advertise a failing grade.

73.    TLG also encourages hospitals to sponsor its annual meetings and awards ceremony.  In 2024, TLG's platinum executive sponsorship required $44,750—yet another way TLG reaps financial rewards from its scheme.

74.    TLG monetizes the data it receives from hospitals who participate in its Hospital Survey.  TLG is therefore incentivized to set up its methodology to reward participating hospitals, so that it gets more data, which it can use to make more revenue. TLG has used the tens of millions of dollars of revenue it has collected from participating hospitals and other sponsors in its pay-to-play system to pay exorbitant salaries to its owner and executives.  Between 2019 and 2023, TLG has paid over three million dollars in salary and benefits to Leah Binder—its CEO.

75.    TLG also licenses its safety grades to insurers, which integrate TLG's grades into websites patients use to determine whether particular healthcare facilities are covered.  Insurers are even able to use TLG's logos and intellectual property—displayed prominently in a drop-down called "Hospital Safety & Accreditation":

---

[8] Gretchen Morgenson et al., *Roaches in the operating room: Doctors at HCA hospital in Florida say patient care has suffered from cost cutting*, NBS News (Feb. 15, 2023), https://www.nbcnews.com/health/health-care/roaches-operating-room-hca-hospital-florida-rcna69563.



TLG receives compensation from insurers to allow those insurers to use TLG's safety grades and logos.  That means TLG has yet another incentive to rank as many hospitals as possible so as to convince insurers TLG's ratings have value and to drive even more revenue to TLG through penalizing non-participating hospitals and trying to coerce them into providing data.

**E.**     **TLG's Websites Confirm TLG Is Knowingly Deceiving Patients.**

76.     TLG has two websites for its hospital safety rankings—www.leapfroggroup.org and www.hospitalsafetygrade.org.  They each reference TLG's safety grades, but they do so in inconsistent ways that confirm not only that TLG knows it is misleading patients but also that it intends to do so.

77.     When a potential patient or even an existing patient Googles "hospital safety rankings," the top two results are TLG's websites, www.hospitalsafetygrade.org and www.leapfroggroup.org:



78.     Each website, however, depicts information about Plaintiffs differently.  Consider the consumer experience looking for safety grades on the first Google hit—www.hospitalsafetygrade.org.  Clicking that link brings a patient to TLG's Hospital Safety Grade website, where TLG encourages users to search for their local hospital by asking, "How Safe is Your Hospital?"



79.     Once a patient searches her hospital's name, she is immediately confronted with the following image—a disturbing "F" grade, the meaning of which even an elementary school student would understand:



80.     When a patient clicks on "View the full Score" she sees a plethora of inaccurate and misleading information about the hospital (explained *infra* Section F):



81.     Only at the bottom of the page—in a small font and in footnotes consumers won't

read—does TLG disclose that the hospital did not provide data to TLG.

82.     TLG's approach on www.hospitalsafetygrade.org is inconsistent with how it

depicts information about Plaintiffs on its other website, www.leapfroggroup.org.     On

leapfroggroup.org, searching for Good Samaritan Medical Center, for example, does *not* result in

any grade at all.  Instead, on *that* website, TLG states that the hospital did not provide data to TLG sufficient to rate the hospital:



83.     TLG's leapfroggroup.org rating website also accurately discloses that TLG has inadequate information to rate the hospital as to every metric:

| Preventing Patient Harm | | |
|---|---|---|
| Measure name | Leapfrog's Standard | Hospital's Progress |
| Nursing and Bedside Care for Patients | Hospitals should have nurse staffing plans in place that ensure there are enough nurses of all types (i.e., registered nurses, licensed practical nurses, or unlicensed assistive personnel) to provide direct care to patients in medical, surgical, or med-surg units each day. | DECLINED TO RESPOND |
| Nursing Care for Patients | Hospitals should have nurse staffing plans in place that ensure there are enough registered nurses (RNs) to provide direct care to patients in medical, surgical, or med-surg units each day. | DECLINED TO RESPOND |

84.     The differences in TLG's websites confirm TLG knows exactly what message it is communicating to consumers.  TLG clearly understands how to tell patients that it can't grade Plaintiffs because it lacks data.  TLG decided not to do that, though, on www.hospitalsafetygrade.org:  Even after admitting on www.leapfroggroup.org that it *can't* rate Plaintiffs, it purports to fail Plaintiffs with a big, bold "F" on www.hospitalsafetygrade.org.

**F.      TLG Assigned Plaintiffs Misleading And Deceptive Low Grades.**

85.      Plaintiffs are among the many hundreds of hospitals across the country who choose not to participate in TLG's Survey.  Given that non-participation, TLG could easily have told consumers—as it does on www.leapfroggroup.org—it lacks sufficient data to provide safety grades for Plaintiffs.  Instead, it "imputed" scores to Plaintiffs and gave them failing or near-failing grades on www.hospitalsafetygrade.org.  As a result, TLG has intentionally and recklessly released misleading and deceptive information about Plaintiffs' health safety performance.

86.      TLG assigned Plaintiffs "Limited Achievement" scores, and corresponding low Safety Grades just as it did with other non-participating hospitals.

87.      ***Delray Medical Center.***  TLG assigned Delray Medical Center an "F" grade for Fall 2024.  Under its flawed methodology, TLG assigned Delray Medical Center the lowest possible score on multiple criteria for which TLG had no information—including "Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

88.      TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Delray Medical Center performed poorly on each of these categories.  Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly reflect that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to say so:



89.    In other words, TLG is deceptively communicating to consumers that Delray Medical Center doctors and nurses don't adequately wash their hands, among other false statements—with no data whatsoever to support that conclusion.

90.     TLG's F grade for Delray Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

91.     ***Good Samaritan.***  TLG also assigned Good Samaritan an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Good Samaritan the lowest possible score on the same criteria for which TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

92.     TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Good Samaritan performed poorly on each of these categories.  Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:



93.    TLG's "F" grade for Good Samaritan is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

94.    ***Palm Beach Gardens Medical Center.***  TLG also assigned Palm Beach Gardens Medical Center an "F" grade for Fall 2024.  Under its flawed methodology, TLG assigned Palm Beach Gardens Medical Center the lowest possible score on the same criteria for which TLG had

no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

95.     TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Palm Beach Gardens Medical Center performed poorly on each of these categories.  Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:



96.     TLG's F grade for Palm Beach Gardens Medical Center is a false and misleading

statement that TLG intentionally and recklessly released—and refused to pull down.

97.     *St. Mary's.*  TLG assigned St. Mary's a "D" grade for Fall 2024.  Under its flawed

methodology, TLG assigned St. Mary's the lowest possible score on the same criteria for which

TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

98.     TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that St. Mary's performed poorly on each of these categories.  Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:



99.     TLG's "D" grade for St. Mary's is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

100.    ***West Boca Medical Center.***  TLG also assigned West Boca Medical Center a "D" grade for Fall 2024.  Under its flawed methodology, TLG assigned West Boca Medical Center the lowest possible score on the same criteria for which TLG had no information—"Handwashing,"

"Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

101.    TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that West Boca Medical Center performed poorly on each of these categories.  Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:



102.     TLG's "D" grade for West Boca Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

G.     **TLG's Deceptive And Misleading "Safety" Grades Have Severely Harmed Plaintiffs, Their Patients, And The Public.**

103.     TLG's misleading safety grades have caused severe, ongoing, and irreparable harm to Plaintiffs, their patients, and the public.  The grades have caused Plaintiffs' patients to move their procedures from Plaintiffs to Plaintiffs' competitors, damaged the goodwill that Plaintiffs worked hard to build with their patients over the years, harmed Plaintiffs' relationships with key business partners, and risked serious consumer harm.  Plaintiffs' elective patient admissions dropped following TLG's release of its Fall 2024 Hospital Safety Grades.  The harm has been significant and widespread, given TLG's efforts to encourage the media to report on the misleading and deceptive grades TLG assigned Plaintiffs.  Indeed, TLG has specifically admitted that it embargoed Plaintiffs' safety grades with the press weeks before those scores went public specifically to generate broad public attention to those false and misleading scores.  TLG's safety grades are even available on insurer websites for patients to rely on when they look up whether certain hospitals fall under insurance coverage.

104.     Each Plaintiff has suffered harm from TLG's deceptive practices.  Plaintiff Delray Medical Center's Medical Executive Committee, which is comprised of the medical leadership that oversees each department within the hospital, has received direct inquiries from patients regarding their concerns about TLG's grades and related public reports.  Physicians were approached by patients who expressed that they did not want to go to Delray Medical Center for surgeries after seeing TLG's grade and associated reports.  Plaintiff Delray Medical Center has also received reports from patients and from doctors that patients have planned to drive past Delray Medical Center to a more distant medical facility due to the grade TLG gave to Delray Medical Center.

105.     Plaintiff Good Samaritan's Medical Executive Committee has also received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. TLG's grades are even impacting Good Samaritan's hiring efforts.  Plaintiff Good Samaritan's Chief Nursing Officer reported that a nursing candidate questioned the quality of care of the hospital in her interview for a job opening.  Good Samaritan has also received reports from patients that they decided not to use its facility because of TLG's misleading grades.

106.     Plaintiff Palm Beach Gardens Medical Center has received reports from patients that they decided not to use the Medical Center due to the misleading grade TLG assigned the hospital.   This is particularly harmful to the Palm Beach Gardens community given that the majority of patients are 65 years old and older, and travel time risks exacerbating their health issues before receiving care, particularly if they are stroke victims.   The Palm Beach Gardens Medical Center's Medical Executive Committee has also received direct inquiries from patients regarding their concerns about TLG's grades and related public reports.

107.     Plaintiff St. Mary's medical leadership has received direct inquiries from patients regarding their concerns about TLG's grades and related public reports.  As a Level I adult and pediatric Trauma Center, Joint Commission Comprehensive Stroke Center, Level III NICU, and RPICC—among other certifications—St. Mary's is a facility people need to go to receive specialized medical care.  TLG's safety grades misleadingly make patients think that they should go to "A" hospitals even though those hospitals do not have the objective accreditation, certification, and facilities—like St. Mary's—needed to treat certain high-risk patients.

108.     When TLG assigns a hospital an A, patients think that facility is where they should receive care.  Objective data debunks that impression.  As just one example, another hospital in the Palm Beach County area that TLG has graded an "A" regularly transfers patients to St. Mary's

for critical, higher-level care services—despite St. Mary's purported TLG "D" safety grade.  In 2024, that A-ranked hospital transferred 600 patients to St. Mary's.  Since 2022, that A-ranked hospital transferred 1,800 patients to St. Mary's.  Why?  Because only St. Mary's had the right specialists, technology, accreditations, and certifications necessary to provide the required care.  Whether a hospital can or should treat a given patient depends on far more than TLG's superficial and misleading marks, but TLG intentionally deceives consumers into thinking otherwise.

109.    Plaintiff West Boca Medical Center's Medical Executive Committee has also received direct inquiries from patients regarding their concerns with TLG's grades and related public reports.  TLG's inaccurate grades have also harmed West Boca Medical Center's relationships with physicians and patients who have chosen alternative options as reflected through West Boca's drop in patient encounters since Fall 2024.

110.    TLG's Hospital Safety Grades have also harmed Plaintiffs' relationships with physicians.  Medical professionals have expressed concern about working with Plaintiffs due to the grades assigned by TLG, especially when patients have requested to schedule their surgeries at alternative facilities.

111.    Attempting to counteract the inaccurate, negative picture created by TLG in the community has required Plaintiffs to devote time and resources that could have otherwise been spent continuing to improve patient care.  The harm is particularly pronounced given that negative safety ratings are particularly "sticky" with consumers—*i.e.*, once a consumer sees a failing safety ranking it is exceedingly difficult to convince them the grade is wrong.

112.    The deceptive Hospital Safety Grades TLG releases about Plaintiffs—and other non-reporting hospitals—mislead consumers to make commercial decisions to purchase healthcare

services that are not in their best interest.  By putting hospitals on unequal footing in its evaluation just to make more money for itself and for its "partners," TLG achieves the opposite of its purported non-profit objective:  It risks patient harm and causes potential patients to make unsafe decisions with potentially life-or-death implications.

113.    TLG's misleading safety grades have resulted in patients delaying medical care. That's a material public safety problem.  Increased time to get to a hospital following an acute health incident materially increases the risk of mortality for emergency patients.  Increased time from incident to the hospital also materially increases the risk of worse outcomes, infection, and other dangerous and harmful health outcomes.  It is for this reason that Florida law requires ambulances to drive emergency patients to the closest hospital.  *See* Fl. Code § 395.1041(3)(e) ("Except as otherwise provided by law, **all medically necessary transfers shall be made to the geographically closest hospital** with the service capability, unless another prior arrangement is in place or the geographically closest hospital is at service capacity." (emphasis added)).

114.    TLG's methodology and public statements contradict this public health principle engrained in Florida law by deceiving patients into thinking they are better off driving longer distances to hospitals based on TLG's misleading grades.  The vast majority (~80%) of emergency patients are transported to emergency rooms by non-ambulatory vehicles.  TLG is putting emergency patients' lives at risk by undermining their trust in local hospitals and encouraging them to delay the care they need based on deceptive information TLG is releasing.  TLG's Hospital Safety Grades cause patients to make commercial decisions to drive past deceptively graded hospitals to another hospital farther away.  This is a dangerous result particularly because the low grade by TLG is false and misleading.

115.	TLG intends these results to encourage non-participating hospitals to participate in its deceptive scheme by warning patients they are "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a C, D, F hospital than at an A hospital."  (emphasis added).

116.	This has directly caused Plaintiffs loss of revenue and harm to their reputation and goodwill.

**CLAIMS FOR RELIEF**

**COUNT I**
**(FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)**

117.	Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

118.	By virtue of its solicitation of information from Florida healthcare facilities, publication of information and Hospital Safety Grades for Florida hospitals, and commission of deceptive acts and unfair practices against Plaintiffs and the residents of Florida, TLG is subject to the Florida Deceptive and Unfair Trade Practices Act.  Fla. Stat. § 501.201 et seq.

119.	TLG's actions described herein constitute unfair or deceptive trade practices substantially affecting trade or commerce in the state of Florida in violation of FDUTPA.

120.	In the course of its business, TLG releases its Hospital Safety Grades, which contain deceptive and misleading statements about hospital quality and patient safety.

121.	TLG has made misleading representations about how its scheme penalizes non-participating hospitals, including, but not limited to, its representation that non-participating hospitals are not disadvantaged compared to hospitals who participate in its deceptive scheme.

122.    TLG's entire grading system, including its imputation model, misleads Florida consumers—and national consumers—into thinking that healthcare decisions should be made by looking to an oversimplified letter grade and by penalizing non-participating hospitals.

123.    TLG abuses the trust of the consumer by intentionally jiggering its Hospital Safety Grades to benefit the hospitals that fund it (through donation and the provision of valuable data), participate in its surveys, and serve on its committees.  TLG's Hospital Safety Grades have harmed Florida consumers by causing them to make dangerous decisions to forego the nearest hospital based on misleading information.  This harm to consumers has harmed Plaintiffs through loss of goodwill, reputation, and revenue.

124.    TLG's   misrepresentations   are   knowing   and   intentional.    TLG   on www.theleapfroggroup.org accurately describes when hospitals have declined to participate in TLG's survey, making clear that TLG has insufficient data with which to assign a safety grade. At the same time, TLG purports to assign "safety grades" based on that same inadequate data on www.hospitalsafetygrade.org.

125.    TLG intends that patients, purchasers, consumers, regional and national health plans, insurers, and researchers will rely on its oversimplified grading system and representations regarding the Plaintiff Hospitals' safety and the safety of all hospitals reported on throughout Florida and the country.  TLG specifically tells patients to "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a C, D, F hospital than at an A hospital."  (emphasis added).

126.    The representations made by TLG to consumers and the methodology TLG employs to calculate the Hospital Safety Grades constitute a deceptive act or practice in trade, and both Plaintiffs and patients have been aggrieved by the deceptive act or practice.

127.    TLG's deceptive acts and practices cause harm to consumers by misleading consumers regarding the quality and safety of the hospitals it grades, including Plaintiffs.

128.    TLG's deceptive acts and practices mislead consumers, causing them to make decisions about their healthcare that are not in their best interests.  These deceptive acts and practices cause actual damages to Florida consumers, including by increasing the incident-to-hospital time for misled patients and causing patients to choose hospitals that do not provide the types of critical care the Plaintiff Hospitals provide.

129.    As a result of TLG's deceptive acts and practices, Plaintiffs suffered damages far in excess of $75,000.

130.    Pursuant to FDUTPA, Plaintiffs demand damages, injunctive relief, declaratory relief, and attorneys' fees and costs.

## COUNT II
## (DECLARATORY JUDGMENT)

131.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

132.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a court may declare the rights and other legal relations of any interested party in the case of an actual controversy within its jurisdiction.

133.    There exists a substantial justiciable controversy between the parties as to whether TLG's grading of Plaintiffs violates FDUTPA.  More specifically, Plaintiffs believe that TLG's grading of Plaintiffs constitutes a deceptive practice under FDUTPA, and TLG disagrees and refuses to abate the deceptive practice.  This Court is thus vested with the power to declare the rights and liabilities of the parties and to grant such other and further relief as may be necessary. Declaration of the parties' rights in these regards will clarify the rights and interests of the parties.

134.    Given the prior and ongoing harm caused by TLG's deceptive practice, the controversy between the parties is actual and of sufficient immediacy to warrant the issuance of a declaratory judgment.   As alleged in the preceding paragraphs, TLG's continued grading of Plaintiffs causes substantial harm to Plaintiffs, patients, and the community such that there is a bona fide, actual, present need for the declaration.

135.    Declaratory relief will resolve the legal issues between the parties regarding whether TLG's grading of Plaintiffs constitutes a deceptive practice under FDUTPA.

136.    Plaintiffs have attempted to engage with TLG as to the issues with its recently-adopted methodology, including explaining in writing that the methodology results in grades that are deceptive and harmful to patients, but TLG has nevertheless continued to assign its harmful, inaccurate grades.

137.    Therefore, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiffs request a judgment declaring that TLG's grading methodology and its application to Plaintiffs, in both the Fall 2024 grading cycle and forthcoming Spring 2025 grading cycle, is a deceptive practice under FDUTPA.

138.    Given that the Fall 2024 Hospital Safety Grades present ongoing harm to Plaintiffs and to each future potential patient who is misled by those grades, pursuant to Federal Rule of Civil Procedure 57, Plaintiffs request a speedy hearing of this claim.

## JURY TRIAL DEMAND

139.    Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)      Preliminarily enjoin TLG from purporting to safety grade Plaintiffs during the pendency of this case and requiring TLG to remove Plaintiffs from its recent Hospital Safety Grades;

b)      Permanently enjoin TLG from including Plaintiffs in its Hospital Safety Grades;

c)      Speedily declare pursuant to Federal Rule of Civil Procedure 57 that TLG's grading methodology and its application to Plaintiffs, in both the current Spring 2025 grading cycle and in recent prior cycles, violates FDUTPA;

d)      Award Plaintiffs damages in an amount to be proven but in excess of $75,000;

e)      Award Plaintiffs their attorneys' fees and costs;

f)      Grant such other and further relief as it may deem just and equitable.

Dated: April 30, 2025

Respectfully submitted,

By: /s Michael Pineiro

MARCUS NEIMAN RASHBAUM & PINEIRO LLP

Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
Brandon S. Floch, Bar # 125218
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
Telephone: 305-400-4268
Facsimile: 954-688-2492
mpineiro@mnrlawfirm.com
drashbaum@mnrlawfirm.com
bfloch@mnrlawfirm.com

GIBSON, DUNN & CRUTCHER LLP

Mary Beth Maloney (*pro hac vice* forthcoming)
Lee R. Crain (*pro hac vice* forthcoming)
200 Park Avenue
New York, NY  10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: mmaloney@gibsondunn.com
Email: lcrain@gibsondunn.com

Betty X. Yang (*pro hac vice* forthcoming)
Scott K. Hvidt (*pro hac vice* forthcoming)
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
Email: byang@gibsondunn.com
Email: shvidt@gibsondunn.com

*Attorneys for Plaintiffs*