IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**THE PLAINTIFF HOSPITALS' RESPONSE IN OPPOSITION TO THE LEAPFROG GROUP'S MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(6)**

Jeffrey E. Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
Brandon S. Floch, Bar # 125218
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
305-400-4268
jmarcus@mnrlawfirm.com
mpineiro@mnrlawfirm.com
drashbaum@mnrlawfirm.com
bfloch@mnrlawfirm.com

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
212.351.4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Betty X. Yang (*pro hac vice*)
Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
214.698.3100
byang@gibsondunn.com
shvidt@gibsondunn.com

*Attorneys for The Plaintiff Hospitals*

## TABLE OF CONTENTS

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

A. The Plaintiff Hospitals Are A Backbone Of Care ..... 2

B. TLG Publishes Grades Designed To Punish Non-Participating Hospitals ..... 3

C. TLG Deceives Consumers About Its Grading System ..... 4

D. TLG's Grades Are A Corrupt Scheme Disguised As Consumer Protection ..... 5

E. TLG's Conduct Has Harmed The Plaintiff Hospitals And Their Patients ..... 6

F. Procedural History, TLG's Motion, And The Binder Op-Ed ..... 6

ARGUMENT ..... 7

I. TLG'S LIES AND MISREPRESENTATIONS ARE NOT CONSTITUTIONALLY PROTECTED ..... 7

A. The First Amendment Does Not Protect Ratings Companies' Deceptive Practices And Misrepresentations ..... 8

B. TLG's Representations Are Provably False And Misleading ..... 9

C. The Pure Opinion Doctrine Does Not Help TLG ..... 12

II. TLG CANNOT ESCAPE THIS COURT'S JURISDICTION ..... 14

III. THE PLAINTIFF HOSPITALS STATE A CLAIM FOR RELIEF ..... 16

A. FDUTPA Applies To TLG's Deceptive And Unfair Practices ..... 16

B. Florida's Anti-SLAPP Statute Does Not Save TLG ..... 20

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

## Cases

*ADT LLC v. Alarm Prot. Tech. Fla., LLC*,
2013 WL 11276119 (S.D. Fla. Apr. 18, 2013) ....................20

*AFI-CIO v. City of Miami*,
637 F.3d 1178 (11th Cir. 2011) ....................7

*Alston v. www.calculator.com*,
476 F. Supp. 3d 1295 (S.D. Fla. 2020) ....................15

*Alvi Armani Med., Inc. v. Hennessey*,
629 F. Supp. 2d 1302 (S.D. Fla. 2008) ....................18, 19

*Argos Glob. Partner Servs., LLC v. Ciuchini*,
446 F. Supp. 3d 1073 (S.D. Fla. 2020) ....................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................7

*Aviation Charter, Inc. v. Aviation Research Group*,
416 F.3d 864 (8th Cir. 2005) ....................11

*Baronowsky v. Maiorano*,
326 So. 3d 85 (Fla. 4th DCA 2021)....................16

*Bluegreen Vacations Unlimited, Inc. v. Timeshare Laws. P.A.*,
2023 WL 3198192, *reconsideration denied*, 2023 WL 3435139 (S.D. Fla. May 12, 2023)....................18, 20

*Bongino v. Daily Beast Co.*,
LLC, 477 F. Supp. 3d 1310 (S.D. Fla. 2020)....................19, 20

*Brown v. Hartlage*,
456 U.S. 45 (1982)....................10

*Browne v. Avvo, Inc.*,
525 F. Supp. 2d 1249 (W.D. Wash. 2007)....................11

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)....................15

*Calder v. Jones*,
465 U.S. 783 (1984)....................16

*CareerFairs.com v. United Bus. Media LLC*,
838 F. Supp. 2d 1316 (S.D. Fla. 2011) ....................16, 19

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*,
169 So. 3d 164 (Fla. 4th DCA 2015)....................9, 12, 16, 17, 18

*Castle Rock Remodeling, LLC v. BBB of Greater St. Louis*,
354 S.W.3d 234 (Mo. Ct. App. 2011)........................................................................11

*Centr. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980)..........................................................................................7

*Davis v. Angelcare USA, LLC*,
727 F. Supp. 3d 99 (D. Conn. 2024)........................................................................17

*Dep't. of Educ. v. Lewis*,
416 So. 2d 455 (Fla. 1982)..................................................................................8

*Doe v. Sun Int'l Hotels, Ltd.*,
1999 WL 639816 (S.D. Fla. Feb. 9, 1999) ...............................................................15

*Dusek v. JPMorgan Chase & Co.*,
832 F.3d 1243 (11th Cir. 2016) ............................................................................7

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*,
752 So. 2d 582 (Fla. 2000)..................................................................................15

*FTC v. Student Aid Ctr., Inc.*,
281 F. Supp. 3d 1324 (S.D. Fla. 2016) ..............................................................13, 14

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)..........................................................................................12

*Godwin v. Michelini*,
371 So. 3d 973 (Fla. DCA 2d 2023) ......................................................................20

*Green Apple Juice Bar, LLC v. Bay Parc Plaza Mkt., LLC*,
2023 WL 3980245 (S.D. Fla. May 19, 2023), *R&R adopted*, 2023 WL
3971175 (S.D. Fla. June 13, 2023) ........................................................................19

*Gundel v. AV Homes, Inc.*,
264 So. 3d 304 (Fla. DCA 2d 2019) ......................................................................20

*Home Performance All., Inc. v. BBB of W. Fla., Inc.*,
354 So. 3d 1165 (2d DCA 2023) ...........................................................................9

*Institutional Deposits Corp. v. Pac. Coast Bankers' Bank*,
2010 WL 11601557 (S.D. Fla. May 12, 2010) ...........................................................8

*Lewis v. Mercedes-Benz USA, LLC*,
530 F. Supp. 3d 1183 (S.D. Fla. 2021) ....................................................................15

*Marco Island Cable v. Comcast Cablevision of S., Inc.*,
312 F. App'x 211 (11th Cir. 2009) .........................................................................20

*Marrache v. Bacardi U.S.A., Inc.*,
17 F.4th 1084 (11th Cir. 2021) .............................................................................17

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990)..............................................................................................10

*Nobles v. State*,
769 So. 2d 1063 (Fla. 1st DCA 2000) ....................16

*Novo Nordisk v. IV Harmony Clinic LLC*,
2025 WL 1124969 (M.D. Fla. Apr. 16, 2025) ....................8

*Ounjian v. Globoforce, Inc.*,
89 F.4th 852 (11th Cir. 2023) ....................19

*Pathman v. Grey Flannel Auctions, Inc.*,
741 F. Supp. 2d 1318 (S.D. Fla. 2010) ....................15

*Perfect Choice Exteriors, LLC v. BBB of Cent. Ill., Inc.*,
99 N.E.3d 541 (Ill. App. Ct. 2018) ....................11

*Rebotix Repair, LLC v. Intuitive Surgical, Inc.*,
2022 WL 3272538 (M.D. Fla. Aug. 10, 2022) ....................19

*Richard Boyd Enters., Inc. v. Aquarium Pharms., Inc.*,
2010 WL 11448226 (S.D. Fla. Feb. 5, 2010) ....................14, 15

*Riley v. Home Retention Servs., Inc.*,
2014 WL 11906642 (S.D. Fla. June 17, 2014) ....................14

*Romantic Tours, Inc. v. Anastasia Int'l, Inc.*,
2011 WL 653724 (M.D. Fla. Feb. 14, 2011) ....................18

*S. Broward Hosp. Dist. v. ELAP Servs.*,
2020 WL 7074645 (S.D. Fla. Dec. 3, 2020) ....................13, 14

*Saint Anthony Hospital v. The Leapfrog Group*,
Case No. 2017CH14420 (Ill. Cir. Ct. June 25, 2018) ....................11

*Thompson v. Procter & Gamble Co.*,
2018 WL 5113052 (S.D. Fla. Oct. 19, 2018) ....................17

*Thursday LLC v. Klhip Inc.*,
2018 WL 4216389 (M.D. Fla. Sept. 5, 2018) ....................14

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) ....................12

*Tymar Distribution LLC v. Mitchell Grp. USA, LLC*,
558 F. Supp. 3d 1275 (S.D. Fla. 2021) ....................19

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ....................10

*Vericker v. Powell*,
406 So. 3d 939 (Fla. 2025) ....................20

*Walden v. Fiore*,
571 U.S. 277 (2014) ....................16

*Weiner v. Podesto*,
2019 WL 7708494 (S.D. Fla. Aug. 2, 2019)....................15

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980)....................16

*Worldwide, LLC v. Google, Inc.*,
188 F. Supp. 3d 1265 (M.D. Fla. 2016)....................8

**Statutes**

Fla. Stat. § 48.193(1)(a)(1) ....................14

Fla. Stat. § 48.193(1)(a)(2) ....................14

Fla. Stat. § 501.202(2)....................16, 18

Fla. Stat. § 501.203(8)....................18

Fla. Stat. § 501.204(1)....................8

## INTRODUCTION

Defendant TLG holds itself out as an honest and credible organization devoted to hospital safety. In reality, it distorts the truth, misleads patients, and inflicts serious harm on hospitals and the communities they serve. Through its "Hospital Safety Grades," TLG assigns A, B, C, D, and F letter grades to hospitals nationwide and prominently displays them on its website. TLG aggressively broadcasts these so-called grades to patients, caregivers, and healthcare workers, orchestrating a sweeping media campaign to maximize exposure and revenue. The message TLG pushes is alarmist and unequivocal: Patients must "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than at an 'A' hospital." (emphasis added). But far from protecting patients, TLG's "safety grades" present a clear danger to public health across Palm Beach County. For that reason, the Plaintiff Hospitals commenced this action under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Trial is set to commence in January 2026.

TLG now moves to dismiss on three grounds. This Court should deny the motion. *First*, there is no First Amendment protection for the deceptive practices the Complaint extensively delineates. FDUTPA exists specifically to combat modern day snake oil salesmen like TLG. *Second*, this Court has personal jurisdiction. TLG's contrary arguments are unsupported in light of the numerous contacts the Complaint alleges TLG has with Florida—including an *op-ed* TLG's CEO published in a Florida newspaper about this case one business day after moving to dismiss for lack of personal jurisdiction. *Third*, the Complaint states a plausible FDUTPA claim. TLG's contrary arguments only raise fact disputes that are not cognizable at this stage of the case.

As the 139-paragraph, 54-page Complaint details, the Plaintiff Hospitals form the backbone of urgent and critical healthcare services in the Palm Beach community. They serve vulnerable populations—especially children and the elderly—with award-winning care. Like all hospitals, they are continuously working to improve and achieve the highest possible quality of care. And they welcome and participate in evaluations based on objective, accurate, and verifiable standards applied fairly across the industry. What they will not accept—and what no patient should accept—are reckless, misleading, and commercially motivated "safety grades" that endanger public trust and patient lives. That is exactly why they brought this case.

In 2020, the five Plaintiff Hospitals decided to stop participating in TLG's 300+ page survey. Until last year, TLG assigned grades to the Plaintiff Hospitals based in part on the

performance of similarly situated participating hospitals. Facing declining hospital participation, escalating expenses, and intensifying pressure to drive up revenue, in 2024, TLG abruptly rigged its grading. Under its new scheme, any hospital that declined to provide TLG with the requested data would automatically fail on measures TLG uses to issue its final safety grades and receive Ds and Fs as a result. That is exactly what happened to the Plaintiff Hospitals for the first time. TLG openly admitted that its change was designed to punish non-participating hospitals and ensure they would not "inadvertently benefit" from positive scores—regardless of the truth. TLG's message is clear: participate in TLG's survey or fail and have TLG smear your hospital as a death trap.

In the weeks that followed the commencement of this case, TLG has done nothing to reform. Instead, TLG has doubled down, and in so doing, confirmed that its motion to dismiss is without merit. While TLG's most recent discovery responses admit that it "is not itself in possession of data showing [the Plaintiff Hospitals'] performance on the 'imputed metrics'"—the same metrics on which it "failed" the Plaintiff Hospitals—TLG continues to publicly amplify false and malicious claims about the Plaintiff Hospitals. Ex. A (July 1, 2025) (Response to Request for Production). One business day after TLG moved to dismiss, TLG's President and CEO Leah Binder published an op-ed in *The Palm Beach Post*—reaching into Florida (and the jury pool for this case) with outrageous, false, and misleading assertions about the Plaintiff Hospitals and the dedicated caregivers who work hard to provide excellent care to the Palm Beach community.

In sum, the Complaint plausibly alleges a FDUTPA claim arising out of a business model that is as simple as it is sinister: prey on public fear, distort the truth, and profit from deception. And discovery on that claim is already proceeding apace—with the parties to substantially complete document discovery in just two weeks. The Court was right to set an expedited trial in this action. It should deny this motion and allow this case to proceed.

## FACTUAL BACKGROUND

### A. The Plaintiff Hospitals Are A Backbone Of Care

Plaintiffs Good Samaritan Medical Center, Inc., Delray Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center, St. Mary's Medical Center, Inc., and West Boca Medical Center, Inc. (together, the "Plaintiff Hospitals") are a group of South Florida hospitals. Plaintiff Hospitals together have 1,676 licensed beds and treated nearly

a half-million patients last year. ¶ 20.[1] Industry commentators and experts consistently rank highly the Plaintiff Hospitals' performance. ¶¶ 20–45:

- Delray has a Level I Trauma Center. It has received awards, including being the first Palm Beach County hospital named a Florida Resuscitation Center of Excellence. ¶¶ 9, 21–24.
- Good Samaritan is a nationally recognized cancer treatment facility. It has been designated a National Accreditation Program for Breast Centers by the American College of Surgeons for the past 13 years in a row, among other accolades. ¶¶ 25–29.
- Palm Beach Gardens Medical Center provides comprehensive cardiovascular care, including open heart surgeries. It has received the American Heart Association's Get with the Guidelines Gold Plus Stroke Recognition Award for 10 years straight. ¶¶ 11, 30–32.
- St. Mary's offers a Level I adult and pediatric Trauma Center and Level III NICU. It is a Certified Comprehensive Stroke Center and the Centers for Medicare and Medicaid ("CMS") have designated it a Regional Perinatal Intensive Care Center. ¶¶ 12, 33–41.
- West Boca Medical Center offers the only Level III NICU in southern Palm Beach County. It is American College of Radiology accredited for Imaging Modalities. ¶¶ 42–45.

### B. TLG Publishes Grades Designed To Punish Non-Participating Hospitals

Defendant TLG is a purported not-for-profit corporation that publishes hospital grades claiming to assess hospital safety. ¶¶ 1, 14. To that end, TLG conducts an annual "Hospital Survey" in which TLG "asks hospitals to report quality and safety data and then publicly reports that information by hospital." ¶ 46. The survey is voluntary—TLG has no regulatory or other authority to compel participation. *See* ¶ *id.* TLG then "assigns a 'Hospital Safety Grade' to nearly 3,000 general acute-care hospitals across the nation every spring and fall." *Id.* It posts these Safety Grades online at hospitalsafetygrade.org. *Id.* It also markets, references, and links to the Hospital Safety Grade website on TLG's home website, leapfroggroup.org. *Id.*

TLG assigns Hospital Safety Grades intending that the grades will guide patients' choices in deciding where to seek care. ¶ 47. TLG tells patients they "should *always* decide on where to receive care based on a hospital's current Safety Grade." *Id.* TLG even tells consumers their choice of hospital "could be a life or death decision," claiming patients are "twice as likely to die of a preventable problem at a C, D, or F hospital than at an A hospital." *Id.*

In devising its Safety Grades, TLG collects information from several sources, including TLG's Hospital Survey responses and information from other supplemental data sources. ¶ 48. TLG also uses publicly available CMS data—though the data it uses is stale and was collected for government-reimbursement purposes. *See* ¶ 58. TLG then compiles the information it receives to

[1] All references to "¶" are references to the paragraph numbers in the Complaint.

produce a single letter grade it claims reflects a hospital's "overall performance in keeping patients safe from preventable harm and medical errors." *Id.* As in grade school, "A" represents the best a hospital can attain, and "F" the worst. *Id.*

TLG claims its ultimate Safety Grade is an aggregated score based on up to 22 patient safety measures. *Id.* But because not all of these measures can be assessed using data from publicly available sources, TLG is highly reliant on voluntary participation in its Hospital Survey. ¶¶ 48, 53. When a hospital opts to complete the survey, TLG uses the hospital's answers to score 12 of the 22 measures. ¶ 48. When a hospital does not participate, TLG relies on other sources to fill in some of those 12 missing measures. ¶ 49. For five measures, TLG uses stale and inapposite CMS data. *Id.* It abandons three measures entirely. *Id.* For the last four—Computerized Physician Order Entry, Bar Code Medication Administration, ICU Physician Staffing, and Hand Hygiene Score—TLG uses its so-called "imputation model." ¶¶ 49, 51. Through that hidden scoring system, TLG makes up values for the four measures and "imputes" them into a hospital's grade. ¶ 50.

In the past, TLG's hidden scoring system assigned non-participating hospitals values for those four measures based on the average value similarly situated participating hospitals received. *Id.* Beginning in Fall 2024, however, TLG changed its model to penalize those hospitals. *Id.* TLG now "imputes" not the average score but rather a *made-up failing score* for each of the four measures. ¶¶ 50, 52. TLG admits this new scoring system was designed to prevent non-participating hospitals from "inadvertently benefit[ing]" as compared to participating hospitals. ¶ 50. The change had the intended effect. Failing to participate in TLG's survey alone severely artificially deflates a hospital's ultimate safety grade.

### C. TLG Deceives Consumers About Its Grading System

TLG has induced consumers to rely on its Hospital Safety Grades with misleading claims of completeness and accuracy. ¶¶ 76–84. Although TLG's website claims, in accordance with its own National Expert Panel's guidance, that "[h]ospitals missing more than six process measures" are "not graded," that is not so. ¶ 53. In truth, for non-participating hospitals, TLG is missing *seven* process measures, meaning based on its own Expert Panel's advice it should not grade non-participating hospitals at all. *Id.* To skirt that "expert" guidance, TLG makes up its automatic failing values on four measures—fabricating compliance with its Expert Panel's advice and punishing non-participating hospitals at the same time. ¶ 50. TLG's approach contradicts its

representation that "[t]he Hospital Safety Grade [assigned to a hospital] reflects how well a hospital does on safety, not whether they complete the [TLG] Hospital Survey." ¶ 54.

A look at hospitalsafetygrade.org illustrates this deception. There, a non-participating hospital receives a letter grade, prominently displayed on the hospital's dedicated page. ¶¶ 78–79. If the consumer clicks "View the full Score," the website will display extensive inaccurate and misleading information about the hospital. ¶¶ 80, 85–102. Take the Good Samaritan page. Because Good Samaritan did not fill out TLG's survey, TLG has no information for the following four measures: (1) Computerized Physician Order Entry, (2) Bar Code Medication Administration, (3) ICU Physician Staffing, and (4) Hand Hygiene Score. ¶ 51; ¶¶ 82–83 (TLG admitting Good Samaritan did not provide sufficient data to allow TLG to grade it). Yet the page graphically indicates that Good Samaritan ranks "Worse Than Average" on these four measures, including "Doctors order medications through a computer" and "Handwashing," ¶¶ 80, 92:







Should the consumer reach the fine print disclosure at the bottom of the page, she would learn that "[t]he hospital declined to report their performance on this measure, so ***a score*** was assigned to reflect the lack of information available." ¶¶ 80–81 (emphasis added). The consumer is left with more questions than answers: What percentage of the data was missing, which data exactly was missing, and how much did the missing data influence the hospital's overall score?

**D. TLG's Grades Are A Corrupt Scheme Disguised As Consumer Protection**

TLG's business relies on hospital participation to market and sell its grades and data. ¶¶ 69, 70, 74, 123. Survey respondents must acknowledge TLG "may use [Hospital Survey] information in a commercial manner for profit." ¶ 70, 74–75. The key to TLG's scheme is maximizing hospital participation and grading: The more hospitals TLG can claim it grades, the greater the value its grades have in the market and the greater amount TLG can extract from its revenue streams.

TLG schemes to collect revenue in multiple ways. Hospitals looking to improve their grades pay more than $25,000 annually to join TLG's Partners Advisory Committee to obtain direct access to the TLG Board of Directors at least four times a year. ¶ 71. Though the grades are on TLG's public website, hospitals hoping to advertise their grades pay TLG between $6,700 and

$29,900 annually for that privilege. ¶ 72. Hospitals are also encouraged to sponsor TLG's annual meetings and awards ceremony. ¶ 73. And TLG licenses its grades and intellectual property to hospitals and insurers.[2] But the economic value is there for TLG only if TLG's platform can represent it grades a critical mass of hospitals nationwide. As a consequence, TLG tries to compel as many hospitals to participate in its survey as it can and to grade as many hospitals as possible.

TLG's scheme has allowed it to reap substantial rewards. TLG has used the tens of millions of dollars it has collected from participating hospitals and others to line the pockets of its executives, including by paying over three million dollars to its CEO between 2019 and 2023. ¶ 74.

### E. TLG's Conduct Has Harmed The Plaintiff Hospitals And Their Patients

Four years ago, the Plaintiff Hospitals re-allocated their staff resources to achieve specialty-specific accreditations and certifications for services that directly address patient needs rather than responding to TLG's excessive 300+-page data survey. ¶ 2. In doing so, they joined hundreds of other hospitals nationwide that do not participate. ¶ 85. When TLG implemented its revised "imputation model" in Fall 2024—the one that automatically fails non-participating hospitals on four measures—the Plaintiff Hospitals all received "D" or "F" grades. ¶¶ 85–102. These poor grades, and TLG's efforts to impugn the Plaintiff Hospitals, have damaged the goodwill the Plaintiff Hospitals worked hard to build with their patients, doctors, and nurses over the years, and have harmed the Plaintiff Hospitals' relationships with key business partners. ¶¶ 103–11, 116, 123, 129. This has caused Plaintiff Hospitals to lose revenue and has harmed consumers. *Id.*

Each Plaintiff Hospital has received direct inquiries from patients regarding its TLG grade. ¶¶ 104–07, 109. Patients have reported that they now plan to drive past a Plaintiff Hospital to a more distant hospital in response to TLG's grades. ¶ 104; *see also* ¶¶ 105–06, 109 (similar). This behavior has increased the incident-to-hospital time for misled patients and patients are choosing hospitals without the types of critical care provided by Plaintiff Hospitals. ¶¶ 113, 114, 128. These practices cost patients precious time in an emergency and have devastating effects on patient wellness. For example, an "A"-graded hospital in Palm Beach County regularly transfers hundreds of patients to St. Mary's for higher-level care services—despite St. Mary's "D" Safety Grade. ¶ 108.

### F. Procedural History, TLG's Motion, And The Binder Op-Ed

On April 30, 2025, the Plaintiff Hospitals commenced this action, alleging TLG had

[2] In a press release following the filing of the Complaint, TLG admitted: "Hospitals, researchers and businesses can license Leapfrog data for a fee." *See* Ex. D (May 2, 2025 Press Release).

violated and continues to violate FDUTPA. ECF No. 1. A few weeks later, the Plaintiff Hospitals moved for a preliminary injunction and for expedited proceedings. ECF No. 20. Three days later, this Court issued an expedited trial date commencing in January 2026. ECF No. 32. Having received part of the relief they had sought, the Plaintiff Hospitals withdrew their preliminary injunction motion to avoid "dual-tracking merits and preliminary injunction-discovery and holding both an evidentiary hearing and a trial in the course of just a few months." ECF No. 34. On June 27, 2025, TLG moved to dismiss. ECF. No. 39 ("MTD").[3] The following Monday, TLG's CEO published an op-ed in *The Palm Beach Post*—affirmatively reaching out to local consumers (and jurors) to attack the Plaintiff Hospitals and their employees—accusing the doctors and nurses at Delray of inadequate handwashing and suggesting such errors contributed to hundreds of thousands of deaths at hospitals around the country. Ex. B (Binder June 30, 2025 op-ed). TLG's CEO also asserted that while TLG's Safety Grades are "opinions," "what matters most are the errors, accidents, injuries and infections behind" those purported opinions. *Id.*

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *see also AFI-CIO v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In reviewing a Rule 12(b)(6) motion, a court, "must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the initial burden of establishing jurisdiction, and all allegations in the complaint are to be taken as true. *See Argos Glob. Partner Servs., LLC v. Ciuchini*, 446 F. Supp. 3d 1073, 1084 (S.D. Fla. 2020).

## ARGUMENT

### I. TLG's Lies And Misrepresentations Are Not Constitutionally Protected

TLG's efforts to use the First Amendment to immunize its conduct fall flat. False and misleading commercial speech, like TLG's, is not protected under the First Amendment and may be prohibited by law. *See, e.g.*, *Centr. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,

[3] TLG's motion is not paginated. All page references refer to the ECF page numbers.

447 U.S. 557 (1980).[4] Here FDUTPA is such a law; it prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The Plaintiff Hospitals have alleged facts pleading a plausible claim that TLG's business conduct is deceptive and unfair *and* that TLG lies to consumers about its grading. ¶¶ 8, 55, 115, 119–128. TLG's constitutional arguments to the contrary contort fundamental First Amendment principles and misrepresent precedent.[5]

TLG relies on three arguments: (1) courts generally dismiss challenges to ratings as opinions protected by the First Amendment; (2) TLG's grades are "statements that are not readily capable of being proven false;" and (3) TLG's grades are "pure opinion." MTD 11–13. Each fails.

### A. The First Amendment Does Not Protect Ratings Companies' Deceptive Practices And Misrepresentations

TLG's efforts to defend its letter grades as opinion ignore the gravamen of the Complaint, which addresses TLG's deceptive business practices and misrepresentations regarding how it grades hospitals. The Plaintiff Hospitals allege that TLG plausibly engages in deceptive business practices, including by: "punish[ing] non-participating hospitals," "awarding participating hospitals with grade inflation," "tilt[ing] its grading in favor of hospitals that participate in TLG's quid-pro quo arrangement," and "chang[ing] its grading model" to avoid "inadvertently benefit[ing]" non-participating hospitals with positive scores. ¶¶ 3, 50, 55, 69. And the Complaint further asserts that TLG has a profit-driven motive, selling the data it obtains from participating hospitals for its own gain. ¶¶ 70, 123. TLG requires Survey participants to agree that "[t]he Leapfrog Group may use this information in a commercial manner for profit." ¶ 70.

The First Amendment does not provide a FDUTPA defense where a plaintiff alleges a

[4] TLG's motion refers to the First Amendment and the parallel provision of the Florida State Constitution. MTD 11 & n.2. Because the scope of protection is coextensive under each, *Dep't. of Educ. v. Lewis*, 416 So. 2d 455, 461 (Fla. 1982), the Plaintiff Hospitals discuss them together.

[5] TLG's motion prefers to characterize this FDUTPA action as one for defamation. *See* MTD 12. But the First Amendment defenses available for defamation do not apply to FDUTPA. *See Novo Nordisk v. IV Harmony Clinic LLC*, 2025 WL 1124969, at *4 (M.D. Fla. Apr. 16, 2025) (allegations defendant falsely or misleadingly advertises were sufficient to survive motion to dismiss FDUTPA claim); *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265, 1277 (M.D. Fla. 2016) (finding FDUTPA allegation actionable when the claim was about Google's provably false assertion that plaintiff violated Google's policies and *not* based on the page ranking assigned to plaintiff's website); *see also Institutional Deposits Corp. v. Pac. Coast Bankers' Bank*, 2010 WL 11601557, at *3 (S.D. Fla. May 12, 2010) (addressing First Amendment defenses to defamation separately from defenses to FDUTPA).

ratings company has made false representations about its practices. *See Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015) (reversing dismissal of FDUTPA claim where plaintiff alleged that the "representations made by [the defendant]" about its grading system were false). In *Caribbean Cruise*, the plaintiff received an "F" grade from the Better Business Bureau ("BBB") and subsequently brought an FDUTPA claim "alleg[ing] that the [BBB] falsely represents that it bases its grade[s]" on certain specific factors, and "does not inform the public that it partially relies on whether a business" seeks and receives accreditation from the BBB. *Id*. at 166. TLG correctly observes (at 19) that the trial court dismissed the plaintiff's claim, in part, on the ground that the defendant's grades "were protected as pure opinion under the First Amendment," adopting the view TLG urges here. *Id*. at 167. But the Florida District Court of Appeals *reversed*. *Id*. It specifically held that, because the plaintiff's "argument in support of its FDUTPA claim is based on representations made by [the defendant], not the opinions it issues," "the First Amendment did not protect [the defendant] from [the plaintiff's] FDUTPA claim." *Id*.[6]

Like the plaintiff in *Caribbean Cruise*, the Plaintiff Hospitals here challenge far more than their artificially low, false, and deceptive final grades. They allege TLG uses unreliable measures and weighs those measures inconsistently. ¶¶ 55, 63. They allege TLG lies to consumers about its grading methods by implying that the Plaintiff Hospitals fail on certain measures that, in truth, TLG has no ability to evaluate. ¶¶ 49–54. And they claim TLG deceives consumers when it tells them it won't grade hospitals if it lacks sufficient data, deceptively reports that TLG has data when it does not, and hides its punitive "imputation" model that makes up fake and failing grades—all designed to coerce hospitals into participating and providing data TLG can use for profit. ¶¶ 50–54. The First Amendment does not protect these deceptive business practices and commercial misrepresentations, all of which are actionable under FDUTPA. *See Caribbean Cruise*, 169 So. 3d at 167; *Home Performance All., Inc.*, 354 So.3d at 1167.

### B. TLG's Representations Are Provably False And Misleading

TLG's motion also ignores the Complaint's allegations of the false assertions of fact that

[6] TLG relies on *Home Performance All., Inc. v. BBB of W. Fla., Inc.,* 354 So. 3d 1165, 1167 (2d DCA 2023), but omits the case's discussion of FDUTPA. Citing *Caribbean Cruise*, *Home Performance* noted "in addition to disputing its rating, Home Performance also alleges that the BBB makes false statements about its ratings process"; consequently, the court held, the trial court erred in not allowing the plaintiff to amend the complaint to assert a FDUTPA claim. *Id.*

underly TLG's grades. The Complaint alleges TLG assigns non-participating hospitals inaccurate scores by making up and "imputing" artificially low scores whenever TLG lacks data necessary to assign an overall grade. ¶ 89. Given that steep penalty for non-participation, TLG's representation that the "Hospital Safety Grades reflect how well a hospital does on safety, not whether they complete the TLG Hospital Survey" is a misrepresentation readily proven false. ¶ 54.

TLG's deception extends to the graphics on hospitalsafetygrade.org. On the page for Good Samaritan, for example, TLG displays a "worse than average" rating for some measures on which Good Samaritan *did not report data*, like "Handwashing." ¶ 92; *see also* ¶¶ 82–83 (TLG admitting, on another website, that Good Samaritan declined to provide data needed for grading). At the same time, TLG provides *no rating* on other measures for which Good Samaritan *also* did not report data—such as "Staff work together to prevent errors":




¶ 92. And while Good Samaritan also declined to report on the other measures noted, this screen suggests Good Samaritan not only provided such data but that, as compared to other hospitals, its performance was in the red—"worse than average"—a provable falsity. TLG repeats this deceptive practice for each Plaintiff Hospital. ¶¶ 88–89, 95, 98, 101.

The overall letter grades assigned the Plaintiff Hospitals are actionable also. False statements "are not protected by the First Amendment in the same manner as truthful statements." *Brown v. Hartlage*, 456 U.S. 45, 60 (1982); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976). And "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990). Thus, the Plaintiff Hospitals may properly object not only to the provably false facts underlying TLG's "grades," but also the final grades themselves, which TLG admits rely on these falsities. ¶ 53 (TLG represents that hospitals missing more than six process measures are not graded—but then gives made-up and failing scores to non-participating hospitals). TLG's cited cases, all of which address clearly subjective opinion ratings, do not suggest

otherwise. *See Perfect Choice Exteriors, LLC v. BBB of Cent. Ill., Inc.*, 99 N.E.3d 541, 549–51 (Ill. App. Ct. 2018) (holding defamation claim inactionable where the "BBB's assignment of letter grade is a subjective assessment" reflecting immeasurable ratings like "degree of confidence" about a business's trustworthiness); *Castle Rock Remodeling, LLC v. BBB of Greater St. Louis*, 354 S.W.3d 234, 239, 242–43 (Mo. Ct. App. 2011) (defeating allegation of defamatory meaning where BBB made it clear its ratings have subjective components and "that [its] impression of the rating is opinion and that 'BBB's rating of a business reflects the BBB's opinion about the business' and BBB's judgment"); *Browne v. Avvo, Inc.*, 525 F. Supp. 2d 1249, 1252 (W.D. Wash. 2007) (emphasizing numerical rating system Avvo used was subjective); *Aviation Charter, Inc. v. Aviation Research Group*, 416 F.3d 864, 870 (8th Cir. 2005) (finding rating system "ultimately a subjective assessment" involving "independent judgments").

TLG's reliance on a factually dissimilar, seven-year-old Illinois ruling, *St. Anthony Hospital v. The Leapfrog Group*, Case No. 2017CH14420 (Ill. Cir. Ct. June 25, 2018), gets it no further. Tellingly, TLG does not attach the purported opinion to its motion, even though the case appears unavailable online or even in hard copy at the courthouse. *See* 11th Cir. R. 36-2 (requiring attachment of opinions unavailable online) (Plaintiffs' counsel sent a vendor to the Illinois courthouse to collect the opinion and then asked TLG's counsel for a copy. They ignored the request.). But based on contemporaneous reporting about the case (Ex. C, Aug. 20, 2018 Article), it is entirely inapposite. There, St. Anthony Hospital paused its data submission to TLG and sued TLG for posting a Fall 2017 Safety Grade that TLG "knew to be wrong" and moved for a preliminary injunction. First Am. Compl. ¶ 1, Case No. 2017CH14420, (April 2, 2018). TLG agreed to the preliminary injunction prohibiting TLG from publishing the grade, and St. Anthony resumed submitting data. *Id.* But TLG later refused to accept St. Anthony's new data submissions, refused to publish a Safety Grade for the hospital, and instead published that St. Anthony had "Declined to Respond" and was "withholding critical information" from the public. *Id.* The court apparently dismissed the dispute on ripeness grounds, finding "no allegation of any [TLG] Hospital Safety Grade that Saint Anthony is currently challenging." Ex. C. Here, the Plaintiff Hospitals challenge TLG's representations regarding TLG's new, Fall 2024 approach, and non-participating hospitals' "imputed" measures. ¶¶ 47–54. Unlike in *Saint Anthony*, the Complaint presents ample grounds to support a FDUTPA claim.

### C. The Pure Opinion Doctrine Does Not Help TLG

In a last ditch effort, TLG claims its statements regarding the four imputed measures were "pure opinion" and not deceptive because TLG disclosed its practices. MTD 13–16. That's false. *See supra* 1. TLG has made false representations about its *practices*, which are not protected opinion. In any event, the sufficiency of TLG's disclosures is a question of fact for trial.

"Under the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). The "pure opinion" doctrine effectuates this principle. It does not protect false statements to consumers. Here, the Plaintiff Hospitals allege TLG misrepresents its grading practices, a viable FDUTPA claim. *Compare Caribbean Cruise*, 169 So. 3d at 167 (pure opinion did not apply to FDUTPA challenge about misrepresentations of grading methods), *with* MTD 13 (citing pure opinion doctrine from cases not involving FDUTPA). And the letter grades TLG provides are not "based on facts which are set forth in the publication" containing disclosures such that a consumer would understand TLG's assigned grades and other statements about non-participating hospitals in an accurate manner. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). For example, and in addition to the confusing and internally inconsistent aspects of TLG's disclosures discussed above (at §1(C)), TLG's webpage promoting the letter grade says "***a*** score was assigned" for the imputed scores—it does not disclose a *failing* score was assigned for non-participation. (emphasis added). TLG's First Amendment "pure opinion" claims are meritless.

TLG's First Amendment claims are belied by the TLG CEO's recent op-ed. In *The Palm Beach Post* TLG's CEO stated that "[s]tars and grades are opinions about these hospitals — ***but what matters most*** are the errors, accidents, injuries and infections behind them." Ex. B (emphasis added). TLG thus admits any false facts in TLG's assertions on its hospital-specific webpages would be false facts underlying TLG's purported opinion. It is precisely these false facts the Plaintiff Hospitals challenge in the Complaint. ¶¶ 85–102. TLG cannot have it both ways: arguing in the press the facts "behind" opinions prove its grades are accurate, while arguing in court through counsel its grades are "pure opinion" protected by the First Amendment or "non-deceptive" opinion immune from FDUTPA.

Even without these op-ed admissions, the Court should still deny the motion as presenting at best a factual dispute for trial. Case law assessing FDUTPA claims is clear that "[t]he adequacy of any of the defendants' disclaimers" asserted as a defense to liability "presents a fact question that is not proper on a motion to dismiss for failure to state a claim upon which relief can be

granted." *FTC v. Student Aid Ctr., Inc.,* 281 F. Supp. 3d 1324, 1338 (S.D. Fla. 2016).[7] That legal rule rings especially relevant due to TLG's contradicting statements: disclosing on one website that a hospital did not report, while implying on another website that data sufficient to rank a hospital was provided, ¶¶ 83–84, 88, 92, 95, 98, 101; noting that a hospital "Declined to Report" only one measure, when others were also not supplied, ¶ 98; and stating that hospitals that do not report more than six measures will not be ranked, while simultaneously ranking hospitals that did not report sufficient data to meet that cutoff, ¶ 53. TLG's arguments at best invoke fact disputes, which the Court may not resolve at this stage. *See S. Broward Hosp. Dist. v. ELAP Servs*., 2020 WL 7074645, at *4 (S.D. Fla. Dec. 3, 2020) ("[W]hether a practice is 'deceptive or unfair' is determined by an objective analysis, and ordinarily is a question of fact for the jury to determine.").

TLG next targets the Plaintiff Hospitals' allegations that TLG's rating approach is shaped by its profit motive, arguing that "nothing about the methodology or [the] Plaintiffs' Hospitals allegations support that conclusion." MTD 14. But, again, the Court must take the factual allegations in the Complaint as true at this stage. The Plaintiff Hospitals allege that TLG coerces participation from hospitals—and makes up data in the process—so that TLG can maximize the number of hospitals it "grades," which in turn allows it to market its Safety Grades to insurers for lucrative licensing fees. *See* ¶ 75. The Plaintiff Hospitals also allege that TLG benefits from participation because it sells Survey responses from participating hospitals. ¶¶ 69, 70, 74. And they further allege that TLG redesigned its Survey in 2024 to prevent non-participating hospitals from "inadvertently benefit[ing]." ¶¶ 3, 50, 70–74, 123. No more is required.

TLG's remaining First Amendment arguments are no better, as all turn on fact disputes about whether TLG's conduct is deceptive. TLG argues its failure to heed its own "requirement to not grade hospitals" where data was not provided is not actionable, pointing to its website's "Notes and Definitions" footnote. MTD 15. TLG also argues its Safety Grade is "based on verifiable data." MTD 15–16. And TLG argues its inconsistent grading approaches across its two websites is not deceptive because consumers could cross reference websites to find "the basis for each Safety Grade, link to data sources including the hospital's Survey results, [which] clearly indicate where a hospital declined to respond to the Survey, and feature specific notes,

[7] The court in *Student Aid Center* distinguished a disclaimer found in a contract between two litigants (which can sometimes be considered at a motion to dismiss) and a dispute, like here, where the Plaintiff Hospitals are "attempting to protect consumer rights." 281 F. Supp. 3d at 1338.

designations, and disclaimers . . . ." MTD 16. In each instance, TLG would have the Court—and the consumer—analyze the fine print across TLG's numerous webpages and websites and determine (1) whether consumers would find TLG's conduct and statements deceptive and (2) whether the various disclaimers are capable of nullifying any deception. In fact, TLG's assertion that its Safety Grade is comprised of "verifiable data," (at 16) is an invitation for the Court to measure the truth of its statements about the imputed metrics. These are just more disputes of fact that cannot be resolved now. *See Student Aid Center*, 281 F. Supp. 3d. at 1338; *S. Broward Hosp. Dist.*, 2020 WL 7074645, at *4.

## II. TLG Cannot Escape This Court's Jurisdiction

The Complaint alleges TLG committed a tort in Florida and transacted business here. TLG is therefore subject to this Court's jurisdiction, and TLG's arguments to the contrary are weak. *Contra* MTD 16–18. TLG cannot publish op-eds in Florida newspapers advocating that Floridian consumers rely on its Safety Grades while simultaneously maintaining TLG cannot be haled into court here to be held accountable for that same false, misleading, and deceptive conduct.

***1. Waiver.*** TLG has partially and completely waived its jurisdictional objections. TLG has waived its personal jurisdiction objection entirely by participating in pre-trial discovery, including Court conferences (ECF No. 28); filing joint scheduling requests (*id*. 33); and filing a joint proposed ESI order (*id.* 38), without reserving *any* jurisdictional objection. *See, e.g.*, *Thursday LLC v. Klhip Inc.,* 2018 WL 4216389, at *4 (M.D. Fla. Sept. 5, 2018). TLG has also at least waived its right to challenge whether jurisdiction is appropriate under the long-arm statute because TLG's brief "asserts only that [the Plaintiff Hospitals] fail[ ] to allege facts supporting personal jurisdiction under the Due Process Clause." *Riley v. Home Retention Servs*., Inc., 2014 WL 11906642, at *3 (S.D. Fla. June 17, 2014); *see* MTD 16–18.

***2. Long-Arm.*** Even if the Court looks past TLG's waiver, the Florida long-arm statute is satisfied here. The Complaint alleges that TLG both "[c]ommit[ed] a tort[ ]" in Florida, Fla. Stat. § 48.193(1)(a)(2), and "[o]perat[ed], conduct[ed], engag[ed] in, or carr[ied] on a business or business venture" in the State, *id.* § 48.193(1)(a)(1), either of which is independently sufficient to confer jurisdiction under the long arm statute. *See* ¶ 16.

*First,* "[a]llegations that a Florida resident suffered injury from violations of . . . FDUTPA are sufficient to state a prima facie case for personal jurisdiction under" the long-arm statute. *Richard Boyd Enters., Inc. v. Aquarium Pharms., Inc.*, 2010 WL 11448226, at *5 (S.D. Fla. Feb. 5,

2010) (citations omitted); *see Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1236 (S.D. Fla. 2021) (citing *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000)) (alleged violation of FDUTPA is tortious act for long-arm); *Weiner v. Podesto*, 2019 WL 7708494, at *5 (S.D. Fla. Aug. 2, 2019) (same). The Plaintiff Hospitals, Florida residents, assert TLG committed a tort (a FDUTPA violation) by changing its grading model in 2024 to punish non-participating hospitals and misrepresenting its business practices. ¶¶ 50, 103. These actions caused damage and injury to the Plaintiff Hospitals in Florida, conferring jurisdiction here.

*Second,* TLG actively maintains a business presence in Florida. TLG has solicited data from hundreds of facilities in Florida, ¶ 18; operated websites aimed at Florida consumers, ¶ 46; embargoed Safety Grades with the Florida media, ¶ 18; and widely publicized Florida hospitals' Safety Grades to patients here, ¶ 17. These actions support TLG's active business presence in Florida for long-arm purposes. *See Pathman v. Grey Flannel Auctions, Inc.*, 741 F. Supp. 2d 1318, 1324 (S.D. Fla. 2010) (finding catalogues that were "presumably for . . . viewing and enticement to buy Defendants' products . . . establishe[d] a clear relationship with the State of Florida"); *Alston v. www.calculator.com*, 476 F. Supp. 3d 1295, 1313 (S.D. Fla. 2020) (operating a website for pecuniary benefit with Florida customers supports jurisdiction). TLG is subject to jurisdiction.

*3.* ***Due Process.*** Exercising personal jurisdiction over TLG for its deceptive and unfair practices also comports with due process. TLG has sufficient minimum contacts with Florida, as described above, *supra* 6–7, 15, purposefully availing itself of the privileges of doing business in Florida. The Complaint alleges, for example, that TLG solicited data from Florida hospitals and reached out to Florida media to reach Florida consumers. ¶ 17–18.

Given these clear allegations, the burden thus shifts to TLG to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Doe v. Sun Int'l Hotels, Ltd.*, 1999 WL 639816, at *6 (S.D. Fla. Feb. 9, 1999) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). TLG's burden is high, as "Florida's interest in adjudicating deceptive trade acts occurring within its borders and injuring its corporations is great." *Richard Boyd Enterprises*, 2010 WL 11448226, at *6. TLG makes no effort to satisfy it.

Instead, TLG's CEO published an op-ed days after filing TLG's motion that affirmatively reaches into Florida and encourages Floridians to rely on TLG's Safety Grades applied to Floridian hospitals. Ex. B. That is more availment. Having targeted the Plaintiff Hospitals (Florida residents) in *The Palm Beach Post* (a Florida newspaper) to influence the Plaintiff Hospitals' Floridian

patients (and, in "direct obstruction to the proper administration of justice," the potential jury pool, *Nobles v. State*, 769 So. 2d 1063, 1066 (Fla. 1st DCA 2000)), TLG must "reasonably anticipate being haled into court," here, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see Calder v. Jones*, 465 U.S. 783, 788–89 (1984) (personal jurisdiction lies where defendant wrote an article for publication in the forum and "brunt" of its damage felt in the forum); *Walden v. Fiore*, 571 U.S. 277, 287–88 (2014) (reaffirming *Calder*); *Baronowsky v. Maiorano*, 326 So. 3d 85, 91 (Fla. 4th DCA 2021) ("minimum contacts may be established where the defendant purposely targets Florida with his internet postings and the effect of this purposeful conduct causes harm in Florida"). TLG's due process argument is baseless.

## III. The Plaintiff Hospitals State A Claim For Relief

TLG does not turn to the merits of the Plaintiff Hospitals' claims until page 18 of its 22 page brief, and even then it fails to seriously confront the Complaint's allegations. The Complaint clearly states a plausible claim under the FDUTPA. *See CareerFairs.com v. United Bus. Media LLC*, 838 F. Supp. 2d 1316, 1324 (S.D. Fla. 2011) (setting out the "three elements for a FDUTPA claim for damages: 1.) a deceptive act or unfair practice; 2.) causation; and 3.) actual damages").

### A. FDUTPA Applies To TLG's Deceptive And Unfair Practices

FDUTPA applies to any "person" that "dece[ives]" or otherwise "unfair[ly]" treats Florida consumers. The Complaint's detailed allegations plainly state a plausible FDUTPA claim.

**1.** The Plaintiff Hospitals have sufficiently alleged TLG engaged in "unfair" or "deceptive" conduct in reporting the Plaintiff Hospitals' Safety Grades and the means by which it invents them. The Florida Legislature instructs reviewing courts that the terms "unfair" and "deceptive" in FDUTPA must be "construed liberally." Fla. Stat. § 501.202(2). And case law makes clear that a deceptive act includes "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Caribbean Cruise*, 169 So. 3d at 169 (emphasis and citation omitted). Further, an unfair act includes "one that offends established public policy" and "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (emphasis and citation omitted).

Here, TLG deceptively and unfairly issued Safety Grades based on made up data and then lied about what those Safety Grades mean. ¶¶ 49–54. TLG assigned the Plaintiff Hospitals failing scores on four measures not based on any data, but rather because the Plaintiff Hospitals did not respond to TLG's Survey. ¶¶ 49–51. TLG then punished the Plaintiff Hospitals with low scores

that it presented to Florida consumers, making it appear as though the Plaintiff Hospitals were failing, for example, to "order medications through a computer," even though TLG had no factual support. ¶¶ 51, 87–101. In fact, TLG has now admitted that it "is not itself in possession of data showing [the Plaintiff Hospitals'] performance on the 'imputed metrics' considered by the methodology." Ex. A; *see, e.g.*, ¶¶ 88–89. TLG then upped the ante, telling consumers, based on TLG's misrepresentations, that they are more likely to *die* if they seek treatment at the Plaintiff Hospitals, as opposed to other facilities. ¶¶ 47, 115. All the while, TLG assured patients its grades were not affected by a hospital's decision to respond to the Survey, even though that's not true. ¶ 54.

TLG cites *Caribbean Cruise* for the proposition that a letter grade can never be deceptive under FDUTPA. MTD 19.[8] But, as discussed *supra* 9, that case *reversed* the trial court's dismissal of a FDUTPA claim. It shows why TLG's motion should be denied. Here, as in *Caribbean Cruise*, the Plaintiff Hospitals "dispute[ ] . . . the *representations* that [the defendant] ma[de], and the *methods* it employ[ed]." 169 So. 3d at 167 (emphases added). The Plaintiff Hospitals here allege, for example, that "TLG's *statements* about its imputation model mislead consumers." ¶ 54 (emphasis added). That is because, the Complaint explains, "TLG relies on invented data for some hospitals but not others, and it applies a different methodology to determine Hospital Safety Grades for non-participating hospitals as compared to participating ones." *Id.* Under *Caribbean Cruise*, these allegations concerning TLG's false representations about its grading offer more than adequate basis for a FDUTPA claim. Indeed, TLG's misrepresentations are far *more* dangerous to consumers than the misrepresentations alleged in *Caribbean Cruise* because they deal with matters of life or death. This is precisely the sort of misconduct that FDUTPA aims to stamp out.

**2.** TLG's hodgepodge of attempts to evade FDUTPA are unavailing. *First*, TLG disputes the facts. It argues its representations concerning its models are *not* misleading. *See* MTD 20. That is a question for the trier of fact. As courts in this district have explained elsewhere, "whether a business practice . . . is deceptive [under FDUTPA], is a question of fact not appropriately resolved on a motion to dismiss." *Thompson v. Procter & Gamble Co.*, 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018); *Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 153 (D. Conn.

[8] TLG also cites *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084 (11th Cir. 2021), MTD 20, but *Marrache* did not involve grades or ratings, and the court there declined to address whether defendants committed an unfair or deceptive act. *Marrache*, 17 F.4th at 1098.

2024) (denying motion to dismiss FDUTPA claim and explaining "the question of whether an act is unfair or deceptive is not proper to resolve on a motion to dismiss").

*Second*, TLG argues FDUTPA applies "only to actions that occur within Florida." MTD 18. But TLG admits it committed acts in Florida—*i.e.*, it solicited data from hundreds of Florida hospitals. MTD 18. And "there is no question that the [FDUTPA] applies" when "conduct occurring outside of Florida is directed at, and impacts, Florida consumers." *Bluegreen Vacations Unlimited, Inc. v. Timeshare Laws. P.A.*, 2023 WL 3198192, at *18, *reconsideration denied*, 2023 WL 3435139 (S.D. Fla. May 12, 2023). Here, TLG concedes conduct directed at and impacting Florida consumers, including TLG's "receipt of Survey responses from Florida hospitals, online publication of Safety Grades, and communications with Florida media publications." MTD 18. These allegations support a FDUTPA claim. *See, e.g.*, *Romantic Tours, Inc. v. Anastasia Int'l, Inc.*, 2011 WL 653724, at *3 (M.D. Fla. Feb. 14, 2011) ("Although the alleged conduct occurred outside Florida, each party operates a commercial web site that provides [services] to men in Florida . . . ."); *Bluegreen*, 2023 WL 3198192, at *18 (denying summary judgment because "the Marketing Defendants advertise their services to timeshare owners nationwide, including Florida").

*Third*, TLG argues its alleged misconduct did not occur within trade or commerce and therefore cannot be actionable under FDUTPA. MTD 18. That, too, is incorrect. For purposes of FDUTPA, "'[t]rade or commerce' means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, *or otherwise*, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or *thing of value*," and it includes "any nonprofit or not-for-profit person or activity." Fla. Stat. § 501.203(8) (emphases added). As this "language clearly indicates, the definition of 'trade or commerce' is quite broad," and "FDUTPA requires that its provisions 'be construed liberally.'" *Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1305 (S.D. Fla. 2008) (quoting Fla. Stat. § 501.202(2)).

The Plaintiff Hospitals amply allege the requisite relationship to trade or commerce here. TLG "provid[es]" a "service" through the publication of its Safety Grades. Fla. Stat. § 501.203(8); *see Alvi Armani Med.*, 629 F. Supp. 2d at 1306 ("provid[ing] information to the consumer public" about the medical industry is "providing . . . [a] . . . service" and is thus "trade or commerce" under FDUTPA (cleaned up)); *Caribbean Cruise*, 169 So. 3d at 169 (reversing dismissal of FDUTPA claim alleging defendant on whose grades consumers relied misrepresented grading practices). And the Plaintiff Hospitals allege that TLG's Safety Grades are part of a money-making operation.

TLG sells the Safety Grades—whether real or, as in the Plaintiff Hospitals' case, fabricated—to insurers for lucrative licensing fees. *See* ¶ 75. TLG also solicits data in exchange for higher Safety Grades, which TLG then monetizes—to use its words—"in a *commercial* manner for profit." ¶ 70 (quoting TLG's survey) (emphasis added); *see also* ¶¶ 69, 74, 123. This system ensures that TLG can continue to pay exorbitant salaries to its owner and executives. ¶¶ 69, 70, 74–75, 123.[9]

That the "Safety Grades and the Survey are both free to the public" is immaterial. *Contra* MTD 19. Gmail, for example, is free to the public, but it plainly is part of a commercial service. *Cf. Alvi Armani Med.*, 629 F. Supp. 2d at 1306 (website freely accessible to the public was nonetheless engaged in trade or commerce). TLG misapplies *Bongino v. Daily Beast Co.*, LLC, 477 F. Supp. 3d 1310 (S.D. Fla. 2020), in this context as well, as the facts of the two cases are distinguishable. MTD 18–19. There, the court held that the mere publication of a news article, without more, did not take place in trade or commerce for purposes of FDUTPA. *Id.* at 1321. Here, the Plaintiff Hospitals allege numerous ways in which TLG generates revenue from its survey and grades, including by exchanging high Safety Grades for Survey data that it then uses "in a commercial manner for profit." ¶ 70; *see also* ¶¶ 69, 71–75, 123.

*Finally*, TLG complains that the Plaintiff Hospitals failed to allege "actual damages" because lost sales and harm to reputation do not count. MTD 20. But Plaintiff Hospitals' claim for injunctive relief does not require a showing of particular damages. *See CareerFairs.com*, 838 F. Supp. 2d at 1324. And TLG's understanding of FDUTPA is outdated.[10] The consensus among Florida federal courts finds "a much larger universe of damages available in FDUTPA claims arising outside the consumer transaction context." *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1286 (S.D. Fla. 2021); *see Green Apple Juice Bar, LLC v. Bay Parc Plaza Mkt., LLC*, 2023 WL 3980245, at *5 (S.D. Fla. May 19, 2023) (finding plaintiff "entitled to default judgment on its FDUTPA claim for actual damages" where it "adequately alleged a detrimental impact" on its "business and reputation"), *R&R adopted*, 2023 WL 3971175 (S.D. Fla. June 13, 2023); *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, 2022 WL 3272538, at *17 (M.D. Fla. Aug. 10, 2022) ("businesses may recover past lost profits under FDUTPA," collecting cases).

[9] TLG's cases are inapposite because they involve generalized allegations that do not involve wrongdoing affecting Florida. *See* MTD 18 (citing cases).

[10] *See* MTD 20–21 (citing outdated case law). *Ounjian v. Globoforce, Inc.*, 89 F.4th 852 (11th Cir. 2023) is similarly inapposite. The court held only that "damages for loss of employment" are not recoverable under FDUTPA. *Id.* at 862.

Accordingly, a business injured by a FDUTPA violation may seek "actual lost profits suffered by reason of the unfair trade practices," *ADT LLC v. Alarm Prot. Tech. Fla., LLC*, 2013 WL 11276119, at *5 (S.D. Fla. Apr. 18, 2013) (cleaned up), as well as damages for the business's "diminish[ment] in value," *Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 214 (11th Cir. 2009). Those are precisely the damages the Plaintiff Hospitals allege here: TLG's deception damaged Plaintiff Hospitals' reputation and steered patients to other hospitals. ¶¶ 123, 128–29.

Regardless, the Plaintiff Hospitals also allege consumer harm. *Contra* MTD 20–21. "With respect to whether consumers were injured as a result of [TLG's] deceptive acts, [the Plaintiff Hospitals] can satisfy causation by prov[ing] that an objectively reasonable person would have been deceived by the deception or unfair act." *Bluegreen,* 2023 WL 3198192, at *18 (third alteration in original) (internal quotation marks and citation omitted). The Plaintiff Hospitals have alleged the highly deceptive nature of TLG's practices at length. *See* ¶¶ 53–54, 76–84. And the Complaint further alleges that consumer have, in fact, been deceived and harmed by TLG's practices. *See, e.g.*, ¶ 113 (alleging "patients delaying medical care"); ¶ 128 (similar).

### B. Florida's Anti-SLAPP Statute Does Not Save TLG

Florida's Anti-SLAPP law does not apply here. When a party moves to dismiss under the Anti-SLAPP statute, the statute "[p]lac[es] the initial burden on the SLAPP defendant to set forth a prima facie case that the Anti-SLAPP statute applies and then shifts the burden to the claimant to demonstrate that the claims are not 'primarily' based on First Amendment rights in connection with a public issue and not 'without merit.'" *Gundel v. AV Homes, Inc.*, 264 So. 3d 304, 314 (Fla. DCA 2d 2019), *disapproved on other grounds by Vericker v. Powell*, 406 So. 3d 939 (Fla. 2025). This is in direct conflict with federal pleading rules and is therefore inapplicable in federal court. *Godwin v. Michelini*, 371 So. 3d 973, 975 (Fla. DCA 2d 2023).[11]

The Plaintiff Hospitals have demonstrated that their case has merit, for all the reasons discussed above and admitted in TLG's op-ed. TLG reported failing grades to hospitals declining to answer its survey—TLG then sells those grades to line its coffers. There is no free speech right to deceive the public for profit. The Anti-SLAPP statute therefore does not even apply on its merits.

## CONCLUSION

The Court should deny TLG's motion to dismiss.

[11] TLG's contrary arguments rely on *Bongino*, MTD 21, which the Florida Supreme Court recently disagreed with, *Vericker*, 406 So. 3d at 944.

Dated: July 11, 2025

Respectfully submitted,

By: */s Jeffrey E. Marcus*

MARCUS NEIMAN RASHBAUM & PINEIRO LLP

Jeffrey E. Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
Brandon S. Floch, Bar # 125218
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
Telephone: 305-400-4268
Facsimile: 954-688-2492
mpineiro@mnrlawfirm.com
drashbaum@mnrlawfirm.com
bfloch@mnrlawfirm.com

GIBSON, DUNN & CRUTCHER LLP

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: mmaloney@gibsondunn.com
Email: lcrain@gibsondunn.com

Betty X. Yang (*pro hac vice*)
Scott K. Hvidt (*pro hac vice*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
Email: byang@gibsondunn.com
Email: shvidt@gibsondunn.com

*Attorneys for the Plaintiff Hospitals*