**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:25-CV-80526-DMM**

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITALS, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC., )

*Plaintiffs*, )

v. )

THE LEAPFROG GROUP, )

*Defendant.* )

**<u>THE LEAPFROG GROUP'S MOTION FOR SUMMARY JUDGMENT</u>**

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

Jura C. Zibas (Bar #124571)
jura.zibas@wilsonelser.com
2063 Main Street, Suite 100
Sarasota, Florida 34237
(941) 866-8561 (Main)
(212) 915-5756 (Direct)

Kimberly E. Blair (*pro hac vice*)
Illinois Bar No.: 6272934
Courtney L. Wood (*pro hac vice*)
Illinois Bar No.: 6344385
161 N. Clark St., Suite 4500
Direct: (312) 821-6139
Main: (312) 704-0550
Mobile: (312) 259-6414
Kimberly.blair@wilsonelser.com

*Attorneys for The Leapfrog Group*

# TABLE OF CONTENTS


I. **INTRODUCTION** ........ 1

II. **FACTUAL BACKGROUND** ........ 2

A. Brief History of Leapfrog & Its Mission ........ 2

1. The Hospital Safety Grade & Methodology ........ 2

2. Leapfrog's Transparency ........ 4

B. The Plaintiff Hospitals' Grades and Relevant Allegations ........ 5

1. The Plaintiff Hospitals Track Their Safety Grades ........ 5

2. The Plaintiff Hospitals' Safety Grades & Underlying CMS Data ........ 5

3. There is No Evidence of Consumer Harm ........ 5

III. **ARGUMENT** ........ 6

A. Summary Judgment Standard. ........ 6

B. The Tenet Hospitals' Claim Fails as a Matter of Law. ........ 6

1. There is No Evidence of Any Consumer Injury, Harm, or Detriment. ........ 6

a. *Novo Nordisk v. Brooksville* is Particularly Instructive. ........ 8

2. Leapfrog's Purported Conduct was *Not* Deceptive. ........ 10

3. Leapfrog Does Not Engage in "Unfair" Practices. ........ 13

4. The Tenet Hospitals Cannot Prove That They Were "Aggrieved" ........ 16

C. The Plaintiff Hospitals Lack Article III Standing. ........ 17

D. Summary Judgment on the Anti-SLAPP Defense is Warranted. ........ 18

## **Table of Authorities**

**Cases**

*Alhassid v. Nationstar Mortg.* LLC, 771 Fed. Appx. 965 (11th Cir. 2019)................................. 15
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................................ 6, 7
*Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310 (S.D. Fla. Aug. 6, 2020)..................... 19
*Caribbean Cruise Line, Ind. v. Better Bus. Bureau of Palm Beach County, Inc.*, 169 So. 3d 164 (Fla. 4th DCA 2015)........................................................................................................ 7, 10
*CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298 (11th Cir. 2022)...................... 7
*Cmty. Health Ctrs., Inc. v. DiamondDog Servs., Inc.*,2024 WL 3278579 (M.D. Fla. July 2, 2024) ........................................................................................................................................ 14
*Cravens v. Garda CL Se., Inc.*, 2024 WL 5058304....................................................................... 17
*Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109 (S.D.N.Y. 2019)................................. 12
*Donoff v. Delta Air Lines, Inc.*, 2020 WL 1226975 (S.D. Fla. Mar. 6, 2020)............................. 16
*Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176 (M.D. Fla. Jan. 25, 2022)................................. 17
*Flynn v. Wilson*, 398 So. 3d 1103 (Fla. 2d DCA 2024)............................................................... 19
*Freeman v. Time Inc.*, 68 F. 3d 285, 289-90 (9th Cir. 1995)........................................................ 11
*Garside v. Osco Drug, Inc.*, 895 F. 2d 46 (1st Cir. 1990)............................................................. 8
*Harrod v. Express Scripts, Inc.*, 2019 WL 8273650 (M.D. Fla. Aug. 16, 2019)............................ 8
*Macias v. HBC of Fla., Inc.*, 694 So. 2d 88 (Fla. 3d DCA 1997)................................................. 17
*Macuba v. DeBoer*, 193 F.3d 1316 (11th Cir. 1999)..................................................................... 8
*Medmoun v. Home Depot U.S.A., Inc.*, (M.D. Fla. May 7, 2022................................................ 16
*Moore v. Trader Joe's Co.*, 4 F. 4th 874 (9th Cir. 2021)......................................................... 11, 12
*Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*, 785 F. Supp. 3d 1123 (M.D. Fla. May 12, 2025) ........................................................................................................................... 6, 9, 10, 18
*Piescik v. CVS Pharm., Inc.*, 576 F. Supp. 3d 1125, 1132 (S.D. Fla. 2021).................... 10, 11, 12
*PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773 (Fla. 2003)................................................... 13
*Qunjian v. Globoforce, Inc.*, 89 F. 4th 852 (11th Cir. 2023)................................................... 7, 11
*Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001............................................................................. 18
*SMS Audio, LLC v. Belson*, 2017 WL 11631378 (S.D. Fla. April 24, 2017)............................... 14
*Snyder v. Phelps*, 562 U.S. 443 (2011)......................................................................................... 20
*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)................................................................................ 18
*State Farm Mut. Auto Ins. Co. v. At Home Auto Glass LLC*, 2024 WL 4349246 *12-13 (M.D. Fla. Sep. 30, 2024)................................................................................................................ 6, 7, 8
*Stewart Agency, Inc. v. Arrigo Enters.*, 266 So. 3d 207 (Fla. Dist. Ct. App. 2019)........... 7, 16, 17
*Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2017 WL 2834783 (M.D. Fla. June 30, 2017) ........................................................................................................................................ 17
*Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275 (S.D. Fla. 2021).. 6, 8

**Statutes**

Fla. Stat. § 768.295(2)(a)............................................................................................................. 20
Fla. Stat. §758.295(3).................................................................................................................... 19

## I. INTRODUCTION

The five (5) Plaintiff hospitals, owned by multiple billion-dollar corporation Tenet Healthcare, brought this case under the guise of protecting the public. But, the record reveals the Plaintiffs' true purpose: Preventing the public from exposure to fair, honest speech with which the plaintiffs disagree. The Leapfrog Group is a non-profit that meticulously – and transparently – provides the consuming public with its data-driven assessment of the safety of hospitals across the Country. That assessment is well respected and used not only by consumers, but also by hospitals – including the Plaintiff Hospitals – to benchmark their performance against peers and set goals for improvement.

Displeased with the grades assigned to them through Leapfrog's Safety Grade methodology (which is disclosed in its entirety online, and provided directly to the Plaintiffs months before the grades become public), the Plaintiff Hospitals have chosen meritless litigation intended to silence Leapfrog rather than addressing their poor patient safety. Specfically, the Plaintiff Hospitals seek to "[p]ermanently enjoin TLG from including Plaintiffs in its Hospital Safety Grades." (ECF Doc. No. 74, p. 41). In other words, the Plaintiffs Hospitals argue that the communities they serve should never see Leapfrog's assessment of their safety.

Beneath the Plaintiffs' obfuscations and lip service is the reality that the Plaintiffs are plainly unconcerned about the public and instead seek only to protect *themselves*. Here, too, lies a fatal problem with the Plaintiffs' case: the Plaintiffs have not – and cannot – present this Court with a shred of evidence that Florida *consumers* have been harmed by Leapfrog's purported conduct. If the Plaintiffs were truly advancing this case to protect the consuming public consistent with FDUTPA's legislative intent, then it would stand to reason that *consumers* would be at the forefront of the Plaintiffs' case. But, they are not. Instead, the Plaintiffs try to sidestep this fatal flaw in their FDUTPA case through table-pounding, legal acrobatics, and speculation that consumers are "likely" to be deceived by Leapfrog's Safety Grades. However, tactics are not evidence, and only evidence can defeat summary judgment.

Indeed, summary judgment for Leapfrog is warranted here. First, Plaintiffs cannot identify a single instance of actual consumer injury, as FDUTPA requires; conjecture and hearsay cannot defeat summary judgment. Second, Leapfrog's methodology and disclosures are transparent, publicly available, and prominently explained, foreclosing any claim of deception under an objective reasonable-consumer standard. Third, Plaintiffs cannot prove an "unfair" practice

because there is no consumer injury, let alone one that outweighs the substantial public benefits of Leapfrog's ratings. Fourth, Plaintiffs are not "aggrieved;" their alleged harms are speculative, contradicted by their own admissions, and untethered to any actionable conduct. Fifth, Plaintiffs lack Article III standing, having failed to show a concrete, particularized injury fairly traceable to Leapfrog and redressable by the requested relief. Finally, because this retaliatory suit targets speech on a matter of public concern, summary judgment is likewise warranted on Leapfrog's Anti-SLAPP defense. This Motion should be granted.

## II. FACTUAL BACKGROUND

### A. BRIEF HISTORY OF LEAPFROG & ITS MISSION

In 1998, a group of employers came together to address a critical, complex public safety issue – medical errors, accidents, injuries, and infections causing preventable harm and death to thousands of patients every year. (SOF ¶1). A report by the Institute of Medicine (now the National Academy of Medicine) estimated that nearly 100,000 people died annually from these problems. (SOF ¶2). Leapfrog was founded to address this by advocating for more transparency to allow consumers to compare hospitals' safety records before choosing where to treat. (*Id.*). By fostering a transparent market, employers aimed to see "giant leaps forward in patient safety." (SOF ¶3).

One of Leapfrog's first steps in its mission was the launch of its Hospital Survey in 2001. (SOF ¶5). The Hospital Survey is a free, voluntary benchmarking tool developed by Leapfrog in consultation with leading researchers and clinicians, and more than 2,400 hospitals participate regardless of their eligibility for a Hospital Safety Grade. (SOF ¶6). Indeed, hospitals and other medical service providers nationwide use the Hospital Survey to assist and guide their patient-safety operations. (SOF ¶14). In 2012, a separate and distinct program was launched – the Leapfrog's Hospital Safety Grade, an A, B, C, D, or F grade assigned to every general hospital in the United States regardless of whether they voluntarily participated in the Leapfrog Hospital Survey. (SOF ¶15). The Plaintiff Hospitals in this case take issue with Leapfrog's Hospital Safety Grades. (ECF Doc. No. 74).

#### 1. The Hospital Safety Grade & Methodology

Leapfrog's Hospital Safety Grade ("Hospital Safety Grade") provides consumers with patient safety information in a consumable format specifically designed to be used by patients and potential patients. (SOF, ¶16-17). Despite receiving grades twice annually for years, it was not until Leapfrog changed its Hospital Safety Grade methodology (the "Methodology") in 2024 that

the Plaintiff Hospitals took issue with the Methodology and the Safety Grades. (SOF ¶18-19). It is notable that the Fall 2024 methodology change is not the first. (SOF ¶21). Rather, Leapfrog reviews its methodology annually based on new developments in clinical science, measurement science, and publicly available data; announces changes well in advance; and solicits public comment before putting them in place. (SOF ¶22).

In Fall 2024, Leapfrog made a change to its Safety Grade Methodology, in consultation with its renowned Safety Grade Expert Panelists. (SOF ¶20). Before the Fall 2024 Methodology change, Leapfrog utilized a 2-step imputation model for four (4) of the 22 measures used to calculate the Safety Grade – Computerized Physician Order Entry (CPOE), Bar Code Medication Administration (BCMA), ICU Physician Staffing (IPS) and Hand Hygiene (HH) – for hospitals that did not complete the Survey. (SOF ¶23). The pre-fall 2024 imputation method used historical data for the hospital if the hospital had participated in a Survey within the last 4 rounds (Step 1) and if no historical data was available for that hospital, the hospital would be assigned the mean score for those measures achieved by similar, "cohort" hospitals (Step 2). (SOF ¶23, 27). Over time, the pre-fall 2024 imputation model became biased in that it conferred a benefit on non-participating hospitals by raising the "cohort mean" scores as participating hospitals improved. (SOF ¶28). Thus, Leapfrog met with its Hospital Safety Grade expert panel to discuss proposed changes to the imputation model, and with the panel's guidance the 2024 Methodology change was published and circulated for public comment and input (including to the Plaintiff Hospitals), and implemented. (SOF ¶20, 29).

The fall 2024 Methodology change addressed the unintended consequences of prior Step 2 "cohort" method by proscribing that if a hospital "does not have historical data from the last two rounds…of the safety grade, the hospital is assigned a point value that is equivalent to receiving 'Limited Achievement' for this measure on the Leapfrog Hospital Survey." (SOF ¶29). "Limited Achievement" scores vary by measure, but they are the lowest scores available for each measure. (*Id.*). Imputation is a well-settled and reliable methodology in such circumstances (*i.e.*, where a hospital does not provide the data itself *via* the Hospital Survey) and is consistently applied. (SOF ¶31).

Besides the foregoing adjustment to the imputation model, the scoring Methodology remained the same. (SOF ¶32). The Methodology continued to include the same performance categories ("Achieved the Standard," "Considerable Achievement," "Some Achievement," and

"Limited Achievement") and the associated measure scores for those performance categories[1] (*e.g.*, measure score of 15 for "Limited Achievement"), which were determine by the Safety Grade Expert Panel relying on peer-reviewed literature and subject matter expertise. (SOF ¶33, 34).

Months in advance of the implementation of the fall 2024 Methodology change, the Plaintiff Hospitals were aware and informed of the proposed Methodology change and the impact, if any, the proposed Methodology change could have on their grades. (SOF ¶22, 46, 35). Plaintiffs knew of their forthcoming Safety Grades prior to Nov. 15, 2024 release, understood impact of Survey participation, and requested authority to participate from Tenet's Home Office. (*Id.*).

2. Leapfrog's Transparency

Contrary to the Plaintiff Hospitals' allegations, Leapfrog's thoroughly discloses its Methodology and other material information, for free, on its websites. (SOF ¶8, 10, 12, 13, 14, 22, 25-26, 36-46). Leapfrog maintains its website (www.leapfroggroup.org), and a site specifically for the Safety Grades (hospitalsafetygrade.org). (SOF ¶42). Leapfrog prominently disclosed its proposed fall 2024 changes months in advance, and invited comment. (SOF ¶45-46). The Hospital Safety Grade website allows users to search for specific hospital, and detailed explanations of the Safety Grades is contained on the landing page for each hospital. (SOF ¶36). The approach for handling Safety Grades for Hospitals that do not participate in the Hospital Survey is prominently explained. (SOF ¶38-40). In fact, the *entire* 29-page methodology is accessible on the same page as the Safety Grade, and contains the Dealing With Missing Data" section how non-reporting hospitals Grades are determined, including, *inter alia*, an explanation of the Four Imputed Measures, imputation, and scoring methodology. (SOF ¶40). Leapfrog further explains this, among other things, on its "About the Grade" page and in all materials shared with hospitals. (SOF ¶43).

Leapfrog's FAQ page also explains how Leapfrog handles Safety Grades for non-participating hospitals. (SOF ¶45). The Safety Grade pages include a link to a "Detailed table view" providing a measure-by-measure breakdown of a given hospital's data underlying the Safety Grade, and also includes red, bolded statements: "**Declined to Report: The hospital was asked to provide this information to the public, but did not**," and "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**," followed by a legal disclaimer. (SOF ¶38).

[1] The measures scores associated with each performance category (both of which were unchanged) re determined by an expert panel in consideration of peer-reviewed literation and subject matter expertise. (SOF ¶34).

### B. THE PLAINTIFF HOSPITALS' GRADES AND RELEVANT ALLEGATIONS

1. The Plaintiff Hospitals Track Their Safety Grades

The Plaintiff Hospitals complain that the Hospital Safety Grade is deceptive, and that the methodology is unfair (*see generally,* ECF Doc. No. 74). Yet, the Plaintiff Hospitals understand Leapfrog's scoring methodology, and the Methodology is available online for all to view. (SOF ¶35). The Plaintiff Hospitals track their own Hospital Safety Grades and in discussed what grades they could earn if they responded to the Hospital Survey. (*Id.*). Indeed, as discussed, Leapfrog goes to extraordinary lengths to publish for the public and hospitals the detail about calculating its Grades. Despite this extraordinary transparency, the Plaintiff Hospitals claim "deception."

2. The Plaintiff Hospitals' Safety Grades & Underlying CMS Data

For years, the Plaintiff Hospitals have received Safety Grades. (SOF, ¶35, 49). West Boca's Safety Grade did not change after the revised Methodology was implemented for the fall 2024 Safety Grades (it remained a "D"). (SOF ¶18, 49). For the others, from spring 2024 to fall 2024: Palm Beach went from a C to an F; Delray went from a D to an F; Good Samaritan went from a C to an F and St. Mary's went from a C to a D. (*Id.*).

Prior years' Safety Grades reflect that the Plaintiff Hospitals' Grades were declining even before 2024; however, they only complain about post-fall-2024 Safety Grades, ostensibly using the methodology change as pretext to sue. (SOF ¶18; citing Ex. 27 (Historical Safety Grades)).

Leapfrog's assessment of the Plaintiff Hospitals' performance is consistent with other reputable ratings publicly available. In the CMS five-star rating program assessing quality and safety, each of the Plaintiff Hospitals receive one- or two-stars. (SOF ¶50-52). Only West Boca receives a two-star overall rating from CMS; the rest receive one-star. (*Id.*) The Mayo Clinic recently began comparatively rating hospitals across the nation. (SOF ¶53). According to the Mayo Clinic, the Plaintiff Hospitals' "overall hospital score[s]" as compared to all hospitals are as follows: (i) Palm Beach - bottom 1%; (ii) Delray - bottom 6%; (iii) Good Samaritan - bottom 6%; (iv) St. Mary's - bottom 15%; and (v) West Boca - bottom 29%. (*Id.*).

Despite lower ratings from other services and despite no other reputable ratings program being as transparent as Leapfrog in revealing the performance of hospitals on each of the measures used in their assessment and in the precise methodology, the Plaintiffs Hospitals complain of deception and unfairness as it relates only to Leapfrog.

3. There is No Evidence of Consumer Harm

The Amended Complaint alleges, in conclusory fashion, that Leapfrog's purported conduct harmed consumers. (ECF Doc. No. 74, ¶¶15, 75, 84, 95, 99-100). In the Plaintiff Hospitals' Statement of Facts ("PSOF," at ECF No.: 87, Nos.: 56-61), the Plaintiff Hospitals purport to identify evidence of consumer harm. (*See,* Resp. to PSOF, #56-61); (*see also*, SOF ¶54-82).

"Consumer harm" for purposes of a FDUTPA claim "parallels consumer harm under the Sherman Act, which requires 'specific damage done to consumers in the market.'" *State Farm Mut. Auto Ins. Co. v. At Home Auto Glass LLC*, 2024 WL 4349246 *12-13 (M.D. Fla. Sep. 30, 2024); citing, *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1289 (S.D. Fla. 2021). The purported evidence of consumer harm on which Plaintiff Hospitals rely is plainly not evidence of consumer harm, and the PSOF uses misleading citations to depositions and documents containing wholly irrelevant testimony and statements that are inadmissible hearsay. The testimony often even reflects the *opposite* of consumer harm. (*See, e.g.*, Haverciak and McCauley testimony, *infra*, about patients purportedly being "pleasantly surprised" with care quality at SOF ¶61, 79).

## III. ARGUMENT

### A. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*, 785 F. Supp. 3d 1123, 1132 (M.D. Fla. May 12, 2025); quoting, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable factfinder to find for the non-moving party. *Id.*

### B. THE TENET HOSPITALS' CLAIM FAILS AS A MATTER OF LAW.

#### 1. There is No Evidence of Any Consumer Injury, Harm, or Detriment.

"While a Plaintiff need not be a 'consumer" under FDUTPA to file suit ***, 'Florida case law requires a plaintiff to **prove harm to a consumer or consumers**.'" *Id.*; citing, *State Farm Mut. Auto Ins. Co.*, 2024 WL 4349246, *4 (M.D. Fla. Sep. 30, 2024) (emphasis added); *see also*, *Qunjian v. Globoforce, Inc.*, 89 F. 4th 852, 860 (11th Cir. 2023) (finding that plaintiff brining a FDUTPA claim must "prove there was an injury or detriment to consumers"); quoting, *Caribbean Cruise Line, Ind. v. Better Bus. Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 169 (Fla. 4th

DCA 2015); *CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, *3 (11th Cir. 2022) ("[I]n order to satisfy the first element for a claim for both damages and injunctive relief under FDUTPA…the plaintiff must allege that the relevant act or practice was **harmful to a consumer**"); *see also, Stewart Agency, Inc. v. Arrigo Enters.*, 266 So. 3d 207, 214 (Fla. Dist. Ct. App. 2019) (FDUTPA claim for injunctive relief requires showing of injury to both claimant and Florida consumers) (emphasis added).

The Plaintiff Hospitals' conclusory assertions that Leapfrog's purported conduct has "harmed consumers in Florida" is insincere and without factual support. (*See, e.g.*, ECF No. 74, ¶95) ("[Leapfrog's] Hospital Safety Grades have harmed Florida consumers by causing them to make dangerous decisions to forego the nearest hospital based on misleading information"). The Plaintiffs have not identified a single consumer, let alone a specific instance where Leapfrog's purported conduct harmed a consumer (*i.e.*, a patient or prospective patient). (SOF ¶57, 61, 69, 71, 73-74, 79-82). This is representative of the Plaintiffs' true motivation here: They are not concerned with harm to Florida consumers, they are concerned with bad press and are using this lawsuit as a pretext to silence Leapfrog and stifle the service that Leapfrog provides to consumers. Summary judgment on this issue proper.

The Plaintiff Hospitals have identified only a smattering of hearsay statements and documents wherein their CEOs (and Rule 30(b)(6) representatives, *see*, SOF ¶80-81, citing NOD Riders at 1, 13-14) state that patients reported complaints to doctors, or expressed to doctors and to others that they were disinclined to use the Plaintiff Hospitals as a result of the Safety Grades. (*See, supra*; citing, ECF No. 87, ¶¶57-62). The Tenet Hospitals even cite instances where patients express *pleasure* with their experiences at the Plaintiff Hospitals. (*Id*. at ¶¶57, 60); (SOF, ¶61,79).

But, this purported "evidence" does not reflect consumer injury or harm. None of the foregoing, inadmissible statements supports Plaintiffs' conclusion that "[Leapfrog's] deceptive acts and practices mislead consumers, causing them to make decisions about their healthcare that are not in their best interests," nor is it proof that "[Leapfrog's] Hospital Safety Grades have harmed Florida consumers by causing them to make dangerous decisions to forego the nearest hospital based on misleading information." (ECF No. 74, ¶¶95, 100).

For one, all of the foregoing is plainly hearsay (out of court statements offered for the truth of the assertion). *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir. 1999); quoting, *Garside v. Osco Drug, Inc.*, 895 F. 2d 46, 50 (1st Cir. 1990) ("[I]nadmissible hearsay 'cannot be considered

on a motion for summary judgment'"). Next, the Plaintiffs have never identified any of these purported consumers (let alone obtained their testimony or disclosed any consumer as a trial witness), nor have the Plaintiffs alleged that these mystery "patients" ever even encountered Leapfrog's website. *See, Harrod v. Express Scripts, Inc.*, 2019 WL 8273650, *13-14 (M.D. Fla. Aug. 16, 2019) (FDUTPA claim failed where there was no proof that the consumer encountered the purported misrepresentation and, thus, no proof the consumer suffered a loss as a result of the alleged violation). Finally, none of the foregoing (nor anything else in the record) is evidence of "'**specific damage done to consumers** in the market.'" *State Farm Mut. Auto Ins. Co.*, 2024 WL 4349246 *12-13[2]; citing, *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d at 1289 (noting that consumer harm under FDUTPA parallels consumer harm under the Sherman Act, which requires "specific damage done to consumers in the market").

Therefore, summary judgment on this issue is proper; there is no genuine dispute of material fact that the Tenet Hospitals' claim fails for lack of consumer injury.

a. *Novo Nordisk v. Brooksville is Particularly Instructive.*

*Novo Nordisk* is instructive on this issue. In *Novo Nordisk*, the plaintiff (Novo), a Dutch pharmaceutical company that produces semaglutide drugs such as Ozempic®, sued defendant Brooksville Pharmacy (Brooksville) under FDUTPA. *Novo Nordisk*, 785 F. Supp. 3d at 1129, 1131.[3] Brooksville sells compounded drugs containing semaglutide. *Id*. at 1129. As in this case, Novo's operative amended pleading contained a FDUTPA claim seeking only injunctive relief. *Id*., 1132. Novo alleged that Brooksville's sale of "adulterated and misbranded drugs" violated

---

[2] In *State Farm Mut. Auto Ins. Co. v. At Home Auto Glass LLC*, State Farm sued defendant (an auto glass repair company) alleged that the defendant's representations to consumers that it would replace windshield damage at no cost to the consumer (the defendant would obtain assignments of insurance reimbursement rights from the car-owners and seek reimbursement from State Farm) violated FDUTPA. 2024 WL 4348246, *4-6. Defendant was granted summary judgment on the "harm to consumer" element of State Farm's FDUTPA claim because there was no evidence that: (i) defendant did not honor the "at no cost" promise; nor that (ii) any consumer had any problem with defendant's service. *Id*., *13-14, 16. The Middle District also rejected State Farm's alternative argument on this issue that the defendant's having the car owners sign contracts that made them responsible if their insurer did not pay satisfied the consumer-harm element, explaining that absent any actual proof of defendant not honoring its "no cost" promise or some other "actual harm [inflicted] on at least one consumer," this argument was a "purely hypothetical possibility of some kind of injury in the future based on possible future actions…" which was insufficient. *Id*. at *14.

[3] After the decision discussed herein, the Middle District of Florida granted Novo's Rule 59(e) motion and amended the judgment to be a dismissal of Novo's amended complaint without prejudice for lack of subject matter jurisdiction, finding that its prior finding of mootness/implied preemption of Novo's FDUTPA claim should have been its only finding. *Novo Nordisk, Inc. v. Brooksville Pharms. Inc.*, 2025 WL 2306505, *2-4 (M.D. Fla. June 30, 2025). However, the Middle District did not state that its merits-based findings on Novo's FDUTPA claims (which are discussed herein) were erroneous, and noted that the Eleventh Circuit may consider those findings on the merits in the event the Eleventh Circuit disagreed with the subject matter jurisdiction holding. *Id*., *4, 6, 9.

FDUTPA, citing Novo's analyses showing Brooksville's products were less potent than advertised and contained impurities. *Id.* 1130-32. Novo alleged Brooksville caused Novo "to suffer injury, including economic harm due to lost sales and 'harm to [Novo's] goodwill and reputation.'" *Id.*, 1132. The Middle District of Florida granted Brooksville's motion for summary judgment on the merits of the FDUTPA claim. *Id.*, 1144.

Relevant here, Brooksville argued that Novo had "failed to establish the consumer injury element of FDUTPA since [Novo] cannot identify 'a single instance in which a patient was injured from the use of Brooksville's compounded semaglutide.'" *Id.*, 1145. In response, Novo "point[ed] to **a handful of email complaints** from Brooksville customers who reported that their prescriptions were 'ineffective.'" *Id.* (emphasis added). Novo further argued that it was "required to prove only that Brooksville's actions are 'likely to cause consumer harm.'" *Id.* The Court rejected both of Novo's arguments. *Id.*

As to the first argument, the Court rejected Novo's position that it should not bear the burden of providing of consumer injury, stating "[t]hat's why parties in a lawsuit conduct discovery." *Id.*, 1146. The Court further held that Novo's presentation of some "hypothetical possibility of some future injury to Florida consumers" was insufficient to survive summary judgment, and that Novo's identification of 5 Brooksville-customer complaints (out of 24,000 customers) about "ineffective" prescriptions did not constitute "evidence that a Florida consumer suffered actual harm from Brooksville's misbranded semaglutide." *Id.*, 1146; *see also, Id.*, 1147 ("After extensive discovery and exhaustive briefing, [Novo's] failure to provide any evidence of consumer harm entitles [Brooksville] to summary judgment on [Novo's] FDUTPA claim"). Similarly, here, "after extensive discovery," the Plaintiff Hospitals can only identify second- and third-hand hearsay accounts of purported complaints from a few purported consumers (patients), despite the Plaintiff Hospitals having thousands of patients. As explained, a consumer who expresses concern about a hospital's Safety Grade is not complaining about being harmed. To show harm, Plaintiffs would need evidence that consumers experienced adverse health outcomes or were charged an inflated fee because they erroneously relied on the Safety Grades. No such evidence exists even though "**actual patient harm is the proper standard at the summary judgment stage**." *Id.*, 1145 (emphasis added). Thus, summary judgment is proper.

As to Novo's second argument, the Court rejected the assertion that "likely" harm to consumers was the relevant inquiry. *Id.* Again, "actual patient harm is the proper standard at the

summary judgment stage," not "likely" consumer harm. Since the Plaintiff Hospitals have no evidence of actual consumer harm, there is no genuine dispute of material fact on this issue.

2. Leapfrog's Purported Conduct was *Not* Deceptive.

Leapfrog reiterates that for a dispute of fact to be a *genuine* dispute, the evidence must be capable of leading a reasonable juror to find for the non-moving party. *Novo Nordisk*, 785 F. Supp. 3d at 1132 (collecting cases). Considering the comprehensive, publicly available, and easily understood disclosures and explanations of, *inter alia*, Leapfrog's Methodology, the Plaintiff Hospitals cannot set forth a *genuine* dispute that Leapfrog's purported conduct was deceptive. Moreover, the fall 2024 Methodology adjustment about which that Plaintiffs complain is not deceptive and, in fact, the purportedly "deceptive" portions thereof were in place *before* the fall 2024 Methodology adjustment. (*See, supra*). Indeed, the fall 2024 Methodology adjustment is simply the pretext upon which the Hospital Plaintiffs have brought this action.

To establish a deceptive practice, plaintiffs must establish that the act or practice is "likely to mislead the consumer acting reasonably in the circumstances, to the *consumer's detriment*." *See Caribbean Cruise Line*, 169 So. 3d at 169 (emphasis in original). Thus, this is a two-part inquiry. As discussed, the "to the consumer's detriment" part cannot be satisfied, and summary judgment on this basis alone is warranted.

There is no genuine dispute of material fact on the "likely to mislead the consumer acting reasonably in the circumstances" inquiry, either. Plaintiffs are required to show "'probable, not possible, deception' that is 'likely to cause injury to a reasonable relying consumer.'" *Piescik v. CVS Pharm., Inc.*, 576 F. Supp. 3d 1125, 1132 (S.D. Fla. 2021) (internal citation omitted). Courts use an objective test to "determine whether 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Id.* (citation omitted).

*Piescik* is instructive. In *Piescik*, a putative class action alleged that the defendant's hand sanitizer's claim that it kills "99.99% of germs" violated FDUTPA as misleading and deceptive because a reasonable consumer would take that as fact. *Id.*, 1128, 1132. The amended FDUTPA claim sought injunctive relief, seeking "'…to prevent Defendant from continuing to lie to its customers in the future.'" *Id*., 1130.

The defendant (CVS) moved to dismiss, arguing that the plaintiff's belief that a reasonable consumer would take the "99.99%" claim as fact was objectively unreasonable based on common knowledge, and also because of the asterisk next to the 99.99% claim led to a disclosure on the

back label. *Id.*, 1132. Relying on *Moore v. Trader Joe's Co.*[4], the Southern District granted the motion to dismiss. *Id.* at 1132-34. The Court held that all the information available to consumers and the context in which that information is provided must be considered, and that claims of deception resting on unreasonable or fanciful interpretations of labels or other advertising fail. *Id.* at 1132-33 (collecting cases). The Court explained that the "information available" to consumers informing the reasonable-consumer inquiry is not limited to the label itself, and that "true information or a disclaimer can rebut a claim of deception." *Id.* at 1133; citing *Freeman v. Time Inc.*, 68 F. 3d 285, 289-90 (9th Cir. 1995). The Court held that a reasonable consumer would not assume that a hand sanitizer product with such a label encompassed "all conceivable disease-causing microorganisms, regardless of whether they are commonly found on the hands," and noted "the asterisk on the back of the hand sanitizer clearly discloses to the consumer that it does not kill 99.99% of *all* germs, and a reasonable consumer would not be expected to ignore the asterisk and the information it leads to." *Id.* at 1133. The claim was dismissed with prejudice. *Id.*, 1133-36.

The *Piescik* Court cited numerous authorities on the above propositions, finding *Moore v. Trader Joe's Co.* instructive. *Id.* at 1132-33; citing, 4 F. 4th 874, 882 (9th Cir. 2021). *Moore* is relevant here as well. There, the Ninth Circuit affirmed dismissal of the plaintiff's charge that Trader Joe's labeling of honey as "100% New Zealand Manuka Honey" and listing "Manuka Honey" as the sole ingredient was misleading to a reasonable consumer. *Moore*, 4 F. 4th. at 876-77, 879-80. The Ninth Circuit explained that a reasonable consumer of a niche product like the Trader Joe's honey would know that it is impossible to produce "pure" batches of honey derived solely from the Manuka flower, and that the relatively cheap price would further signal a **reasonable consumer of that honey** that the jar does not contain 100% Manuka honey. *Id.* at 881 (emphasis added). Indeed, the inquiry is whether a reasonable consumer of the *subject product* would be misled considering all the information available to him or her. *See, Id.* at 884 (consumers of "a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care").

Here, Leapfrog's provides substantial transparent, free, readily accessible, and comprehensive information and explanations to consumers related to its Hospital Safety Grade produc. (SOF ¶8, 12-13, 14, 22, 25-26, 36-46). Indeed, it is far more than the information available to the consumers in *Piescek* and *Trader Joe's* and, thus, the undisputed facts here present *even stronger* grounds to hold that Leapfrog's purported conduct was not deceptive to a reasonable

[4] *Moore v. Trader Joe's Co.*, 4 F. 4th 874, 882 (9th Cir. 2021).

consumer of its products. Leapfrog reiterates and incorporates by reference its detailed disclosures discussed *supra* and in the SOF, including that: (i) the imputed score for non-participating hospitals is shown as equivalent to the worst score; (ii) Navigation of the Grades and measure-by-measure scores leads to a link allowing access to the full, 29-page Methodology; and (iii) Non-reporting hospitals' Grades feature, *inter alia*, bold and red disclosures with an asterisk. (SOF ¶38).

As in *Piescik*, any potential to deceive a reasonable consumer of Leapfrog's products is ameliorated by additional information denoted by an asterisk, and by the substantial additional material provided. A reasonable consumer is not expected to ignore this asterisk. *Piescik*, 576 F. Supp. 3d at 1133. Whether a reasonable consumer would be deceived is a totality-of-the-information inquiry, and must account for the type of consumer. A reasonable consumer of health care information such as the Hospital Safety Grade would exhibit a higher standard of care and awareness when choosing where to receive their medical treatment, and Leapfrog's provision of substantial and transparent information (including delineating between absent data and imputed data) allows these consumers to fully and comprehensively inquire and educate themselves about the material that they are consuming. *Moore*, 4 F. 4th at 884; quoting, *Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 123 (S.D.N.Y. 2019) ("Consumers of Manuka honey, a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care than 'a parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow,' who is 'not likely to study with great diligence the contents of a complicated product package'").

Consumers of health care are presumed reasonable and aware that many considerations go into choosing where to receive medical treatment. To this point, red, bold disclaimers (among other things) clearly identify to a consumer that a score is *assigned* for certain measures because of a lack of information. (SOF ¶38). Further, among other disclosures, Leapfrog distinguishes between absent data and imputed data. (Motion to Dismiss Ruling, ECF No. 41, p. 6); (SOF ¶36-43). Indeed, Leapfrog's grading system is intentional. (SOF ¶8, 12-13, 42).

In this era, rating systems are common across all consumer interests. Consumers use Yelp to rate restaurants, Google Reviews to rate businesses, TripAdvisor to rate experiences, and so on. Likewise, rating healthcare providers is not unique to Leapfrog. Many similar organizations rank healthcare providers on various measures – CMS, Healthgrades, HealthLocator (SOF ¶53), Lown Institute, U.S. News & World Report, to name a few. Consequently, consumers are (and, for purposes of this inquiry, presumed to be) familiar with rating websites, and considering all the

information available, reasonable consumers of rating systems are aware that each system only considers certain criteria. Thus, a consumer of Leapfrog *Safety* Grades can reasonably conclude that the grade itself measures aspects of patient *safety* and *not* whether the hospital has, for example, a highly ranked, top performing NICU. Interestingly, the Tenet Hospitals publicly highlight their "Healthgrades," but filed this instant lawsuit against Leapfrog alleging deceptive Safety Grades. (SOF ¶83). Plaintiffs ulterior purpose is blatant.

There can be no genuine dispute that – considering the vast world of detailed, transparent information that Leapfrog provides to a particularized consumer base – the alleged conduct is not deceptive. The Plaintiff Hospitals' conclusory, false, and unreasonable assumption that it *is* deceptive, and that the Methodology is not based on real data, does not suffice for this inquiry. *Moore*, 4 F.4th at 882. Summary judgment is proper on the claim of deceptive practices.

3. Leapfrog Does Not Engage in "Unfair" Practices.

The Florida Supreme Court defines an unfair practice as "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious ***to consumers***." *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted; emphasis added). To establish an unfair act or practice, plaintiffs must establish that the act or practice inflicts "***consumer injury*** that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) that consumers could not reasonably have avoided." *SMS Audio, LLC v. Belson*, 2017 WL 11631378, *10 (S.D. Fla. April 24, 2017). (emphasis added). Plaintiffs fail to offer any evidence to prove the three elements of unfairness. *Id.*

***First***, as discussed, the Plaintiffs have no proof of *any* consumer injury; let alone one that is "substantial." The Plaintiffs have never identified a single consumer injured by a Leapfrog practice that is allegedly unfair. Further on the point of "substantial consumer injury," there is an obvious flaw in the Plaintiffs' premise. Even if patients were refusing to treat at an "F" hospital, like Good Samaraitan, the Plaintiffs fail to show how a patient treating at an "A" hospital harms the consumer in any way. Notably, the Plaintiff Hospitals do not allege or otherwise provide proof showing that patients are refusing to treat at the Plaintiff Hospitals because of the Safety Grades, nor any evidence that those patients are then harmed when treated at a competitor hospital. Simply alleging that patients choose to treat at a competitor hospital rather than one of the Plaintiffs is not enough to show consumer injury. *See Cmty. Health Ctrs., Inc. v. DiamondDog Servs., Inc.*,2024

WL 3278579, *10 (M.D. Fla. July 2, 2024) (dismissal of plaintiff's FDUTPA claim after determining that plaintiff only alleged harm to *plaintiff* that the defendant caused, but failed to plead consumer injury); *see also, SMS Audio,* *10 (defendant granted judgment as a matter of law because plaintiffs did not prove detriment or injury to consumers).

***Second*** and ignoring (for purposes of this argument) that the Plaintiffs cannot establish consumer injury, any purported injury is outweighed by the substantial benefit that Leapfrog provides to consumers navigating the labyrinthian American healthcare system. In fact, as just discussed, patients would *benefit* from treating at a competitor hospital (at bottom, Plaintiffs offer no proof that treating at a competitor hospital would cause a detriment to consumers).

Plaintiffs have no evidence on the requirement that the injury "not be outweighed by any countervailing benefits to consumers or competition that the practice produces." *Id.* at *3. The purpose of the Safety Grade is to "educate and encourage consumers to consider safety when selecting a hospital for themselves or their families." (SOF, Ex. 20 (Methodology) p. 3). Further, the Safety Grade fosters market incentives for hospitals to prioritize safety. (SOF ¶1, 6, 14, 28). Next, Leapfrog has received feedback over the years from hospitals advising that they use the Hospital Survey as a benchmarking tool on how to improve on their patient safety measures. (SOF ¶14). In fact, the Plaintiff Hospitals themselves used the Survey as an internal tool to benchmark their patient safety progress. (SOF ¶14, 18, 35). Next, the fact that year-over-year improvements to mean "cohort" scores for Survey-participant hospitals occurred also proves the benefit that Leapfrog's purported conduct conferred. (SOF ¶28). Thus, not only do patients benefit from receiving access to hospital's patient safety data, but the Hospital Survey also provides a free tool for hospitals to improve patient safety. (SOF ¶6). Stated differently, "unfair practices" generally offend public policy and are immoral, unethical, oppressive and unscrupulous. *Alhassid v. Nationstar Mortg.* LLC, 771 Fed. Appx. 965, 969 (11th Cir. 2019). The Plaintiff Hospitals cannot set forth a genuine dispute of material fact that Leapfrog, a non-profit providing substantial information to the public about healthcare facilities' safety, engaged in conduct fitting any of those categories. The Plaintiff Hospitals have not provided any evidence of any consumer injury, let alone how any such consumer injury outweighs the benefits that Leapfrog's conduct confers on the public. Summary judgment is thus warranted.

***Third,*** there is no genuine dispute of material fact that any purported injury could be reasonably avoided. For one, it bears repeating that no actual consumer injury can be identified.

Regardless, to the extent the Plaintiffs stand by their unsupported conclusion that consumers have been injured because Leapfrog has "caus[ed] them to make dangerous decisions to forego the nearest hospital based on misleading information," (ECF No. 74, ¶95), the Plaintiffs offer no explanation nor evidence as to how or why the consumers could not avoid this purported "injury."

As shown, consumers (*e.g.*, prospective patients) could easily avoid this purported injury by navigating Leapfrog's various webpages and explanations of its Methodology contained therein. More specifically, at the bottom of each page of its websites, Leapfrog expressly states, *inter alia*, "Individuals are solely responsible for any and all decisions with respect to their medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs that may be incurred with respect to use of this site. **Never disregard, avoid or delay in obtaining medical advice from a doctor or other health care professional because of material on this site, as the site is not intended to be a substitute for professional medical advice**." (SOF, ¶44 (full disclaimers) (*see also*, full terms of use at SOF, Ex. 39) (emphasis added). Further, Leapfrog is clear that when deciding on where to receive health care, "people should consider other aspects of hospital performance in the decision-making process, such as whether the hospital delivers a high level of care for the health concern the patient has, i.e., if the hospital has high-quality obstetrics or orthopedics." (SOF ¶45; citing, Ex. 10 (FAQ page))[5]. Finally, the Complaint does not identify what purported conduct was "unfair" to consumers; it merely cites a purported warning from the American Hospital Association stating that the Safety Grades are not fair *to hospitals*. (*See, e.g.*, ECF Doc. No. 74, ¶35). This alone is grounds for summary judgment.

As shown, there is no genuine dispute of material fact that Leapfrog did not engage in "unfair" conduct because any purported injury can be reasonably avoided. Leapfrog's transparent disclosure of its methods cannot be genuinely described as "unfair." *See, e.g., Medmoun v. Home Depot U.S.A., Inc.*, *14-15 (M.D. Fla. May 7, 2022) (where documents that Home Depot provided to the consumer informed the consumer of the very information that was allegedly unfair under the FDUTPA, dismissal was proper as the harm could have been reasonably avoided); *see also, Donoff v. Delta Air Lines, Inc.*, 2020 WL 1226975, *22-24 (S.D. Fla. Mar. 6, 2020) (summary

[5] Leapfrog further acknowledges that in "some cases, the only hospitals available in a community are not highly rated." (SOF ¶43). Further, Leapfrog "offers guidance and resources on [its] website for patients and family members to protect themselves during a hospital stay, which is important no matter the hospital's grade." (SOF, Ex. 10 (FAQ)). Leapfrog's website contains a dedicated "Resources and Tools" page for patients, wherein numerous additional resources and information centers are provided, including a section dedicated to a discussion of, and materials related to, digital care. [https://www.leapfroggroup.org/hospital-choice/resources-and-tools].

judgment for defendant granted on plaintiff's claim that Delta's website violated FDUTPA because Delta does not expressly disclose that it is not licensed to sell insurance because: (i) Delta's website advised that terms and conditions related to travel insurance applied; and (ii) that advisement was followed by a link to Allianz's website and, therefore, "Delta's identification of Allianz as the licensed producer and link to the Allianz website is not only true, but desirable and necessary…," and finding that "[t]he notion that truthfully telling the consumer that Allianz is the licensed producer and administrator and providing a link to its website is somehow deceptive is just sophistry"). Summary judgment on the "unfair practices" claim is proper.

4. The Tenet Hospitals Cannot Prove That They Were "Aggrieved"

Assuming, *arguendo*, the Plaintiff Hospitals could show a "deceptive or unfair act or practice," each Plaintiff fails to prove that they were "aggrieved" by the Safety Grade. "[T]o state a claim for equitable relief, an entity must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc.*, 266 So. 3d at 214.

To be aggrieved, "'the injury claimed to have been suffered cannot be merely speculative.'" *Id.*; citing *Ahearn*, 180 So. 3d at 173; *see also Macias v. HBC of Fla., Inc.*, 694 So. 2d 88, 90 (Fla. 3d DCA 1997) ("The clear intent of [FDUTPA] as expressed by its plain language is to provide both equitable and legal remedies to private consumers who are aggrieved parties and/or have sustained **actual losses** because of a violation(s) under FDUTPA") (emphasis added). Because the Tenet Hospitals are business entities and do not "share the characteristics of humans, such as being 'angry or sad'" the following definition of "aggrieved" applies: "'having [their] legal rights [] adversely affected; having been harmed by an infringement of legal rights.'" *Stewart Agency, Inc.*, 266 So. 3d at 213-14. "[A] plaintiff is 'aggrieved' under FDUTPA when the deceptive conduct alleged has caused a **non-speculative injury** that has affected the plaintiff beyond a general interest in curbing deceptive or unfair conduct.'" *Cravens v. Garda CL Se., Inc.*, 2024 WL 5058304, *36; quoting, *Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1190 (M.D. Fla. Jan. 25, 2022); *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2017 WL 2834783, * (M.D. Fla. June 30, 2017) (emphasis added). In other words, the Plaintiffs must show that they were suffered a direct, non-speculative and actual harm as a result of the alleged conduct. They cannot do so.

In *Stewart Agency, Inc.*, Florida's Fourth District of Appeals affirmed summary judgment for the defendant on the plaintiff-entity's FDUTPA claim. *Stewart Agency*, 266 So. 3d at 215. Both

the plaintiff (Stewart) and defendant (Arrigo) were car dealers. *Id*. at 210. Both accepted vehicles containing defective airbags from the manufacturer, but Stewart did not sell those vehicles and alleged that Arrigo did. *Id*. at 211. Stewart claimed that Arrigo's purported "bait and switch" tactics toward consumers in selling those cars violated FDUTPA. *Id*. However, Stewart admitted that his decision not to sell those cars was not impacted by Arrigo's contrary decision, and that Stewart would not have sold those cars regardless of whether Arrigo sold them. *Id*. Therefore, Stewart could not show that it was adversely affected (*i.e*., aggrieved) by Arrigo's alleged conduct, and summary judgment for Arrigo was affirmed. *Id*. at 214-15. The Fourth District rejected Stewart's argument that he was aggrieved because Arrigo's sales equated to sales that Stewart could not make. *Id*. The Court explained that it "would be entirely speculative [to hold this equated to being "aggrieved"] and require building an inference upon an inference." *Id*. at 214.

Likewise, here, the Plaintiff Hospitals' allegations that they were aggrieved are wholly conclusory (*see, e.g.*, ECF Doc. No. 74, ¶95), and the "evidence" that the Plaintiffs were aggrieved is, at best, speculative. The Plaintiffs' conclusory and often contradictory claims of adverse impacts do not suffice and would require this Court to engage in an impermissible level of speculation. All five of the Plaintiff Hospitals' CEO's signed declarations early in this litigation, averring that the Safety Grades have harmed their Hospital's reputation and goodwill, but at their depositions none of them could identify any non-speculative or admissible evidence in support. (SOF ¶53-81). Likewise, none of these CEOs (who are the Plaintiffs' Rule 30(b)(6) representatives) could identify any actual financial harm suffered beyond a speculative level. In fact, Delray and West Boca have seen increased revenue, and Palm Beach has seen increased patient admissions during the relevant timeframe. Similarly, St. Mary's and Good Samaritan could not verify any revenue loss. (*Id*.). West Boca's Safety Grades did not change after the new, purportedly deceptive/unfair Methodology was implemented. (SOF, ¶49; citing Ex. 27 (historical Grades)). All five Plaintiff Hospitals understand that they can participate in the Hospital Survey, but do not do so. (SOF ¶35). Plainly, the Plaintiffs' conclusory, speculative, often contradictory and plainly self-serving claims of being "aggrieved" are insufficient to create a genuine dispute of material fact on this issue and summary judgment is warranted.

**C. <u>THE PLAINTIFF HOSPITALS LACK ARTICLE III STANDING.</u>**

Article III standing requires plaintiffs to demonstrate that: (1) they suffered an "injury-in-fact," (2) there is a causal connection between the asserted injury-in-fact and the challenged action

of the defendant, and (3) "the injury will be redressed by a favorable decision." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (citation omitted). Injury-in-fact is established when a plaintiff "shows that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation and quotations omitted). A concrete injury is "real, and not abstract." *Id.* at 340. A particularized injury "affect[s] [a] plaintiff in a personal and individual way." *Id*. at 339. Claims for injunctive relief, moreover, require a "real and immediate…threat of *future* injury." *Shotz*, 256 F.3d at 1081 (emphasis in original) (citation omitted). In response to a summary judgment motion challenging Article III standing, "'the plaintiff…must 'set forth' by affidavit or other evidence specific facts' showing that the defendant injured [them]." *Novo Nordisk*, 786 F. Supp. 3d at 1133; citing, *Ga. Republican Party v. Secs. & Exch. Comm'n*, 888 F.3d 1198, 1201 (11th Cir. 2018); quoting *Lujan*, 504 U.S. at 561.

First, for the reasons discussed above and in the SOF, the Plaintiff Hospitals cannot show any concrete injury that is fairly traceable to Leapfrog that would be redressed by a favorable judicial outcome. Second, given the Plaintiff Hospitals' lack of testimony and failure to produce any documents showing financial harm, they cannot show that there is an amount in controversy in excess of $75,000. (SOF ¶54-82). Third, as set forth *supra*, the Plaintiff Hospitals have failed to identify a single lost patient or physician who dissociated with them, proving: a lack of: (i) concrete and particularized (as opposed to conjectural or hypothetical) invasion of a legally protected interest; (ii) a real and immediate threat of future injury; and (iii) sufficient amount-in-controversy. Finally, especially in light of the Plaintiffs' acknowledgement and understanding that participating in the Hospital Survey would offer them control over the Four Imputed Measures, and given that the Plaintiff Hospitals have failed to articulate how a favorable ruling in this matter would redress their (speculative and undefined) harm, there is no genuine dispute of material fact as to the third requirement of Article III standing. Indeed, summary judgment is proper.

**D. <u>SUMMARY JUDGMENT ON THE ANTI-SLAPP DEFENSE IS WARRANTED.</u>**

Florida's Anti-SLAPP statute prohibits "fil[ing]…any lawsuit… against another person or entity [1] without merit and [2] primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue…as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution." Fla. Stat. §758.295(3). Leapfrog pleads anti-SLAPP as an affirmative defense. (ECF Doc. No. 43, p. 47).

A cause of action is "without merit" if it fails to state a claim or if the defendant(s) prevail on a motion for summary judgment. *See, e.g.*, *Flynn v. Wilson*, 398 So. 3d 1103, 1115 (Fla. 2d DCA 2024) (affirming grant of defendant's motions for summary judgment on both the merits of plaintiff's defamation claim and anti-SLAPP; the anti-SLAPP summary judgment grant was warranted because the plaintiff's claim "lacked merit" as shown by the merits failing in the face of summary judgment and upon demonstration that the case was brought "primarily" because of defendant's exercise of his free-speech rights); *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1322 (S.D. Fla. Aug. 6, 2020) (suit was without merit because it failed to state a claim, and because the suit also arose out of an exercise of free-speech, the anti-SLAPP motion was granted).

Florida's anti-SLAPP statute broadly defines "free speech in connection with public issues" to include "any written or oral statement that is protected under applicable law and . . . is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

Leapfrog's mission is premised on free speech in connection with a public issue; it is intended to assist the public in assessing their healthcare options and healthcare safety. Thus, if this Court grants Leapfrog's Motion, summary judgment on its anti-SLAPP defense is also warranted because both requirements of the statute will be satisfied. Indeed, this case is nothing more than a deep-pocketed hospital system trying to silence a non-profit in retaliation for what they perceive as negative press; it is the Plaintiffs Hospitals' filing of this case, which amounts to prior restraint on free-speech, that harms the public, not Leapfrog's alleged conduct.

WHEREFORE, Defendant, The Leapfrog Group, respectfully requests that this Honorable Court enter an ORDER granting this Motion and Judgment in its favor as set forth in the Proposed Order, and award any and all other appropriate relief.

Date: November 12, 2025

Respectfully submitted,

*/s/ Kimberly E. Blair*

**Kimberly E. Blair** (*pro hac vice*)

kimberly.blair@wilsonelser.com
Illinois Bar ID # 6272934
**Courtney L. Wood** (*pro hac vice*)
courtney.wood@wilsonelser.com
Illinois Bar ID #6344385
Wilson Elser Moskowitz Edelman & Dicker LLP
161 N. Clark, Ste. 4500
Chicago, IL 60601
312.821.6139 (Direct)
312.704.0550 (Main)
(312) 259-6414 (Cell)

Jura C. Zibas (Bar #124571)
Wilson Elser Moskowitz Edelman & Dicker LLP
jura.zibas@wilsonelser.com
2063 Main Street, Suite 100
Sarasota, Florida 34237
(941) 866-8561 (Main)
(212) 915-5756 (Direct)

*Attorneys for Defendant, The Leapfrog Group*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2025, a true and correct copy of the foregoing was served on all counsel or parties of record via the ECF system.

By: /s/ *Courtney L. Wood*
COURTNEY L. WOOD