**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

GOOD SAMARITAN MEDICAL CENTER,
INC., DELRAY MEDICAL CENTER, INC.,
PALM BEACH GARDENS COMMUNITY
HOSPITAL, INC. D/B/A PALM BEACH
GARDENS MEDICAL CENTER, ST.
MARY'S MEDICAL CENTER, INC. AND
WEST BOCA MEDICAL CENTER, INC.,

          Plaintiffs,

          v.

THE LEAPFROG GROUP,

          Defendant.

25-CV-80526-MIDDLEBROOKS

**DEFENDANT THE LEAPFROG GROUP'S REPLY IN SUPPORT OF ITS MOTION
FOR RECONSIDERATION AND TO ALTER OR AMEND THE JUDGMENT,
<u>OR FOR NEW TRIAL</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................1

ARGUMENT ...............................................................................................................................1

I.      LEAPFROG'S SAFETY GRADES ARE WITHIN THE HEARTLAND OF THE FIRST AMENDMENT ...........................................................................................1

       A.      Leapfrog Did Not Forfeit Its First Amendment Defense ........................................1

       B.      Leapfrog's Safety Grades Are Pure Opinion .............................................................3

       C.      Actual Malice Is Required ..................................................................................6

II.      FDUTPA DOES NOT APPLY ...............................................................................7

III.      THE INJUNCTION IS ITSELF UNCONSTITUTIONAL..........................................8

       A.      The Injunction Is A Prior Restraint ........................................................................8

       B.      The Injunction Compels Speech...........................................................................10

CONCLUSION..........................................................................................................................10

i

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ..................................................................................................10

*Alexander v. United States*,
  509 U.S. 544 (1993) ..................................................................................................10

*Banister v. Davis*,
  590 U.S. 504 (2020) ....................................................................................................1

*Basulto v. Netflix, Inc.*,
  2023 WL 7129970 (S.D. Fla. Sept. 20, 2023) ...........................................................9

*Berisha v. Lawson*,
  973 F.3d 1304 (11th Cir. 2020) ..................................................................................7

*Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County,
  Inc.*,
  169 So. 3d 164 (Fla. 4th DCA 2015) ..........................................................................2

*Curtis Publishing Co. v. Butts*,
  388 U.S. 130 (1967) ....................................................................................................6

*FDIC v. Chicago Title Insurance Co.*,
  2019 WL 1437873 (N.D. Ill. Mar. 31, 2019) .............................................................2

*Grayson v. No Labels, Inc.*,
  2023 WL 2919911 (M.D. Fla. Jan. 17, 2023)..............................................................9

*Hodge v. Department of Housing & Urban Development*,
  862 F.2d 859 (11th Cir. 1989) .................................................................................1, 8

*Home Performance Alliance v. Better Business Bureau of Western Florida*,
  354 So. 3d 1165 (Fla. 2nd DCA 2023) ........................................................................2

*Humphrey v. FBI*,
  2024 WL 867253 (D. Alaska Feb. 29, 2024) ..............................................................2

*Kinney v. Barnes*,
  443 S.W.3d 87 (Tex. 2014)........................................................................................10

*Krapacs v. Bacchus*,
  301 So. 3d 976 (Fla. 4th DCA 2020) .....................................................................9, 10

*Lucero v. Trosch*,
 121 F.3d 591 (11th Cir. 1997) ...................................................................................................9

*Madsen v. Women's Health Center, Inc.*,
 512 U.S. 753 (1994) ...................................................................................................................9

*McCarthy v. Fuller*,
 810 F.3d 456 (7th Cir. 2015) (Sykes, J., concurring) ...............................................................10

*Miami Herald Publishing Co. v. Tornillo*,
 418 U.S. 241 (1974) .................................................................................................................10

*Michel v. NYP Holdings, Inc.*,
 816 F.3d 686 (11th Cir. 2016) ...................................................................................................4

*Milkovich v. Lorain Journal Co.*,
 497 U.S. 1 (1990) ..................................................................................................................4, 5

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010) ...................................................................................................................8

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
 720 F.3d 490 (2d Cir. 2013) .......................................................................................................3

*Organization for a Better Austin v. Keefe*,
 402 U.S. 415 (1971) ..............................................................................................................3, 4

*Sindi v. El-Moslimany*,
 896 F.3d 1 (1st Cir. 2018) ......................................................................................................8, 10

*Spurgeon v. Social Security Administration, Commissioner*,
 2024 WL 1395258 (Apr. 2, 2024) ...............................................................................................6

*St. Amant v. Thompson*,
 390 U.S. 727 (1968) ...................................................................................................................7

*State v. Gale Distributors*,
 349 So.2d 150 (Fla. 1977) ..........................................................................................................7

*State v. Giorgetti*,
 868 So.2d 512 (Fla. 2004) ..........................................................................................................7

*Torrey v. Infectious Diseases Society of America*,
 86 F.4th 701 (5th Cir. 2023) .......................................................................................................3

*Tory v. Cochran*,
 544 U.S. 734 (2005) ...................................................................................................................9

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) ................................................................................5

*United States v. Alvarez*,
567 U.S. 709 (2012) .................................................................................................6, 7

*Zinkand v. Brown*,
478 F.3d 634 (4th Cir. 2007) ...................................................................................2

## Other Authorities

First Amendment .............................................................................1, 2, 3, 4, 5, 6, 7, 8, 10

Federal Rule of Civil Procedure 59 ...........................................................................1, 2

Fla. Stat. § 768.295 ...........................................................................................................8

*Bloomberg ESG Scores* 5 (Dec. 2025),
https://professional.bloomberg.com/globalassets/professional/solutions/sustain
able-finance/scores/bloomberg-esg-scores-methodology.pdf .....................................4

CDP, https://cdn.cdp.net/cdp-
production/cms/guidance_docs/pdfs/000/000/233/original/Scoring-
Introduction.pdf .......................................................................................................4

*Complaints*, Better Business Bureau, https://www.bbb.org/process-of-complaints-
and-reviews/complaints...............................................................................................4

Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157,
158, 167 (2007)...........................................................................................................9

*Public Advocate in Texas Reaches Thousands on Pro-Family Survey Results 3
Senate Hopefuls Respond, 10 Did Not Respond* (Feb. 21, 2014),
https://www.publicadvocateusa.org/news/article.php?article=9247 ..........................4

Rachel Frazin, *ACLU Sends Out Mailer in South Carolina Questioning Biden's
Civil Rights Stances*, The Hill (Sept. 4, 2019)................................................................4

**INTRODUCTION**

First Amendment concerns loom large in this case and cry out for resolution before it concludes. These concerns surfaced at the dismissal stage, when Leapfrog contended its Safety Grades are protected opinion. (Dkt. 39 at 11–16.) They recurred on summary judgment, when Leapfrog warned against a "prior restraint on free-speech." (Dkt. 99 at 19.) They came back at trial, where Leapfrog opened by decrying Plaintiffs' attempt "to silence Leapfrog" (Dkt. 204-1 at 39:15–18), and closed by arguing FDUTPA "is not a tool to silence simple speech of a non-profit watchdog group." (Dkt. 204-5 at 43:22–44:4.) Plaintiffs recognized these to be First Amendment arguments, which is why they devoted chunks of their submissions to addressing the prior-restraint problem along with the actual-malice standard. (Dkt. 203 ¶¶ 290, 292; Dkt. 136 ¶ 133.) Now that the First Amendment merits are under a spotlight, however, Plaintiffs run away from them.

Especially problematic are aspects of the Court's injunction. Notably, Plaintiffs did not disclose the full scope of their requested relief, including the sweeping "any similar methodology" clause, until their *post*-trial proposed findings, submitted the same day as Leapfrog's. (*Compare* Dkt. 136 *with* Dkt. 203 ¶¶ 9, 288, 295.) Leapfrog had no opportunity to respond before the Court adopted that formulation. Moreover, only post-injunction did Plaintiffs' counsel begin brandishing the hammer of contempt to chill protected speech that the Court never adjudged to be unlawful—including Leapfrog's truthful observation that certain hospitals declined to participate in its survey, and its *new* program for rating *non*-party ambulatory surgery centers. (Dkt. 219-1, 219-3.) Rule 59 enables the Court to "rectify its own mistakes in the period immediately following its decision," *Banister v. Davis*, 590 U.S. 504, 508 (2020) (citation omitted), and a "continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need," *Hodge v. Dep't of Hous. & Urban Dev.*, 862 F.2d 859, 862 (11th Cir. 1989) (citation omitted). Given constitutional imperatives that are clear from governing precedent and developments post-trial, this is a paradigmatic case—admittedly, rare—for granting the requested relief.

**ARGUMENT**

**I. LEAPFROG'S SAFETY GRADES ARE WITHIN THE HEARTLAND OF THE FIRST AMENDMENT**

**A. Leapfrog Did Not Forfeit Its First Amendment Defense**

As an initial matter, Plaintiffs contend that this Court's motion to dismiss ruling finally resolved Leapfrog's constitutional objections, and that the contours of the judgment align. Neither

1

is correct.  The Court's motion to dismiss order drew a clear, principled line:  "[C]hallenge[s] to false or misleading statements made about the rating process itself" may be actionable, while pure opinions, like ratings or the "subjective weighing of objective data" upon which they are based, are constitutionally protected.  (Dkt. 41 at 5–6.)  The judgment, by comparison, veers astray.  It does not limit its reach to Leapfrog's "representations about its methodology."  (*Id.* at 6.)  It instead holds Leapfrog liable for—and flatly prohibits—"assigning a Safety Grade to the Community Hospitals" under "any" methodology that assigns import to nonparticipation.  (Dkt. 212 at 40–41.)

Plaintiffs try in vain to harmonize this Court's threshold ruling with the final judgment.  According to Plaintiffs, the Court ruled that the First Amendment's protections for pure opinion were categorically "inapplicable" to Leapfrog's "grades and methods."  (Opp. at 6–7.)  But Plaintiffs overlook this Court's express assumption, which was that "Plaintiffs' action arises from a challenge to Defendant's representations about its methodology," particularly representations "professing that grades are not influenced by a hospital's lack of survey participation."  (Dkt. 41 at 6.)  Plaintiffs further overlook that the cases cited by this Court involved "false statements about [the Better Business Bureau's] rating process," *Home Performance Alliance v. Better Business Bureau of W. Fla.*, 354 So. 3d 1165, 1167 (Fla. 2nd DCA 2023), and "representations made by BBB, not the opinions it issues," *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015).

Rule 59(e) exists so that courts can correct precisely this sort of inconsistency.  *See Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007) (explaining that Rule 59 "in essence, gives the district court a chance to correct its own mistake if it believes one has been made").  Courts grant Rule 59 motions where a judgment deviates from prior rulings or where a court itself belatedly recognizes an error in its judgment.  *See, e.g.*, *FDIC v. Chi. Title Ins. Co.*, 2019 WL 1437873, at *9 (N.D. Ill. Mar. 31, 2019) (granting Rule 59 motion to amend the judgment based on the Court's own prior ruling from which subsequent jury award deviated); *Humphrey v. FBI*, 2024 WL 867253, at *3 (D. Alaska Feb. 29, 2024) (granting Rule 59 motion where "the Court's prior holding [wa]s incorrect" because it failed to consider "controlling precedent").  Nor is this a case where, as Plaintiffs suggest (Opp. at 7), a losing party is trying to relitigate an on-point ruling.  Rather, Leapfrog merely urges the Court now to restore the constitutional line it so carefully drew at the threshold—differentiating pure opinion ratings, which are necessarily protected by the First Amendment, from falsifiable factual statements about those ratings, which may be actionable.

2

Plaintiffs also claim Leapfrog abandoned its position that Leapfrog's Safety Grades themselves are opinion by arguing at trial that Leapfrog's Safety Grades are scientifically justified. (Opp. at 7–8.)  Contrary to Plaintiffs' suggestion, however, scientific interpretations of evidence can be laden with subjectivity.  "[W]hile statements about contested and contestable scientific hypotheses constitute assertions about the world that are in principle matters of verifiable 'fact,' for purposes of the First Amendment . . . , they are more closely akin to matters of opinion, and are so understood by the relevant scientific communities." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013) (recognizing First Amendment distinction between a claim that data were fabricated and a claim that "inferences drawn from those data were the wrong ones"); *see also Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 705 (5th Cir. 2023). Thus, a speaker can simultaneously maintain that its views are protected opinion and that those views are "scientifically valid" (Opp. at 8).  Holding otherwise would, perversely, force public speakers to confess to being *un*scientific before invoking their First Amendment rights.

**B.      Leapfrog's Safety Grades Are Pure Opinion**

On the merits, Plaintiffs betray desperation.  They now claim their suit is *not* about Leapfrog's *speech*, but only its "*conduct*" in "perpetrating a coercive scheme to extract hospital data."  (Opp. at 8 (citation omitted).)  Yet Plaintiffs have no answer to Leapfrog's authority squarely holding that "the reach of the First Amendment" extends to "expressions … intended to exercise a coercive impact" and "plainly intended to influence [Plaintiffs'] conduct." (Mot. at 15 (quoting *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)).)  Throughout our Nation's history, speakers have been free to criticize and even condemn as they see fit in order to discourage conduct they oppose—that is a defining purpose of the First Amendment and its protection of free expression.  The Framers would not have ascribed paramount importance to this right had they *not* envisioned free expression actually changing the *conduct* of those in power.

Assuming that Leapfrog designedly gave lower grades to hospitals that declined to answer the survey *because* they did not answer the survey, that cannot justify denying Leapfrog its First Amendment protections.  On this point, Plaintiffs simply substitute the word "blackmail" in lieu of a reasoned argument for muzzling Leapfrog.  If Plaintiffs use of their "blackmail" pejorative can jettison First Amendment protections in this case, then a wide spectrum of core protected speech is in peril.  It would no less be "blackmail," under Plaintiffs' theory, to "distribute[] leaflets … critical of [a plaintiff's] real estate practices" because he "refused to sign" an agreement not to

3

"solicit property" in a community.  *Org. for a Better Austin*, 402 U.S. at 416-17.  It would be "blackmail" for the ACLU to run a campaign "questioning former Vice President Joe Biden's stances on civil rights issues" in the 2020 Democratic Primary in order to "put pressure on the candidate[] to answer [survey] questions."[1]  It would be "blackmail" to give candidates "a 0% Pro-Family rating" on a candidate scorecard "seeking to promote traditional marriage" if those candidates "fail[ed] to return their survey."[2]  The same holds for an environmental scorecard assigning an automatic "F" for "fail[ing]" to "disclose . . . data"; the Better Business Bureau allocating a "negative impact" on a rating from "[f]ailure to respond" to a complaint; and a Bloomberg ESG "[s]core[]" lowered in consideration of "disclosure of quantitative data as a dimension of performance"—all of that is designed to empower the scoring enterprise, and all of that would be "blackmail" in Plaintiffs' view.[3]  Needless to say, Plaintiffs' invented gap in First Amendment protections is nowhere to be found in the Constitution or in caselaw applying it.

Upon addressing Leapfrog's *speech*, Plaintiffs invoke *Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016), and *Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990), for the proposition that a statement implying objective facts loses First Amendment protection.  (Opp. at 9.)  But the factual claims that were there cloaked as opinions were "true or false" statements, such as "the assertion that [a performer] was a 'no-show' for the benefit concert," *Michel*, 816 F.3d at 697, or the "that [plaintiff] perjured himself in a judicial proceeding," *Milkovich*, 497 U.S. at 21.

The subjective judgment calls that Leapfrog necessarily makes in measuring performance en route to its Safety Grades are cut from different cloth.  Plaintiffs erroneously suggest Leapfrog's Safety Grades imply factual content such as "that physicians at the Community Hospitals do not

---

[1]  Rachel Frazin, *ACLU Sends Out Mailer in South Carolina Questioning Biden's Civil Rights Stances*, The Hill (Sept. 4, 2019), https://www.huffpost.com/entry/the-aclu-is-reminding-voters-joe-biden-hasnt-taken-stances-on-key-issues_n_5e1b37afc5b6640ec3d5faf6.

[2]  *Public Advocate in Texas Reaches Thousands on Pro-Family Survey Results 3 Senate Hopefuls Respond, 10 Did Not Respond* (Feb. 21, 2014), https://www.publicadvocateusa.org/news/article.php?article=9247.

[3]  *Complaints*, Better Business Bureau, https://www.bbb.org/process-of-complaints-and-reviews/complaints; *Scoring Introduction 2023*, CDP, https://cdn.cdp.net/cdp-production/cms/guidance_docs/pdfs/000/000/233/original/Scoring-Introduction.pdf; *Bloomberg ESG Scores* 5 (Dec. 2025), https://professional.bloomberg.com/globalassets/professional/solutions/sustainable-finance/scores/bloomberg-esg-scores-methodology.pdf.

wash their hands." (Opp. at 9.) As this Court specifically noted, however, "[the] imputed Step 2 score is not zero." (Dkt. 212 at 6.) The Safety Grades do not imply the objectively verifiable fact that a hospital either does or does not have a hand hygiene policy (let alone that physicians at the hospital do or do not wash their hands) because providing a non-zero score "giv[es] credit to hospitals for having a . . . Hand Hygiene Policy." (*Id.*) What the Safety Grades do is *subjectively* assess the *quality* of a hospital's hand hygiene policy by placing nonparticipating hospitals at a low, non-zero point on an achievement scale, thereby conveying "Limited Achievement" as compared to participating hospitals. "Limited Achievement" in hand hygiene is not an empirically measurable fact: "limited" reflects a subjective take on the degree of "achievement," another subjective term.

Plaintiffs may disagree with Leapfrog's assessment that nonparticipation is indicative of "Limited Achievement." But the one predicate fact here—that a hospital declined to participate in Leapfrog's survey—is true, and Leapfrog disclosed it. And the evaluative judgment Leapfrog drew from that fact—that non-participation warrants a lower safety score—is precisely the kind of "subjective weighing of objective data" that this Court acknowledged at the motion-to-dismiss stage constitutes protected opinion. (Dkt. 41 at 5.) Plaintiffs identify nothing that might render false either the inference from nonparticipation or the assessment of "Limited Achievement" in safety. Under *Milkovich*, the upshot is complete protection: a statement on a matter of public concern "must be provable as false before there can be liability." 497 U.S. at 19.

Finally, Leapfrog's disclosure of its methodology suffices to vindicate it. Plaintiffs argue that, even if the Safety Grades could otherwise be characterized as opinion, they lose that protection because Leapfrog's readers did not have "existing background knowledge" about Leapfrog's methodology and the methodology was not in "the same publication." (Opp. at 10.) But that misstates the test. "[A] defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are *otherwise known or available to the reader* or listener as a member of the public." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (emphasis added); *see* (Opp. 11 (conceding that "the methodology document" was "*available*").). That standard—which Plaintiffs ignore, after Leapfrog emphasized it repeatedly—depends upon *availability*, not uptake. The First Amendment has never required publishers to demonstrate that readers found or engaged with a disclosure—a rule that would expose commentators, reviewers, and analysts to untold liability depending on how judges and

5

juries assess their website design and web traffic patterns.  Such second-guessing of accurate disclosures is not only anomalous but antithetical to freedom of expression in this context.

### C.     Actual Malice Is Required

Even if Leapfrog's Safety Grades and imputed-value methodology were not protected pure opinion—and they are—the judgment still cannot stand because the Court never made the finding of actual malice that the First Amendment independently requires.[4]

Plaintiffs first suggest that Leapfrog has drawn a "false equivalence" between a modern statutory cause of action and the "common-law speech torts" considered in landmark Supreme Court cases.  (Opp. at 14.)  But Plaintiffs here are arguing against the U.S. Supreme Court.  A statutory tort is not exempt from First Amendment coverage simply because it covers false statements "to gain a material advantage" in the abstract.  (Opp. at 14 (quoting *United States v. Alvarez*, 567 U.S. 709, 723 (2012)).)  "Instead, content-based restrictions on speech have been permitted, as a general matter, only when confined to the few 'historic and traditional categories of expression long familiar to the bar."  *Id.* at 717 (quotation marks and brackets omitted). Plaintiffs do not analogize to any such category—the closest they come is their misconceived (and dangerous) analogy to extortion, *see supra* pp. 3–4.  And when a plaintiff tries to fit a speech claim within the confines of the First Amendment based on "injury upon honor and reputation through false publication," it must meet the constitutional standards for justifying an exception to the protections that otherwise hold sway:  a false statement of fact made with actual malice.  *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 135 (1967).  Any contrary rule would empower a state to thwart the actual-malice standard just by enacting a new cause of action authorizing suit for negligently caused reputational harms.

No finding of actual malice appears anywhere in the Court's injunction order, nor would the record support one.  Plaintiffs contend the Court's findings about Leapfrog's "intentional[]" motives satisfy actual malice (Opp. at 14–15), but they are wrong.  Finding that a speaker acted to achieve a commercial or strategic goal, as the Court did here, says nothing about whether that

---

[4]  Plaintiffs argue that Leapfrog specifically "forfeited" its "actual-malice argument."  (Opp. at 12.)  But parties can forfeit only "issues," not "arguments"—and even a "new argument" "inconsistent" with one raised earlier may be made if in service of "the same bottom-line request." *Spurgeon v. Soc. Sec. Admin., Comm'r*, 2024 WL 1395258, at *3 (Apr. 2, 2024).  In any event, *Plaintiffs* previously briefed actual malice, recognizing that requirement followed inexorably from Leapfrog's invocation of the First Amendment.  (Dkt. 136 ¶ 133.)

speaker harbored subjective doubts about the truth of what it published.  Actual malice requires proof specifically that the defendant published "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *St. Amant v. Thompson*, 390 U.S. 727, 728 (1968).  Reckless disregard demands "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication"—not merely that the defendant had a punitive or commercial motive.  *Id.* at 731.  Leapfrog maintained throughout trial that its non-response-bias rationale reflects legitimate scientific reasoning, and the Court's own findings confirm that Leapfrog *believed* its methodology was defensible.  (Dkt. 212 at 27–28 & n.8 (noting Leapfrog's view expressed at trial that accounting for non-participation accurately reflects that non-responsive hospitals "decline to participate in the Survey to avoid disclosure of poor safety performance").)  A party that subjectively believes in its methodology has not entertained "serious doubts as to the truth" of its publication.  *St. Amant*, 390 U.S. at 731.  Nor does *Alvarez*, 567 U.S. 709, fill in the gap.  There, the plurality reaffirmed that "falsity alone may not suffice to bring the speech outside the First Amendment" and that "[t]he statement must be a knowing or reckless falsehood."  *Id.* at 719.  Finally, by no means did this Court come anywhere close to finding, as it would need to, that *clear and convincing* evidence established that Leapfrog was speaking with actual malice relative to the truth.  *See Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020).

## II.   FDUTPA DOES NOT APPLY

Even if the Court declines to reach Leapfrog's First Amendment arguments directly, it can and should resolve this case on statutory grounds by construing FDUTPA to avoid the serious constitutional questions identified.  Plaintiffs argue this argument is forfeited.  (Opp. at 15–16.)  But the constitutional-avoidance canon is not a freestanding claim requiring independent preservation.  Instead, it is a principle of statutory interpretation that courts apply as a matter of their own interpretive "obligat[ion]," *State v. Giorgetti*, 868 So.2d 512, 518 (Fla. 2004), or "duty," *State v. Gale Distribs.*, 349 So.2d 150, 153 (Fla. 1977).  Nor are Plaintiffs persuasive in denying any ambiguity.  Plaintiffs contend FDUTPA is unambiguous in light of its breadth.  The relevant question, however, is not whether FDUTPA is facially ambiguous in the abstract, but whether its application to this particular category of conduct (a nonprofit watchdog's publication of hospital safety grades) is constitutionally problematic.  It is, for the reasons explained above.  Further, while

7

denying that vagueness inheres in a broadly worded statute, (Opp. at 16), Plaintiffs cite no authority for categorically exempting a broadly worded statute from the avoidance canon.

A constitutionally sound construction here jumps out. Florida's Legislature has expressly declared that the public policy of this State is to protect the exercise of free speech in connection with public issues. Fla. Stat. § 768.295(1). Applying FDUTPA to a nonprofit's non-commercial publication of evaluative hospital safety grades defies that declared public policy. A court construing FDUTPA's "unfairness" standard in light of that policy, and the serious First Amendment concerns identified above, should conclude that this conduct falls outside the statute's reach. Similarly, FDUTPA's "deceptive" prong, while broadly worded, has never been applied to the editorial judgments of a press organization publishing on a matter of public concern, absent any showing of knowing or reckless falsity. Construing the statute to require at least that showing—as both Plaintiffs and Leapfrog agreed the First Amendment would require if it applies—is a reasonable and available reading that avoids grave constitutional difficulties.

## III.   THE INJUNCTION IS ITSELF UNCONSTITUTIONAL

### A.   The Injunction Is A Prior Restraint

Plaintiffs are wrong in arguing (Opp. at 17) that Leapfrog never contended that injunctive relief would constitute an impermissible prior restraint. In actuality, Leapfrog so contended at summary judgment, (Dkt. 99 at 19), in opening at trial, (Dkt. 204-1 at 39:15–18), and in closing, (Dkt. 204-5 at 43:22–44-4; *id.* at 43:6–7), where Leapfrog further protested any remedy that might restrain speech, (Dkt. 204-5 at 81:2–3). And Plaintiffs grasped these arguments well enough to devote substantial ink to engaging Leapfrog's prior-restraint theory. (Dkt. 203 ¶¶ 290, 292.)

Regardless, the very fact that an ongoing injunction is at issue would "cut[] in favor of . . . considering inadequately preserved arguments." *Sindi v. El-Moslimany*, 896 F.3d 1, 29 (1st Cir. 2018). After all, "[a]n injunction is a drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). This Court retains jurisdiction to modify its injunction whenever equitable principles so warrant, *see Hodge*, 862 F.2d at 861–62, and, here, the First Amendment problems became starkest post-trial, when Plaintiffs began wielding the injunction to chill protected speech that the Court never ruled to be unlawful, (Dkt. 219-1, 219-3).

Notably, Plaintiffs are hard pressed to defend the injunction on the merits. They assert that the injunction, including its prohibition on "any similar" future methodologies, is "narrowly drawn" to target conduct found unlawful. (Opp. at 17.) But their reasoning, such as it is, does not

8

bear scrutiny.  According to Plaintiffs, injunctions must reach "any similar" conduct or else be "for naught." (*Id.*)  By that logic, the requisite "narrow" injunction would become unbounded, as it would need to extend ever-further lest it be "circumvented."  Nor is this injunction tailored towards the potentially actionable aspects of Leapfrog's safety grading; it silences the Safety Grades themselves, instead of targeting statements about the methodology.

Plaintiffs cite *Lucero v. Trosch*, 121 F.3d 591 (11th Cir. 1997), to argue that the injunction is not a prior restraint because it remedies adjudicated unlawful conduct.  (Opp. at 18.)  But *Lucero* applied *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994), to a content-neutral injunction regulating the time, place, and manner of protestors' conduct surrounding an abortion clinic—the defendants could "still express their message," albeit while standing farther away. *Lucero*, 121 F.3d at 600, 606.  Here, by contrast, the injunction completely prohibits Leapfrog from expressing its substantive views about Plaintiffs' safety performance through the medium of Safety Grades.  *Lucero* comes nowhere close to authorizing any such content-based ban.[5]

Plaintiffs also cite *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations* (Opp. at 18), but that case, unlike this one, concerned an injunction issued by a city commission that lacked the power of contempt to punish noncompliance.  413 U.S. 376, 390 n.14 (1973).  When it comes to *court*-issued injunctions, the Supreme Court has bracketed the question whether injunctive relief targeting speech may *ever* be appropriate. *See Tory v. Cochran*, 544 U.S. 734, 736–38 (2005) (summarily vacating injunction and declining to reach merits of whether a permanent injunction is a constitutionally permissible remedy in a defamation case where the plaintiff died post-argument).  In any event, courts in this circuit and state subscribe to the conventional view that injunctions proscribing speech based on its content are impermissible prior restraints, "even where liability . . . has been found." *Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *52 (S.D. Fla. Sept. 20, 2023); *see, e.g.*, *Grayson v. No Labels, Inc.*, 2023 WL 2919911, at *5 (M.D. Fla. Jan. 17, 2023); *Krapacs v. Bacchus*, 301 So. 3d 976, 980 (Fla. 4th DCA 2020).

This "traditional rule of Anglo-American law" was applied "with remarkable uniformity" by nineteenth- and twentieth-century American courts and endures to this day across state and federal courts.  Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157,

---

[5]  Plaintiffs omit to note that *Lucero* applied the strict-scrutiny-like standard of *Madsen*—which is the floor, not the ceiling, of constitutional scrutiny that obtains when injunctive relief touches even tangentially upon speech. *Lucero*, 121 F.3d at 605.

158, 167 (2007); *see also McCarthy v. Fuller*, 810 F.3d 456, 466 (7th Cir. 2015) (Sykes, J., concurring). Plaintiffs note that the rule frequently applies in cases involving preliminary injunctions issued "absent a prior determination of illegality." (Opp. at 18–19.) But it applies with equal force in cases involving permanent injunctions, which pose a never-ending restraint on liberty. *Alexander v. United States*, 509 U.S. 544, 550 (1993) (classifying both "[t]emporary restraining orders and permanent injunctions" as "prior restraints"); *see, e.g.*, *Sindi*, 896 F.3d at 30 (permanent injunction following jury trial); *Kinney v. Barnes*, 443 S.W.3d 87, 95, 99 (Tex. 2014) (permanent injunction following trial on the merits); *Krapacs*, 301 So. 3d at 978, 980 (permanent injunction).

### B.       The Injunction Compels Speech

The injunction also violates the First Amendment by compelling Leapfrog to speak contrary to its own views. Plaintiffs argue the corrective disclosure requirements are permissible because they involve commercial speech. (Opp. at 20.) But requiring Leapfrog to declare to its licensees and in its promotional materials that its Safety Grades were "found to be deceptive and unfair" is neither "commercial" nor a neutral recitation of the litigation outcome. It is a court-mandated recantation of Leapfrog's own expert judgments about hospital safety. The *Zauderer* line of cases on which Plaintiffs rely permits compelled disclosure only of factual, uncontroversial information in the commercial advertising context to prevent consumer deception. Here, the required disclosure does not convey a neutral fact about a product being advertised—it compels Leapfrog to denounce its own editorial judgments. That is categorically different from, for example, requiring disclosure of a product's ingredients or a service's material terms. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). Because Leapfrog's Safety Grades reflect its "exercise of editorial control and judgment" for the benefit of an external audience focused on hospital safety, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), the messaging surrounding them should remain Leapfrog's alone, and the injunction provisions compelling disclosure should be withdrawn.

### CONCLUSION

For the foregoing reasons, the Court should grant Leapfrog's motion.

10

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of May, 2026, a true and correct copy of the foregoing document was electronically transmitted to all counsel of record via the CM/ECF system.

By: */s/ Jason D. Sternberg*
Jason D. Sternberg
Florida Bar No. 72887
jasonsternberg@quinnemanuel.com

DATED: May 20, 2026                    **Respectfully submitted,**

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
By:   */s/ Jason D. Sternberg*
Jason D. Sternberg

Derek L. Shaffer (*pro hac vice*)
**QUINN EMMANUEL URQUHART & SULLIVAN LLP**
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8123
derekshaffer@quinnemanuel.com

Jason D. Sternberg (Fla. Bar No. 72887)
**QUINN EMMANUEL URQUHART & SULLIVAN LLP**
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
jasonsternberg@quinnemanuel.com
(305) 439-5008

*Counsel for Defendant The Leapfrog Group*

11