**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-CV-80526-MIDDLEBROOKS**

**GOOD SAMARITAN MEDICAL CENTER,
INC., DELRAY MEDICAL CENTER, INC.,
PALM BEACH GARDENS COMMUNITY
HOSPITAL, INC. D/B/A PALM BEACH
GARDENS MEDICAL CENTER, ST.
MARY'S MEDICAL CENTER, INC. AND
WEST BOCA MEDICAL CENTER, INC.,**

      **Plaintiffs,**

**v.**

**THE LEAPFROG GROUP,**

      **Defendant.**

_____/

**DEFENDANT THE LEAPFROG GROUP'S RESPONSE IN OPPOSITION
<u>TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS</u>**

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

      A.     Plaintiffs Staff Their Legal Team Disproportionately To Leapfrog's And
           Exceed The Constitutional Limits Set By The Court's Motion To Dismiss ...........2

      B.     Plaintiffs Unreasonably Multiply Costs Throughout The Litigation.......................3

      C.     Leapfrog Challenges The Judgment On First Amendment Grounds
           Following Plaintiffs' Threats To Initiate Contempt Proceedings ...........................5

LEGAL STANDARD...........................................................................................................6

ARGUMENT .......................................................................................................................6

I.      PLAINTIFFS ARE NOT ENTITLED TO FEES OR COSTS .............................................6

      A.     Plaintiffs Are Not Prevailing Parties Under FDUTPA And Their Motion Is
           Premature As A Matter Of Law................................................................................7

      B.     Plaintiffs Should Not Be Awarded Fees Even Assuming They Properly
           Qualify As Prevailing Parties...................................................................................8

II.     PLAINTIFFS' CLAIMED FEES AND COSTS ARE UNREASONABLE .....................15

      A.     Plaintiffs' Able Local Counsel Was Capable Of Handling This Case,
           Which Plaintiffs Grossly Overstaffed Compared to Leapfrog ..............................16

      B.     Plaintiffs Seek Fees for Work Related to a Preliminary Injunction and
           Damages That Are Not Recoverable .....................................................................17

      C.     Plaintiffs Unreasonably Inflated the Costs of Routine Tasks ...............................18

      D.     The Extent of the Unreasonableness Warrants A Large, Across-the-Board
           Percentage Reduction............................................................................................19

CONCLUSION....................................................................................................................20

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*ACLU of Georgia v. Barnes*,
  168 F.3d 423 (11th Cir. 1999) ....................................................................................................19

*Berk v. Choy*,
  607 U.S. 187 (2026)......................................................................................................................7

*Caplan v. All Am. Auto Collision, Inc.*,
  36 F.4th 1083 (11th Cir. 2022) ...................................................................................................6

*CITGO Petroleum Corp. v. Petroleum Logistics Serv. USA, Inc.*,
  2022 WL 17718802 (S.D. Fla. Nov. 30, 2022)..........................................................................19

*CityPlace Retail, L.L.C. v. Wells Fargo Bank, N.A.*,
  2021 WL 3361172 (S.D. Fla. Jan. 12, 2021) ......................................................................16, 18

*Cohen v. Off. Depot, Inc.*,
  184 F.3d 1292 (11th Cir. 1999), *vacated in part on other grounds*, 204 F.3d
  1069 (11th Cir. 2000)....................................................................................................................7

*Colomar v. Mercy Hosp., Inc.*,
  2008 WL 4459383 (S.D. Fla. Sept. 29, 2008), *aff'd*, 335 F. App'x 29 (11th
  Cir. 2009) ........................................................................................................................11, 12, 13

*FTC v. Corpay, Inc.*,
  164 F.4th 807 (11th Cir. 2026) ..................................................................................................15

*Gonzalez v. Nobregas*,
  357 So. 3d 193 (Fla. 3d DCA 2023) ...............................................................................6, 8, 10

*Hanna v. Plumer*,
  380 U.S. 460 (1965).....................................................................................................................7

*Herbst v. Am. Orthodontics Corp.*,
  2025 WL 3755394 (S.D. Fla. Jan. 23, 2025) .....................................................................7, 8, 15

*Home Performance Alliance, Inc. v. Better Bus. Bureau of W. Fla., Inc.*,
  354 So. 3d 1165 (Fla. 2d DCA 2023) .........................................................................................3

*Humane Society of Broward County, Inc. v. Florida Humane Soc.*,
  951 So. 2d 966 (Fla. 4th DCA 2007)...............................................................................8, 10, 13

*Loranger v. Stierheim*,
  10 F.3d 776 (11th Cir. 1994) ....................................................................................................19

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*,
    30 F.3d 113 (11th Cir. 1994) ................................................................7, 8

*Med-Stop, Inc. v. Vandutch, Inc.*,
    2025 WL 3282528 (S.D. Fla. Sept. 24, 2025) ..........................................17

*Mejia v. Com. Driver's License Sch., Inc.*,
    2021 WL 1893065 (S.D. Fla. Feb. 10, 2021) ...........................................16

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................................9

*Norman v. Hous. Auth. of City of Montgomery*,
    836 F.2d 1292 (11th Cir. 1988) ..................................................17, 18, 19

*Novo Nordisk, Inc. v. Wells Pharmacy Network, LLC*,
    2025 WL 1018422 (M.D. Fla. Apr. 4, 2025)...............................................7

*Otto v. City of Boca Raton*,
    2025 WL 2952783 (11th Cir. Oct. 20, 2025)...............................................6

*Pretka v. Kolter City Plaza II Inc.*,
    2014 WL 12300373 (S.D. Fla. Sept. 19, 2014) ........................................16

*Publius v. Boyer-Vine*,
    237 F. Supp. 3d 997 (E.D. Cal. 2017)........................................................9

*Taviere v. Precision Motor Cars, Inc.*,
    2010 WL 557347 (M.D. Fla. Feb. 12, 2010) ............................................13

*Vazquez v. 1052 LLC*,
    2016 WL 541432 (S.D. Fla. Feb. 11, 2016) .............................................16

*Warren Tech., Inc. v. UL LLC*,
    2020 WL 9219127 (S.D. Fla. Dec. 17, 2020) ...........................................14

**Rules/Statutes**

Federal Rule of Civil Procedure 54 ...............................................................7

Federal Rule of Civil Procedure 65 ...............................................................6

Florida Statutes § 501.2105(1)...................................................................7, 8

Local Rule 7.3 ............................................................................................15

**<u>Other Authorities</u>**

Jessica Jerreat, *Court Injunction Bars USAGM From Editorial Interference*, VOA
     News (Nov. 21, 2020), https://www.voanews.com/a/press-freedom_court-
     injunction-bars-usagm-editorial-interference/6198667.html ....................................................14

**INTRODUCTION**

Plaintiffs, five major local hospitals collectively owned by a publicly traded for-profit corporation, brought this action to muzzle the speech of Leapfrog, a consumer-focused nonprofit watchdog devoted to promoting the safety of patients nationwide. After obtaining a broad injunction that Leapfrog has moved to vacate on First Amendment grounds in the first round of this litigation, Plaintiffs have raced back to court to ram through a $10.5 million attorney's fee award against Leapfrog before it has even had an opportunity to appeal—a right protected by binding state and circuit law alike. That eight-figure amount may be inconsequential for Plaintiffs, whose parent company boasts more than $20 *billion* in annual revenue. For Leapfrog, however, it would represent a financial death sentence—one that would extinguish Leapfrog, along with its lifesaving, constitutionally protected work that has long benefited patients and other stakeholders whose interests far transcend this case.

Plaintiffs' jackbooted effort to pulverize, summarily, their nonprofit opponent turns upside-down Florida's law of unfair trade practices. To begin, Plaintiffs' fee request is premature. The statute requires that Plaintiffs be "the prevailing party" after "exhaustion of all appeals." But Leapfrog's appeal—assuming it proceeds following the Court's resolution of Leapfrog's pending motion to alter or amend the judgment—is far from exhausted. As Leapfrog has explained in its pending, expedited motion for summary denial of Plaintiffs' fee motion (Dkt. 227), the prematurity of Plaintiffs' motion alone warrants that it be denied, or at minimum, held in abeyance.

Timing aside, Plaintiffs' motion should be denied. The motion offends cherished First Amendment values together with Florida public policy. Plaintiffs' requested fee award would destroy a journalistic nonprofit organization that disseminates information of urgent public importance based on its challenged speech about just five local hospitals. That grossly excessive remedy would be punitive towards Leapfrog and *gravely injurious to consumers*. A statute that is meant to protect consumers should not be weaponized at the expense of consumers and the free flow of information and expression on which they rely. This is, therefore, the paradigmatic case on which sound exercise of this Court's discretion should result in the total denial of fees. Straightforward application of the traditional discretionary factors confirms as much.

Finally, even if the Court were to overlook the timing problem and perceive good warrant for some award, Plaintiffs' $10.5-million ask should be massively reduced. Plaintiffs gratuitously overstaffed this case by multiples as compared to Leapfrog, unnecessarily piling a national firm

1

(complete with multiple offices) atop distinguished local counsel that was fully capable of trying this case on its own. They then compounded that excess by failing entirely to exercise billing restraint, submitting entries for abandoned claims, duplicative work, and inscrutably vague descriptions. As detailed in the accompanying declaration of Paul R. Regensdorf, Esq., Plaintiffs' request is so riddled with overstaffing, duplication, and non-compensable work such that their fee request should be denied entirely or, at minimum, slashed to a fraction of the amount claimed—a conclusion that stands unrebutted, as Plaintiffs chose not to retain a fees expert of their own.

## BACKGROUND

### A. Plaintiffs Staff Their Legal Team Disproportionately To Leapfrog's And Exceed The Constitutional Limits Set By The Court's Motion To Dismiss

Plaintiffs seek more than a year's worth of fees—13,149.20 hours billed by 25 attorneys spanning more than 1,400 pages of legal bills—dating back to December 2024. (Dkt. 226-1 at 5; Dkt. 226-2 at 811.) Plaintiffs' team of local counsel from Marcus Rashbaum Pineiro & Meyers LLP and Neiman Mays Floch & Almeida PLLC was led by Jeffrey Marcus—a partner nationally recognized by Chambers USA. (Dkt. 226-5 at 1.) Plaintiffs also hired Gibson, Dunn & Crutcher LLP, who staffed the case with more than 20 lawyers from multiple offices. (Dkt. 225 at 15.) As Mr. Regensdorf explains, the addition of more than 20 Gibson Dunn attorneys—layered atop a local counsel team that was itself capable of trying this case—was unnecessary and resulted in structural redundancy throughout the billing record. (Regensdorf Report ¶¶ 30-31, 36.)

The earliest entries in Plaintiffs' bills relate to drafting a letter sent from Plaintiffs' parent company, Tenet Healthcare, to Leapfrog and its counsel in January 2025, conveying demands that far exceeded the relief that Plaintiffs—five local Tenet hospitals—obtained in this litigation. Tenet demanded that Leapfrog "remove from its website *all* references to Tenet Hospitals"—not just the Safety Grades, and not just references to Plaintiffs. (DX-931 (emphasis added).) Plaintiffs likewise threatened to assert causes of action that they never brought in this case and to "seek[] damages," which they later disavowed when pressed to prove their damages in discovery. (*Id.*)

Plaintiffs followed up on their threats with a complaint filed on April 30, 2025. (Dkt. 1.) Plaintiffs' original complaint dated April 30, 2025 included a request for preliminary injunctive relief. (Dkt. 1 at 53.) Plaintiffs filed a motion for a preliminary injunction accompanied by 65 exhibits on May 17, 2025. (Dkt. 20.) But Plaintiffs withdrew their request for a preliminary injunction on May 27, 2025 (just ten days after submitting their voluminous filing), citing the Court's decision to set a trial date for January 2026. (Dkt. 34.)

2

On the other side of the caption, Leapfrog staffed this case with a small, core team of three attorneys (one partner and two associates) from Wilson Elser Moskowitz Edelman & Dicker LLP, who accomplished the lion's share of the work from start to finish.  The defense moved to dismiss, including on First Amendment grounds.  (Dkt. 39.)  The Court denied dismissal on the basis that claims that "challenge false or misleading statements made about the rating process itself" are constitutionally permissible, while claims that challenge the subjective assessments of online ratings services are not.  (Dkt. 41 at 5-6; Dkt. 220 at 8); *see Home Performance Alliance, Inc. v. Better Bus. Bureau of W. Fla., Inc.*, 354 So. 3d 1165, 1166 (Fla. 2d DCA 2023).  Thereafter, Plaintiffs disregarded that essential distinction by trying to bar Leapfrog from even expressing its constitutionally protected opinions in developing its Safety Grades—not just its representations about the Grades—compounding the cost of the litigation to no good end.  (Dkt. 203 at 72-75.)

## B.      Plaintiffs Unreasonably Multiply Costs Throughout The Litigation

Plaintiffs' discovery tactics further ballooned their bills.  Plaintiffs made far-ranging discovery requests comprising 46 requests for production and 20 interrogatories.  (Blair Dec. ¶ 5.) Leapfrog proposed targeted search terms, but Plaintiffs rejected them as "too narrowly constructed."  (*Id.* ¶ 6.)  Plaintiffs then proposed counter search terms to which Leapfrog acquiesced.  (*Id.*)  Plaintiffs further expanded their list of search terms on July 9, 2025, on July 16, 2025, and again on July 18, 2025.  (*Id.*)

Plaintiffs' search terms hit upon nearly a million pages of documents, as  Leapfrog reported to Plaintiffs on July 18 and again on July 25.  (*Id.* ¶ 8.)  Yet Plaintiffs responded by urging Leapfrog to produce in haste, which Leapfrog endeavored to do as best it could amidst the delays inherent in producing voluminous data in batches, beginning with RFPs Plaintiffs identified as high priority. *Id.*  At that point, Plaintiffs began complaining that the documents produced according to their own search terms were unduly burdensome for Plaintiffs to review.  (*Id.* ¶ 9.)[1]

By contrast, when due to respond to *Leapfrog's* discovery requests, Plaintiffs devoted their energies to trying withholding responsive documents.  Plaintiffs refused to respond to eight of

---

[1]  Plaintiffs continued compounding the discovery burden through eve of trial when Plaintiffs devoted "substantial additional time" to pressing for information about an alleged change to language on Leapfrog's webpages—information that was found in Lauren Bailey's deposition designations, as played at trial.  (Dkt. 225 at 8.)  Perplexingly, the issue never even made it into Plaintiffs' final proposed findings of fact and conclusions of law.  (Dkt. 203.)

3

Leapfrog's interrogatories and 19 of Leapfrog's requests for production. (*Id.* ¶ 10.) After initially citing "relevance" objections, Plaintiffs belatedly pivoted to dropping their damages claim—which came as a surprise to Leapfrog after several meet and confers lasting more than an hour apiece where Plaintiffs never previewed the maneuver. (Dkt. 62 Ex. 2.) Plaintiffs then devoted resources to seeking a protective order, necessitating a hearing before Judge Matthewman. (Dkt. 55.) Post-hearing, Plaintiffs agreed to provide additional discovery. (Dkt. 76; *see also* Regensdorf Report ¶ 59.) Plaintiffs also exacerbated costs by marking the vast majority of documents they produced as "confidential." (Blair Dec. ¶ 18.) This included communications between Plaintiffs and Leapfrog. (*Id.*) Because this designation made it nearly impossible for Leapfrog to file Plaintiffs' documents, Leapfrog challenged Plaintiffs' spurious confidentiality designations in emails and meet and confers in late October and early November. (*Id.* ¶ 19.) Only after Leapfrog informed Plaintiffs that it would need to challenge Plaintiffs' excessive confidentiality designations did Plaintiffs finally relent. (*Id.* ¶ 20.)

Just as Plaintiffs abandoned their request for a preliminary injunction midstream, they also abandoned the claim for damages set out in their original complaint. (Dkt. 1 at 53.) Plaintiffs' notice of withdrawal was not filed until August 12, 2025, after both sides had already engaged in substantial damages-related discovery. In addition to seeking to avoid reciprocal discovery, Plaintiffs acknowledged that they decided to drop their damages claim in part because Leapfrog's Answer noted Plaintiffs' failure to mitigate damages and the speculative and remote nature of the claimed damages. (Dkt. 54 at 1.) In a similar vein, Plaintiffs engaged, prepared, and then dropped their branding expert, Thomas Chakurda. (*See* Regensdorf Report ¶¶ 49-51.)

Several of the motions Plaintiffs *did* fully brief were meritless and were denied by the Court in their entirety. This included Plaintiffs' summary judgment motion. (Dkt. 139; *see also* Regensdorf Report ¶ 62.) In denying Plaintiffs' motion for summary judgment, the Court noted Plaintiffs' "problematic interpretation" of FDUTPA as not requiring that an "unfair" practice relate to consumer injury and Plaintiffs' "misplaced" argument that hospitals are consumers under FDUTPA. (Dkt. 139 at 9-10.) Plaintiffs' purported *Daubert* motion seeking to exclude four Leapfrog witnesses was similarly denied, as Plaintiffs' arguments "boil[ed] down more to objections on relevance and/or sufficiency of the evidence grounds" that were better saved for trial. (Dkt. 176 at 1, 3; *see also* Regensdorf Report ¶ 62.)

4

The parties attended a settlement conference before Magistrate Judge Matthewman in November 2025. (Dkt. 106.)  The conference resulted in an impasse, though Judge Matthewman expressly found that "[n]egotiations were held in good faith" at the conference. (*Id.*)  Plaintiffs contend that the impasse demonstrates Leapfrog's ostensible refusal to compromise, but omit any mention of their own settlement demands and own decision not to compromise. (Dkt. 225 at 4.)

The case proceeded to a five-day bench trial.  At trial, Plaintiffs put on a single unified case that did not differentiate among the five hospitals—just as all prior motion practice and discovery had proceeded with Plaintiffs acting as a unit.  Never once did Plaintiffs file separate briefs. (*See* Regensdorf Report ¶ 11.)

The Court ruled for Plaintiffs and entered injunctive relief. (Dkt. 212.)

### C. Leapfrog Challenges The Judgment On First Amendment Grounds Following Plaintiffs' Threats To Initiate Contempt Proceedings

Following the entry of the injunction, Plaintiffs and their parent company, Tenet Healthcare Corporation, wrote several demand letters to Leapfrog.  In an April 14, 2026 letter, Plaintiffs alleged Leapfrog's "noncompliance with the Court's recent injunction" based on aspects of Leapfrog's reporting that the Court's injunction order was silent about. (Dkt. 219-1 at 1.)  The letter demanded that Leapfrog remove content from its website, including a page noting that hospitals that declined to respond to Leapfrog's survey had "Declined To Respond," and objected to a pop-up stating that "Thousands of hospitals nationwide report to the Leapfrog Hospital Survey to help patients and purchasers make better health care decisions.  This hospital did not participate. Ask them why not." (*Id.* at 2-4.)  Plaintiffs' letter alleged that Leapfrog was violating the injunction by using its "Declined to Respond" label and accompanying, fully disclosed definition. (*Id.*)  The letter further claimed that Leapfrog violated the injunction by opining that facilities that declined to respond "deprived patients of 'critical, life-saving information.'" (*Id.* at 2-3.)  Even though the Court's injunction did not restrict Leapfrog's expression on the relevant website— leapfroggroup.org—which does not display Safety Grades at all, Plaintiffs tried to censor Leapfrog's speech as to "all Tenet-owned hospitals," including dozens that were never joined in this case. (*Id.* at 4.)  The letter also demanded that "Leapfrog agree that it will not rate or otherwise score any Tenet-owned [Ambulatory Surgical Center (ASC)] facility" as part of a planned ASC public reporting program never addressed by this litigation. (*Id.* at 5.)  Based on these asserted violations of the injunction, Plaintiffs threatened to "pursue . . . enforcement measures under Federal Rule of Civil Procedure 65." (*Id.*)  When Leapfrog responded by highlighting the

constitutional offensiveness of these threats, Plaintiffs seemed to backtrack while pledging to "continue to carefully monitor" Leapfrog's speech.  (Dkt. 219-3 at 3.)

Leapfrog has moved to alter or amend the judgment on First Amendment and constitutional-avoidance grounds.  (Dkt. 220.)  As a protective measure, Leapfrog also filed a notice of appeal.  (Dkt. 221.)  Two weeks later, Plaintiffs filed the instant fee motion even as Leapfrog objected to its prematurity citing FDUTPA's appeal-exhaustion requirement and binding Eleventh Circuit precedent interpreting it, as well as the facial unreasonableness of the fees Plaintiffs claim.  (Dkt. 231-1.)  Leapfrog accordingly filed a separate expedited motion for summary denial of the fee motion or, alternatively, to hold the fee motion in abeyance or convene a status conference.  (Dkt. 227.)  That expedited motion is now fully briefed and remains pending.

## LEGAL STANDARD

A "fee applicant bears the burden of establishing entitlement to attorney's fees" and the reasonableness of the fees claimed.  *Otto v. City of Boca Raton*, 2025 WL 2952783, at *2 (11th Cir. Oct. 20, 2025).  FDUTPA "vests the trial court with discretion to award fees and costs" to the prevailing party.  *Gonzalez v. Nobregas*, 357 So. 3d 193, 195 (Fla. 3d DCA 2023).  District courts likewise have discretion to determine the amount of a reasonable attorney's fee, which they may calculate by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate"—often called the "lodestar method."  *Caplan v. All Am. Auto Collision, Inc.*, 36 F.4th 1083, 1089 (11th Cir. 2022) (citation omitted).  In applying that method, district courts must "deduct time for excessive or unnecessary hours," "unnecessary motion practice," and unreasonably "litigious" conduct.  *Id.* at 1090-91.

## ARGUMENT

### I.   PLAINTIFFS ARE NOT ENTITLED TO FEES OR COSTS

Plaintiffs are not entitled to any fees or costs under FDUTPA.  Their motion is premature under FDUTPA's express terms and binding circuit precedent.  Beyond that, their requested fee award offends First Amendment values and state public policy.  And the traditional multi-factor test for evaluating fee claims under FDUTPA weighs strongly against an award.  The Court should deny Plaintiffs' motion in its entirety for any or all of these reasons.

6

**A.      Plaintiffs Are Not Prevailing Parties Under FDUTPA And Their Motion Is Premature As A Matter Of Law**

For the reasons explained in Leapfrog's motion to summarily deny Plaintiffs' fees motion (Dkt. 227) and reply in support (Dkt. 232), which Leapfrog fully incorporates here, Plaintiffs' motion is premature and defective on that basis alone.  As Plaintiffs concede in the instant motion, when it comes to "the timing of this motion," "[e]arlier decisions"—including binding Eleventh Circuit authority—"treated FDUTPA's exhaustion-of-appeals language as controlling." (Dkt. 225 at 6 n.1.)  Under Florida Statutes § 501.2105(1), a prevailing party "may" receive a fee award only "after judgment in the trial court and exhaustion of all appeals." (emphasis added).   Binding precedent therefore holds that, "[t]o award such fees" in federal as well as state court, "the Court must determine if [litigants] were prevailing parties, and ensure that all appeals have been exhausted." *Herbst v. Am. Orthodontics Corp.*, 2025 WL 3755394, at *1 (S.D. Fla. Jan. 23, 2025) (Middlebrooks, J.) (emphasis added); *see also M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 30 F.3d 113, 115 (11th Cir. 1994).  Courts interpret the "plain language of Fla. Stat. § 501.2105(1) at face value and routinely den[y] motions for attorney's fees . . . under FDUTPA without prejudice, subject to renewal, if appropriate, following the conclusion of an appeal." *Novo Nordisk, Inc. v. Wells Pharmacy Network, LLC*, 2025 WL 1018422, at *3 (M.D. Fla. Apr. 4, 2025).  Far from displacing FDUTPA's timing provisions, Federal Rule of Civil Procedure 54(d)(2)(B) incorporates them, specifying a default timeline for filing "[u]nless a statute or a court order provides otherwise." Fed. R. Civ. P. 54(d)(2)(B).

Plaintiffs try, but fail, to dispel that authority by invoking a recent Supreme Court case, *Berk v. Choy*, 607 U.S. 187 (2026).  Plaintiffs purport to find revelatory *Berk*'s observation "that, when a valid Federal Rule of Civil Procedure answers the disputed timing question, it governs notwithstanding contrary state law.  (Dkt. 225 at 6 n.1.)  But that merely restates first-year civil procedure doctrine, as long articulated by the Supreme Court and the Eleventh Circuit. *See Hanna v. Plumer*, 380 U.S. 460, 471 (1965); *Cohen v. Off. Depot, Inc.*, 184 F.3d 1292, 1296 (11th Cir. 1999) ("Under *Hanna,* the proper question to ask is not whether the state law provision is procedural or substantive; instead, the court must ask whether the state law provision conflicts with a federal procedural rule.  If it does, the federal procedural rule applies and the state provision does not."), *vacated in part on other grounds*, 204 F.3d 1069 (11th Cir. 2000).

Since filing their original motion, Plaintiffs have shifted positions; now, they claim that they need not resort to *Berk* or the *Erie* doctrine, and are correct under existing precedent, because

7

there is no conflict between federal and state law.  (*See* Dkt. 231.)  Plaintiffs are right to now concede, contrary to their fees motion, that there is no conflict between federal and state law.  But they were correct the first time about what state law requires:  As this Court has expressly recognized, FDUTPA controls when fees can be "award[ed]."  *Herbst*, 2025 WL 3755394, at *1. That is because, as the Eleventh Circuit has held, FDUTPA "expressly includes the culmination of the appellate process in its definition of a prevailing party."  *M.G.B. Homes*, 30 F.3d at 115. And under FDUTPA, only a "prevailing party" may move for fees.  Fla. Stat. § 501.2105(1). Because Leapfrog's "appeals" have not "been exhausted," there is not yet any prevailing party whose fees may be sought and "award[ed]" at this time.  *Herbst*, 2025 WL 3755394, at *1; (*see also* Dkt. 225 at 6 n.1 (citations omitted)).  At a minimum, judicial economy counsels in favor of deciding the motion after the conclusion of appeal.

### B.      Plaintiffs Should Not Be Awarded Fees Even Assuming They Properly Qualify As Prevailing Parties

In any event, the motion should be denied whenever it comes.  Leapfrog is a consumer-advocacy nonprofit that publishes constitutionally protected speech on issues of urgent public concern.  Heaping a substantial fee award atop a broad permanent injunction would undermine—not promote—both the First Amendment and the policy goals enshrined by the Florida Legislature. Moreover, the discretionary factors for FDUTPA fee awards set out in *Humane Society of Broward County, Inc. v. Florida Humane Society*, 951 So. 2d 966 (Fla. 4th DCA 2007), point to the same outcome.  The Court thus has ample reason to deny fees on the merits.  Mr. Regensdorf, who has lectured extensively on FDUTPA fee awards, likewise concludes that the *Humane Society* factors weigh against any award approaching the claimed amount.  (Regensdorf Report ¶¶ 3-8, 78-80.)

#### 1.      First Amendment And Public Policy Concerns Alone Warrant Denial Of Any Fee Award

The Court should deny any fee award because any such award would be anathema to both the First Amendment and state public policy as expressed by the Florida Legislature.  That is reason enough to deny fees, even setting aside other factors.  *See Gonzalez*, 357 So. 3d at 195 (the *Humane Society* factors are "non-exhaustive" and courts "may consider" them).

This Court has recognized that Leapfrog is "a watchdog" nonprofit organization devoted to the "laudable" mission of promoting the "safety, quality and affordability of U.S. health care by using transparency to support informed health care decisions" for patients nationwide.  (Dkt. 212 at 3, 29.)  That mission is no less laudable, no less urgent, and no less dependent on adequate

financing following the Court's injunction.  Even assuming the Court's judgment persists unaltered, the Court's order addressed Leapfrog's publication of Safety Grades as applied to only a small number of local hospitals who decline to report their data in Leapfrog's survey.  (*Id.* at 40-41.)  Leapfrog's assessments of other hospitals nationwide remain beyond reproach.  Those constitutionally protected assessments not only inform consumers but stand to save lives.  Yet a fee award—particularly of the size that Plaintiffs now demand—would threaten Leapfrog's very existence and, along with it, Leapfrog's consumer-focused mission.  The requested amount of $10.5 million would represent a financial death sentence for Leapfrog; even on Plaintiffs' own account, it exceeds Leapfrog's annual *revenue* (*before* any expenses) by well over a million dollars.  (Dkt. 225 at 9-10; *see also* Regensdorf Report ¶¶ 5, 82.)

It would not be a sound exercise of discretion to bankrupt a consumer-advocacy press organization in the name of protecting consumers.  "[T]he imposition of attorney's fees and costs is a form of liability, particularly in the First Amendment context, where even their mere potential may have a chilling effect on First Amendment rights."  *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1019-20 (E.D. Cal. 2017).  Assuming this Court continues to fault specific aspects of Leapfrog's speech about five local hospitals, it by no means follows that the Court should end Leapfrog's vitally important and constitutionally protected work on behalf of patients nationwide.  Otherwise, FDUTPA would become a chilling regime under which "would-be critics of official conduct may be deterred from voicing their criticism . . . because of . . . fear of the expense of" litigation.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).

The Court should decline Plaintiffs' invitation to set that chilling precedent.  The injunction permanently restraining Leapfrog's speech—which, Leapfrog respectfully submits, also transgresses constitutionally sacrosanct ground—more than suffices.  There is no good reason why this Court should magnify the obvious threat to free expression.

Even louder alarms should be raised by Plaintiffs' studied disregard of acknowledged First Amendment constraints.  The Court denied Leapfrog's motion to dismiss on the premise that the First Amendment permits "a challenge to [Leapfrog's] representations about its methodology," but not to the protected opinions of "online grading services," like Leapfrog's, "which often rely on a subjective weighing of objective data."  (Dkt. 41 at 5-6.)  At trial, however, Plaintiffs blew past that constitutional limit, insisting on an injunction that enjoined publication of the Safety Grades themselves, the imputed-value methodology underlying them, and any similar

9

methodology—not just factual representations about the methodology. (Dkt. 203 at 72-75; Dkt. 212 at 40-41.) Although Plaintiffs now bid to avoid scrutiny of their overreach based on procedural arguments (Dkt. 223 at 6-8, 12-13, 15-17, 19), those arguments have no place in this context, where the Court is being asked to exercise its discretion contrary to core constitutional constraints.

Worst of all may be Plaintiffs' post-judgment effort to leverage the injunction and the specter of contempt under it to impose a prior restraint. (Dkt. 219-1; Dkt. 219-3.) As meritless and constitutionally foreclosed as Plaintiffs' effort is, it shows they want to amass every conceivable arrow into their censorial quiver. No sooner had the Court entered judgment than the Plaintiffs threatened, *e.g.*, to pursue contempt proceedings against Leapfrog for speech not even plausibly covered by the Court's injunction, including speech about *non-parties* and a ratings program this Court has never addressed. (Dkt. 219-1.) Since then, Plaintiffs have continued threatening Leapfrog in the same vein. The Court should not endorse, enhance or encourage this heavy-handed, censorial campaign.

FDUTPA's text, history, and purpose lead to the same conclusion. FDUTPA does not provide for automatic fee awards; in 1994, the Florida legislature amended the statute to make any award under it discretionary. *Humane Soc.*, 951 So. 2d at 971. That discretion exists for cases like this one. Leapfrog differs profoundly from the typical FDUTPA defendant that has misled its own customers for profit. It is a nonprofit organization whose mission is to *protect* consumers by publishing information vital to their safety and wellbeing. Plaintiffs are blinking reality when they paint the mechanical entry of a discretionary eight-figure fee award against a consumer watchdog as though it is "ordinary." (Dkt. 225 at 5.) In actuality, such an award would be both extraordinary and perverse: Plaintiffs want to use the prospect of bankrupting a consumer-advocacy nonprofit as means to censor and silence its speech, at the grave expense of patients nationwide and also of freedom of speech and of the press. The Court should decline to assist them.

### 2. The *Humane Society* Factors Do Not Support A Fee Award

Alternatively or in addition, the Court should deny fees under the *Humane Society* factors. These "non-exhaustive" factors "include: (1) the scope and history of litigation; (2) the ability to pay fees; (3) whether an award of fees would deter future conduct; (4) the merits of the respective positions of the parties; (5) whether the claim was frivolous, unreasonable, or groundless; (6) whether claims or defenses were raised to frustrate or stall; and (7) whether the claim was brought to resolve a significant issue under FDUTPA." *Gonzalez*, 357 So. 3d at 195 (quoting *Humane*

*Soc.*, 951 So. 2d at 971-72).  Here, each factor counsels against fees or is neutral.  *See Colomar v. Mercy Hosp., Inc.*, 2008 WL 4459383, at *5 (S.D. Fla. Sept. 29, 2008) (denying fee award under FDUTPA to prevailing-party hospital because the *Humane Society* factors were either neutral or favored non-prevailing party), *aff'd*, 335 F. App'x 29 (11th Cir. 2009).

***Scope and history of the litigation.***  This factor weighs against fees or is, at most, neutral. Responsibility for multiplying the cost of this litigation belongs with Plaintiffs, which staffed this case with more than two dozen billers across three law firms even though local counsel was thoroughly capable of handling the case on its own.  The predictable result was a gargantuan tab— $10.5 million in fees purportedly resting on 13,149.20 hours billed, the equivalent of 547 full calendar days and triple the number of hours billed by Leapfrog's core counsel team.  Leapfrog should not be forced to bear the resulting, gratuitous costs.  (*See also* Regensdorf Report ¶¶ 28-33, 35-39.)

The record and Plaintiffs' own invoices drive the point home. Plaintiffs seek to charge Leapfrog with paying for research on causes of action, like defamation (*see, e.g.*, Dkt. 226-1 at 16, 21-22, 49), that Plaintiffs never pursued, a damages claim they pled and forced Leapfrog to defend against in discovery but then abandoned (Dkt. 54), and a withdrawn motion for preliminary injunction (Dkt. 20).  Plaintiffs also filed a series of meritless motions that the Court denied in their entirety—including Plaintiffs' summary judgment motion (Dkt. 139) and their motion to exclude four Leapfrog witnesses (Dkt. 176).  (*See* Regensdorf Report ¶¶ 60-62.)  Plaintiffs' motion (Dkt. 225) is silent about all of their doomed tactics and filings.

Separately, Plaintiffs' skewed recounting of the litigation history (*id.* at 7-8) obscures Plaintiffs' own culpability in causing the expenditures they lament.  Plaintiffs complain about the size of Leapfrog's document productions, but omit that they demanded that Leapfrog apply unreasonably broad search terms while ignoring Leapfrog's warnings that their requested discovery parameters were disproportionate.  Plaintiffs contend that Leapfrog served discovery requests too close to the deadline, but omit that they unilaterally postponed the deadline without objection from Leapfrog.  Plaintiffs insist that Leapfrog modified language on its website before trial, but ignore that they did not even mention these changes in their post-trial proposed findings and conclusions (Dkt. 203).  And Plaintiffs invite the Court to draw the adverse inference that Leapfrog "refused to compromise" (Dkt. 225 at 4) from the parties' impasse at a settlement conference, apparently forgetting Judge Matthewman's express finding that Leapfrog

11

"negotiat[ed] in good faith" and the fact that Plaintiffs obtained substantially *less* relief at trial than they demanded as part of a settlement.   (Dkt. 106; *see also* Dkt. 219-2 (refuting Plaintiffs' contentions that they are entitled to more relief than the injunction affords).)

Plaintiffs' unreasonable and disproportionate legal spend on this case by itself warrants counting the first factor in Leapfrog's favor.   At worst, however, the factor is neutral, as it frequently is following hard-fought litigation.   *See, e.g.*, *Colomar*, 2008 WL 4459383, at *2 (concluding that factor was neutral where litigation "generat[ed] significant amounts of fees and costs" but "was heavily litigated by all Parties").

***Ability to pay.***   This factor weighs strongly against any award.   As explained above, a fee award in the amount Plaintiffs demand would likely wipe out Leapfrog.   Plaintiffs' assertion that Leapfrog's $8 million in 2024 revenue confirms its capacity to absorb an even larger fee award (Dkt. 225 at 9) ignores the obvious:  an award that exceeds an organization's entire annual revenue is not one that it can be expected to pay.[2]   As for Plaintiffs' reliance on Leapfrog's post-judgment fundraising campaign (*id.*), that is equally misplaced and actually cuts against them.   A solvent organization with deep reserves would not need to raise funds on an emergency basis after a judgment.   Plaintiffs' claim that Leapfrog could pay their attorney's fees does not square with the frugality Leapfrog maintained in litigating this case for a fraction of what Plaintiffs spent.[3]   (Blair Dec. ¶ 2.)

Unable to muster a credible argument that Leapfrog can pay their desired award, Plaintiffs attempt to change the subject, contending that Leapfrog should be "blame[d]" for the expenditure of all of Plaintiffs' fees.   (Dkt. 225 at 9.)   Of course, that argument has no bearing on whether Leapfrog can afford an eight-figure fee.   It also defies both the record and common sense.   At every turn, Plaintiffs multiplied the scope of the litigation.   *See supra*, p. 3-5.   Especially when considered alongside Plaintiffs' unjustifiable staffing and billing practices, it is quite clear that Plaintiffs have only themselves to blame for their scorched-earth approach.

---

[2]   Leapfrog's most recent, publicly available Form 990 reflects total revenue of approximately $8.85 million, before expenses.

[3]   Plaintiffs' motion (Dkt. 225 at 9) references Leapfrog's $5 million primary liability insurance policy.  Following the Court's entry of the injunction order, however, Leapfrog was alerted by its insurance broker to an excess liability policy affording an additional $2.5 million in potential coverage, the terms of which have been provided to Plaintiffs in parallel with this filing.

***Deterrence.***  This factor counsels strongly against fees.  In the context of a nonprofit press organization engaged in constitutionally protected activity nationwide, deterrence is *disfavored* as both a constitutional and state-law matter.  As Plaintiffs concede, Leapfrog already "bear[s] the burden of complying with the Court's injunction" (Dkt. 225 at 10), and Plaintiffs have already shown that the injunction equips them all too well to invoke the threat of contempt proceedings to daunting deterrent effect.  (Dkt. 219-1.)  In urging the Court to pile on, Plaintiffs give the lie to their argument (Dkt. 225 at 5) that their requested award is not punitive.  Plaintiffs also mischaracterize FDUTPA's fee provision as authorizing near-automatic cost shifting.  (*See* Dkt. 225 at 10 (arguing that non-prevailing parties "cannot shift the cost of stopping their unlawful conduct onto the" prevailing parties).)  Assuming prevailing-party status is satisfied—and it is not here—any award is designedly discretionary, and courts frequently exercise their discretion to deny fees to prevailing parties.  *See, e.g.*, *Colomar*, 2008 WL 4459383, at *5; *Taviere v. Precision Motor Cars, Inc.*, 2010 WL 557347, at *5 n.10 (M.D. Fla. Feb. 12, 2010).  Moreover, as Mr. Regensdorf observes, there appear to be no other entities—for-profit or nonprofit—operating nationally in the hospital safety evaluation space other than the federal government; Leapfrog appears to be the sole provider of this type of publicly available hospital safety information.  A fee award exceeding $10,000,000 against the only participant in that market would not calibrate deterrence—it would eliminate the deterred actor entirely and chill any future entrant from occupying the same public-interest role.  (*See* Regensdorf Report ¶¶ 5, 79.)

***Degree of the non-prevailing party's bad faith.***  This factor weighs strongly against an award.  Plaintiffs contend otherwise only by misstating the relevant inquiry as being whether the non-prevailing party "lost."  (Dkt. 225 at 10.)  But this factor does not rehash the prevailing-party question.  Rather, the question here is whether "the merits of the respective positions" reflected any "degree of the opposing party's culpability or bad faith."  *Humane Soc.*, 951 So. 2d at 971.  And Plaintiffs offer no serious argument that this demanding standard is met.  They primarily recount issues Leapfrog raised and lost, omitting an abundance of unsuccessful arguments that Plaintiffs made themselves.  (Dkt. 225 at 10-11.)  Such reasoning cannot carry this factor.  *See Colomar*, 2008 WL 4459383, at *4 (finding that factor weighs in favor of non-prevailing party where prevailing party "can point to no meaningful evidence that [its opponent] litigated the action in bad faith, other than reiterating the fact that [it] ultimately prevailed").

Recognizing as much, Plaintiffs retreat to an argument having nothing to do with the conduct of the litigation or the "merits of the respective positions" taken in it by the parties:  that Leapfrog's CEO, Leah Binder, published and spoke about Plaintiffs' poor Safety Grades.  (Dkt. 225 at 10-11.)  But that does not evince bad faith.  As reflected in Leapfrog's declaration (Dkt. 215) and pending motion to alter or amend the judgment (Dkt. 220), Leapfrog continues to believe that its Safety Grades reflect justified assessments of hospital safety and that such assessments are constitutionally protected.  Plaintiffs' lone case on this score, involving a plaintiff that brought suit for improper "anticompetitive purposes and in bad faith," is vastly afield.  *Warren Tech., Inc. v. UL LLC*, 2020 WL 9219127, at *6 (S.D. Fla. Dec. 17, 2020).

***Plaintiffs' bad faith in bringing suit.***  This factor weighs in favor of Leapfrog.  As outlined in Leapfrog's motion to amend or alter the judgment (Dkt. 220), Plaintiffs' legal theories of liability violate the First Amendment and exceed the Court's motion-to-dismiss ruling.  And Plaintiffs' post-judgment threats of seeking contempt sanctions against Leapfrog for speech transgress even further beyond the confines of this litigation.  (Dkt. 219-1.)  Plaintiffs' tactics betray a bad-faith, patently unconstitutional effort to censor Leapfrog and impose a prior restraint against its protected expression on matters of public concern.  Elsewhere, Plaintiffs' own counsel has agreed that invoking the coercive power of the government to "attempt[] to take control of … journalistic outlets" and "attempt[] to influence or control their reporting content" violates the First Amendment.  Jessica Jerreat, *Court Injunction Bars USAGM From Editorial Interference*, VOA News (Nov. 21, 2020), https://www.voanews.com/a/press-freedom_court-injunction-bars-usagm-editorial-interference/6198667.html.  One wishes that Plaintiffs' counsel actually practiced what counsel preaches.  By no stretch of the imagination should Plaintiffs' unconstitutional campaign now be rewarded (and replenished) with an eight-figure fee award against a nonprofit.

***Defense raised to frustrate or stall.***  This factor weighs in Leapfrog's favor.  Although Leapfrog asserted defenses that the Court ultimately did not credit, that is not the same thing as raising defenses for the improper purpose to frustrate or stall.  To the contrary, Leapfrog litigated this case on the same expedited schedule that Plaintiffs did and cooperated to meet that demanding schedule with far fewer lawyers than Plaintiffs.  Plaintiffs' inflammatory and misleading recounting of Leapfrog's unsuccessful defenses (Dkt. 225 at 11) does not persuade.  This factor does not duplicate the prevailing-party inquiry; Plaintiffs must instead show that Leapfrog raised defenses for an improper purpose.  They cannot.  Plaintiffs' own telling confirms that Leapfrog

14

judiciously dropped defenses at summary judgment.  (*Id.*)  And while Plaintiffs accuse Leapfrog of "gamesmanship" for ostensibly modifying its website on "the eve of trial," Plaintiffs ignore that they dropped this issue following trial because it was irrelevant.  (*Id.* at 12; *see* Dkt. 203.)

  ***Significant legal question.***  This factor either weighs against a fee award or is neutral. Struggling to identify a significant *legal* question that the Court resolved at trial, Plaintiffs point to the Eleventh Circuit's decision during the litigation in *FTC v. Corpay, Inc.*, 164 F.4th 807 (11th Cir. 2026).  But the Court's analysis of that case in its injunction order underscores the *insignificance* of *Corpay*; the Court spent just one paragraph discussing *Corpay*'s effect on the law, and in the next sentence, determined that its ruling did not depend on *Corpay* anyway.  (Dkt. 212 at 19-20.)  The most significant legal questions in the case are the First Amendment and constitutional-avoidance arguments that now await further treatment post-trial.  (Dkt. 220.)  But those arguments derive from the Court's motion-to-dismiss order, decades of First Amendment precedent, and well-established Florida law.  (*Id.* at 7-20.)  Accordingly, the *Humane Society* factors weigh decisively against awarding fees, and the Court should deny Plaintiffs' motion.

## II. PLAINTIFFS' CLAIMED FEES AND COSTS ARE UNREASONABLE

  Even if this Court were to find that Plaintiffs are entitled to fees under FDUTPA, which they are not, their claimed fees would be wildly excessive.  "The fee applicant 'bears the burden of . . . documenting the appropriate hours expended and hourly rates.'"  *Herbst*, 2025 WL 3755394, at *3 (citation omitted).  Plaintiffs cannot meet that burden because the claimed hours expended—13,149.20 hours for 25 attorneys purporting to bill an average of over 525 hours each—are unreasonable on their face and cannot be justified based on Plaintiffs' submitted bills.  Leapfrog's expert, Mr. Regensdorf, has reviewed the billing records and identified multiple independently sufficient—and cumulatively overwhelming—defects requiring a substantial reduction. (Regensdorf Report ¶¶ 72-81.)  And Leapfrog's arguments against Plaintiffs' outrageous requested award figure are not waived, as Leapfrog has explained in its reply supporting summary denial of Plaintiffs' fee application.  To the contrary, Local Rule 7.3 expressly invites "either party [to] move the Court to determine entitlement *prior* to submission on the issue of *amount*."  S.D. Fla. L.R. 7.3(a) (emphases added).  Nor is there any requirement that such motions be fully briefed, let alone adjudicated; instead, the contemplation is simply that such motions will be "filed and served" within sixty days of judgment and that the parties will confer with "reasonable particularity," as Leapfrog did by any fair reading of the record.  (Dkt. 232 at 7-10.)

A.      **Plaintiffs' Able Local Counsel Was Capable Of Handling This Case, Which Plaintiffs Grossly Overstaffed Compared to Leapfrog**

Plaintiffs engaged multiple law firms: Gibson, Dunn & Crutcher LLP, a national firm, and local counsel from Marcus Rashbaum Pineiro & Meyers LLP and Neiman Mays Floch & Almeida PLLC.  "When more than one attorney represents a party, a court must deduct from the fee award any 'redundant hours.'" *Vazquez v. 1052 LLC*, 2016 WL 541432, at *3 (S.D. Fla. Feb. 11, 2016).  Here, hiring a national firm on top of highly competent local counsel was itself redundant.

Plaintiffs' own submissions demonstrate that their local counsel was fully capable of leading this litigation.  Jeffrey Marcus—a partner whom Chambers USA has ranked in the top band for litigation (Dkt. 226-5 at 1)—served as a "full member of the trial team," "examined multiple witnesses at trial," and participated in "core trial preparation and strategy."  (Dkt. 225 at 17.)  Together with his experienced Florida colleagues, Mr. Marcus and local co-counsel devoted approximately 726 hours to the case.  If this team was capable of examining witnesses at trial and driving core strategy—as Plaintiffs' own fee motion concedes—the question naturally arises why it was necessary to import a team of national-firm attorneys adding 12,423 hours on top of that. (*See also* Regensdorf Report ¶¶ 31, 36.)  And regardless of whether a national firm was necessary in addition to Plaintiffs' able local counsel, Plaintiffs fail to justify deploying *25* lawyers in a case involving a single cause of action that was tried to completion in under nine months.  Indeed, courts in this district have found far fewer attorneys staffed on a single case to be "excessive." *See, e.g.*, *CityPlace Retail, L.L.C. v. Wells Fargo Bank, N.A.*, 2021 WL 3361172, at *1, *9–10 (S.D. Fla. Jan. 12, 2021) (*17* lawyers in a dispute under a mortgage loan agreement that involved "almost nineteen months of prolonged litigation" and an "eight-day non-jury trial"); *Pretka v. Kolter City Plaza II Inc.*, 2014 WL 12300373, at *1 (S.D. Fla. Sept. 19, 2014) (*13* lawyers in a class action case); *Mejia v. Com. Driver's License Sch., Inc.*, 2021 WL 1893065, at *1, *5 n.3 (S.D. Fla. Feb. 10, 2021) (*3* lawyers in a Fair Labor Standards Act collective action).  And here, there is no indication that Plaintiffs took any steps to efficiently allocate tasks across offices and teams, so it appears that at a minimum, each of these 25 lawyers duplicated the time required to get up to speed on the entire case.  (Regensdorf Report ¶ 30.)

Plaintiffs' overstaffing is particularly egregious in light of the disproportionality here.  Leapfrog—a small nonprofit, watchdog group defending its First Amendment rights in a case  with existential stakes—enlisted a core counsel team that expended 4,500 total attorney hours defending this litigation through trial compared with Plaintiffs' 13,149.20.  (*See* Blair Decl. ¶ 2.)  Plaintiffs

16

point to no justification for spending nearly three times as many hours as Leapfrog litigating the same case with the same legal issues and record.  It is also particularly unfair for Plaintiffs to outgun Leapfrog and then seek to burden Leapfrog with the associated fees.  The Court can avoid this inequitable result by—at the very least—reducing Plaintiffs' fee award to more closely align with what Leapfrog spent on this case.

The only justification Plaintiffs offer for their overstaffing is that Plaintiffs represented five hospitals, creating "five separate factual records." (Dkt. 225 at 4.)  But Plaintiffs never once filed separate briefs on behalf of separate hospitals.  No representation agreements have been produced identifying which subset of lawyers agreed to represent any particular hospital.  (*See* Regensdorf Decl. ¶11.)  Indeed, Plaintiffs' pro hac vice motions were all made with respect to all Plaintiffs. (*See, e.g.*, Dkt. 9.)  And the billing records confirm that every Gibson Dunn invoice submitted to the Court carries a single client-matter number—64230-01116, captioned "Leapfrog Dispute"— covering all five hospitals as a single undifferentiated matter.  There are no hospital-specific matter numbers and no hospital-specific billing summaries.  The billing records are structured as if this were a single-client case; indeed, the invoices were all billed to the same "client"—"Tenet Health System" in "Dallas, TX."  (*See, e.g.*, Dkt. 226-1 at 39.)

Plaintiffs' counsel only introduced the "five hospital" frame after Leapfrog disclosed its own fee figure of $1.75 million in the pretrial stipulation.  (Dkt. 129 at 30.)  Then, at trial, lead counsel introduced the Gibson Dunn attorneys by assigning each one to a specific hospital.  (Dkt. 204-1, Trial Tr. at 3.)  But Plaintiffs have not disclosed any trial invoices containing any individual hospital attribution for a given attorney's work.  Crediting Plaintiffs' own view that the award should be approximately $2 million per hospital (Dkt. 129 at 30; Dkt. 225 at 1), the *total* award should therefore be no more than $2 million or one-fifth of what Plaintiffs seek.

**B.      Plaintiffs Seek Fees for Work Related to a Preliminary Injunction and Damages That Are Not Recoverable**

"[I]n determining reasonable hours the district court must deduct time spent on discrete and unsuccessful claims."  *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988); *see also Med-Stop, Inc. v. Vandutch, Inc.*, 2025 WL 3282528, at *14 (S.D. Fla. Sept. 24, 2025) (cutting fees associated with the preparation of an unsuccessful motion to compel). Here, that requires a reduction to reflect Plaintiffs' hours attributable to their abandoned preliminary injunction, claim for damages, branding expert, and (apparently contemplated) defamation claim.  Mr. Regensdorf details these categories of non-compensable work in his report.

17

(Regensdorf Report ¶¶ 43-51, 65.)  Plaintiffs' claimed billing for this work is sizeable.  The phrase "preliminary injunction" appears 74 times across the claimed billing entries and "temporary restraining order" appears 27 times.  (Regensdorf Report ¶ 45.)  Additional entries explicitly referencing the preliminary injunction approach 200 hours.  (Dkt. 226-1 at 35-161.)  One entry illustrates the absence of billing judgment particularly well: thirty-four days after the preliminary injunction was withdrawn, Kuntz billed 0.90 hours to "Revise draft motion for preliminary injunction." (Regensdorf Report ¶ 46.)  No reasonable client would pay for revising a motion withdrawn for over a month, and no adversary should be required to fund it.

Similarly, Plaintiffs' abandoned damages claim generated substantial unrecoverable fees. Though Plaintiffs withdrew the claim on August 12, 2025, it had dominated both parties' discovery through July and August—after expert retention, preparation, and deposition work had already been completed.  At least 19 hours of billing entries *explicitly* reference damages, but as Mr. Regensdorf explains, that figure dramatically understates the true total.  (Regensdorf Report ¶¶ 48-50.)  Plaintiffs likewise retained and then abandoned branding expert Thomas Chakurda only after multiple attorneys billed for preparing him and reviewing his work.  (*Id.* ¶ 51.)  Finally, Plaintiffs' bills include explicit references to a defamation claim that was never filed.  (Regensdorf Report ¶ 65.)  That these plainly non-compensable entries survived Plaintiffs' review process casts serious doubt on the diligence of that review across the far larger volume of entries too vague to evaluate independently.

## C.    Plaintiffs Unreasonably Inflated the Costs of Routine Tasks

The party requesting fees must exercise "billing judgment" and must exclude hours from its fees motion that would be unreasonable to bill a client, and therefore to one's adversary, "irrespective of the skill, reputation, or experience of counsel." *Norman*, 836 F.2d at 1301.  When "a fee applicant seeks to recover fees for the work of multiple attorneys, the fee applicant must show that the attorneys are not unreasonably doing the same work, and are being compensated for the distinct contribution of each lawyer." *CityPlace Retail, L.L.C.*, 2021 WL 3361172, at *9.

A review of the billing entries confirms a consistent pattern of billing multiple attorneys— often three to five on a single day—for the same routine tasks, with no explanation of each attorney's distinct contribution. (Regensdorf Report ¶¶ 52-55.)  To take one example at each end of the case: between February and April 2025, five attorneys all billed to "draft, review and revise" the same complaint on overlapping days, with no indication of who was responsible for what.

18

(Dkt. 226-1 at 23-70.)  The March 14 entry for one partner alone spans 8.20 hours.  (Dkt. 226-1 at 32.)  On December 20, 2025, five associates billed a combined 25.5 hours to drafting or revising proposed findings of fact, with no descriptions indicating the work was divided rather than duplicated: Kuntz billed 4.80 hours, Reilly 6.00 hours, Garnick 7.00 hours, Togias 5.40 hours, and Delwiche 2.30 hours—all on the same task, on the same day.  (Dkt. 226-2 at 465-67.)  This is not isolated slippage, and it warrants a substantial reduction standing alone.  *See Norman*, 836 F.2d at 1301.

As stated *supra* pp. 3-5, Plaintiffs also billed heavily for self-inflicted costs that are not chargeable to Leapfrog: time spent briefing a summary judgment motion and *Daubert* motion the Court denied in their entirety in terms that make clear that Plaintiffs' positions were "misplaced" (Dkt. 139 at 9-10); discovery costs generated by Plaintiffs' own overbroad search terms, which hit nearly a million pages, followed by a dispute Plaintiffs then picked with Leapfrog over the resulting production volume; and a protective order motion Plaintiffs filed to avoid their own damages discovery obligations.  (Regensdorf Report ¶¶ 56-59.)

Beyond these systemic problems, the billing records contain specific entries that no reasonable client would pay and that no adversary should be required to reimburse.  Entries such as "compose memorandum re legal and factual issues" (Togias, 6.40 hours, Dkt. 226-1 at 135), "calls with clients regarding strategy and status of matter and confer internally re same" (Maloney, 1.00 hour, Dkt. 226-1 at 12), and "prepare for client meeting, including developing themes for trial and overall trial strategy" (Maloney, 3.00 hours, Dkt. 226-1 at 135) provide no meaningful description of the subject matter or document worked on.  *ACLU of Georgia v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999).  Plaintiffs cannot claim entries are reasonable while withholding the information necessary to assess their reasonableness.  *Id.*; (Regensdorf Report ¶¶ 63-65).

**D.    The Extent of the Unreasonableness Warrants A Large, Across-the-Board Percentage Reduction**

Leapfrog should not be required to audit over 1,400 pages of billing records line by line to demonstrate that the request is inflated.  Where, as here, the defects are pervasive, an across-the-board reduction is the most straightforward approach.  *See, e.g.*, *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994) ("Where fee documentation is voluminous, . . . an hour-by-hour review is simply impractical and a waste of judicial resources."); *CITGO Petroleum Corp. v. Petroleum Logistics Serv. USA, Inc.*, 2022 WL 17718802, at *6 (S.D. Fla. Nov. 30, 2022) (noting that when overstaffing is apparent, "an across-the-board percentage reduction" is appropriate).

19

The defects here are numerous and severe.  The submission involves over 1,400 pages of billing records that even minimal review demonstrates contain billing for abandoned work, internally duplicated effort, discovery costs inflated by Plaintiffs' own overbroad and ever-expanding demands, and entries so vague they cannot be evaluated.  For all the reasons set forth above, Plaintiffs' fee request should be denied in its entirety, or in the alternative, reduced to no more than 20% of Plaintiffs' proposed figure.  Reducing Plaintiffs' award to one-fifth of Plaintiffs' requested amount is in line with Plaintiffs' position that a fee award of $2 million per hospital is justified, as this case was in fact litigated as a single unit as if on behalf of a single hospital, not five.  (*See* Regensdorf Report ¶¶ 33, 80.)

## CONCLUSION

The Court should deny Plaintiffs' Verified Motion For Attorneys' Fees and Costs (Dkt. 225) in its entirety, or at minimum, hold the motion in abeyance pending the exhaustion of any appeals.  In the alternative, the Court should substantially reduce the fee awarded.

DATED:  June 8, 2026        Respectfully submitted,


QUINN EMANUEL URQUHART & SULLIVAN LLP

By  */s/ Jason D. Sternberg*
Jason D. Sternberg

Derek L. Shaffer (*pro hac vice*)
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
555 13th Street NW, Suite 600
Washington, D.C. 20005
(202) 538-8123
derekshaffer@quinnemanuel.com

Jason D. Sternberg (Fla. Bar No. 72887)
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
jasonsternberg@quinnemanuel.com
(305) 439-5008

*Counsel for Defendant The Leapfrog Group*

21

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of June, 2026, a true and correct copy of the foregoing document was electronically transmitted to all counsel of record via the CM/ECF system.

By: */s/ Jason D. Sternberg*
Jason D. Sternberg
Florida Bar No. 72887
jasonsternberg@quinnemanuel.com

22